# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **KIMBERLY-CLARK CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 1:10-cv-34-CAP** |
| **v.** | ) | |
| | ) | |
| **CARDINAL HEALTH 200, LLC f/k/a CARDINAL HEALTH 200, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## KIMBERLY-CLARK'S MEMORANDUM OF LAW IN SUPPORT OF MOTION IN *LIMINE* TO EXCLUDE THE <u>SURVEY AND TESTIMONY OF MOHAN RAO</u>

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ...................................................................... i

**TABLE OF AUTHORITIES** .............................................................. iii

**I.**   **Introduction** ................................................................................. 1

**II.**   **Overview of the Rao Survey** ....................................................... 1

**III.**   **Legal Analysis** ............................................................................. 5

     A.   The Standard for Determining the Admissibility of Expert Testimony .................................................................................. 5

     B.   Dr. Rao is Not Qualified in the Field of Consumer Survey Research .. 6

          1.   *An Expert Must Be Qualified in the Relevant Field* ................... 6

          2.   *Dr. Rao is Not Qualified as a Consumer Survey Expert* ........... 7

     C.   The Rao Survey and Related Testimony Are Not Reliable ............... 10

          1.   *Dr. Rao Improperly Defined his Survey Population* ............... 11

               a.   **The Rao Survey Includes Irrelevant Respondents** .... 11

               b.   **The Rao Survey Failed to Include Certain Relevant Respondents** ................................................................. 13

          2.   *Dr. Rao's Sample Was Not Representative of the Population* . 14

          3.   *The Survey Questions Were Biased and Leading on Key Issues* ......................................................................... 16

               a.   **Dr. Rao Biased Respondents in the Screening Questionnaire on the Very Issue He Claimed to Test** ................................................................................ 16

               b.   **The Substantive Questions Were Severely Leading** .. 17

i

    *4.    The Survey Design Failed to Ensure Objectivity and Accuracy* .......................................................................19

        **a.    The Survey Failed to Replicate Market Conditions** ..19

        **b.    Dr. Rao Failed to Follow Several Other Standard Survey Procedures** ........................................................21

    5.    Dr. Rao's Switch Rate is Manufactured ..................................23

  D.    The Rao Survey and His Related Testimony Will Mislead the Jury ..25

**IV.  Conclusion** .................................................................................. 25

6267491.6

# TABLE OF AUTHORITIES

**Cases**

Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC, 685 F. Supp. 2d 1360 (N.D. Ga. 2010) ........................................................................ 10

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548 (11th Cir. 1998) ............ 5

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) ........................... 5, 6

Increase Minority Participation by Affirmative Change Today of Northwest Fla., Inc. (IMPACT) v. Firestone, 893 F.2d 1189 (11th Cir. 1990) ............................... 6

J & J Snack Food Corp. v. Earthgrains Co., 220 F. Supp. 2d 358 (D.N.J. 2002) .... 13

Johnson & Johnson–Merck Consumer Pharma. Co. v. Rhone–Poulenc Rorer Pharma., Inc., 19 F.3d 125 (3d Cir. 1994) ............................................................ 18

LG Elecs. U.S.A., Inc. v. Whirlpool Corp., 2010 WL 3397358 (N.D. Ill. Aug. 24, 2010) ...................................................................................................................... 8

McDowell v. Brown, 392 F.3d 1283 (11th Cir. 2004) ............................................ 25

Montgomery v. Noga, 168 F.3d 1282 (11th Cir. 1999) ............................................. 6

Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc., 2007 WL 4563873 (N.D. Ga. July 17, 2007) .................................................................................................. 10, 11

Procter & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d 339 (S.D.N.Y. 2008) ..... 8, 22

Quantum Capital Corp. v. MBNA Am. Bank, N.A., 2003 WL 25672802 (N.D. Ga. Apr. 16, 2003) ...................................................................................................... 10

Smith v. Wal-Mart Stores, Inc., 537 F. Supp. 2d 1302 (N.D. Ga. 2008) ................. 11

Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293 (N.D. Ga. 2008) ..... 6

U.S. v. Frazier, 387 F.3d 1244 (11th Cir. 2004) ....................................................... 5

Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734 (E.D. Mich. 2003) . 13

**Other Authorities**

SHARI SEIDMAN DIAMOND, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE,
   Reference Guide to Survey Research (3d ed. 2011)......................................passim

**Rules**

Fed. R. Evid. 702 ...................................................................................................... 6

**Treatises**

DAVID F. HERR, ANNOTATED MANUAL FOR COMPLEX LITIGATION (4th ed. 2009) .. 11

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
   (4th ed. 2012) ................................................................................................. 13, 20

6267491.6

## I.      Introduction

Consumer surveys are commonly offered and admitted in cases involving Lanham Act and other unfair competition claims, as long as the offering party establishes that the survey was designed and implemented by an expert in the field and in a manner consistent with generally accepted principles of survey research. Challenges to such surveys typically go to the weight the survey is given.  There are instances, however, when a survey is so fundamentally flawed that it must be excluded in its entirety, as the only evidentiary use it could be put is to unfairly prejudice and mislead a jury.  The survey conducted by Dr. Rao in this case (the "Rao Survey") is a textbook example of such a survey.  (See Expert Report of Mohan Rao, Ph.D (the "Rao Report"), relevant portions are attached as Exhibit 1.) As discussed in the expert reports of Ken Bernhardt, Ph.D and Kenneth Hollander (attached as Exhibits 2 and 3, respectively) and demonstrated below. rather than objectively test consumer opinion, the Rao Survey was a farce designed to manufacture a basis for Dr. Rao to opine about the damages Cardinal Health 200, LLC ("Cardinal") allegedly suffered.  It should be excluded in its entirety.

## II.     Overview of the Rao Survey

Asserting causes of action under various federal and state statutes, Cardinal contends that Kimberly-Clark has marketed certain of its MicroCool® line of

surgical gowns using *implicitly* false advertising.   More specifically, Cardinal contends that by describing the surgical gowns at issue as "impervious" and by attaching to these gowns a hanging label displaying a two-dimensional drawing of a gown with shading on part of the front and sleeves, Kimberly-Clark has implicitly mislead consumers into believing that the sleeve seams of its gowns are "impervious," as that term is understood in the industry.[1]   Notably, Cardinal does not contend that Kimberly-Clark has made any literally false advertising claims or any express performance claims about the sleeve seams of its gowns.   To support its claims, Cardinal proffered the Rao Report.

Dr. Rao states that Cardinal asked him "to provide economic analysis" related to the false advertising allegations at issue and "to evaluate the economic harm to Cardinal resulting from Kimberly-Clark's alleged false advertising" of certain surgical gowns.  (Rao Report, ¶ 4.)  To perform this assignment, Dr. Rao suggested to Cardinal that he conduct a survey.  (Deposition of Mohan Rao ("Rao Dep.") at 7, 11, (excerpts attached as Exhibit 4).  Charging $825 an hour, Dr. Rao designed his survey "to determine consumer awareness and understanding of the terms

---

[1] Kimberly-Clark contends that the actions of the FDA preempt and/or preclude Cardinal's claims and that Cardinal may only seek a remedy from the FDA.  Those contentions remain in the case.

'impervious' and 'fully impervious' and to measure the impact on the purchase decisions of surgical gown consumers." (Rao Report, ¶¶ 3, 26.)

Dr. Rao says that he sought to study a representative sample of "consumers who influence or make purchasing decisions of surgical gowns." (Rao Report, ¶ 30-31.) He identified surgeons, surgical nurses, procurement personnel, operating room ("OR") managers and educators, employee health and safety personnel, infection control personnel, and material management personnel as people who meet that description. (Rao Report, ¶ 31, n. 59). This population was consistent with the population the industry group AAMI surveyed when gathering information to help it make decisions about standardized barrier protection levels and nomenclature for surgical gowns, which survey Dr. Rao read before designing his survey here. (Rao Dep. at 96-98, 165, Ex. 7; Rao Report, ¶ 31, n.59).

Despite recognizing that numerous groups of people make up the relevant population and admitting that people within all of these groups were accessible to him, (Rao Dep. at 162), Dr. Rao decided to survey only surgeons, surgical nurses and procurement personnel.[2] (Rao Report, ¶ 31, 34.) He filtered these three groups

---

[2] Dr. Rao also asked procurement personnel if they seek input from others "[w]hen ordering surgical gowns" and provided the choices (a) Surgeons/Nurses, (b) Adminstrators, (c) Other (please describe ____), (d) None. (Rao Report, Tab 9, Q. 2). Over twenty-two percent (21 of 93 respondents) took the time to write in groups

using various demographic criteria, such as employment setting and years of experience.  Dr. Rao determined that he needed responses from 384 surgeons and surgical nurses (surgical gown users) and 94 procurement personnel (alleged surgical gown "purchasers") who met his screening criteria to reach the benchmark levels in social science research for confidence level and margin of error.  (Rao Report, ¶¶ 34-35, 39-40, Tab 4.)  Dr. Rao contends that his survey results can be reliably projected to the entire population of surgeons, surgical nurses, and procurement personnel in the U.S., which he claims to be 135,854 active surgeons, more than 1.6 million licensed nurses, and an unspecified number of purchasing personnel..  (Rao Report, ¶. 32-33, 37, 40-41, Rao Dep. at 165).

The Rao Survey was implemented via the Internet by third-party research companies who e-mailed members of their medical personnel databases inviting them to participate in the survey and administered the online survey to those who responded.  Initially, the Rao Survey included substantive responses from 385 surgeons and surgical nurses and 100 procurement personnel, consistent with the numbers Dr. Rao desired, but these numbers fell dramatically by the time Dr. Rao got down to his "switch rate," the figure that drives his damages analysis.

---

of people such as infection control and value analysts, lending further credence to the relevant population being broader than what Dr. Rao surveyed.

### III.   Legal Analysis

A.   <u>The Standard for Determining the Admissibility of Expert Testimony</u>

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  Rule 702 incorporates the principles established in <u>Daubert v. Merrell Dow Pharmaceuticals</u>, 509 U.S. 579, 589 (1993), in which the Court charged trial courts with a gate-keeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  Applying Rule 702 and <u>Daubert</u>, the Eleventh Circuit articulated a three-factor test for determining the admissibility of expert testimony.  Specifically, "[e]xpert testimony may be admitted into evidence if:   (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in <u>Daubert</u>; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue."  <u>City of Tuscaloosa v. Harcros Chems., Inc.</u>, 158 F.3d 548, 562 (11th Cir. 1998); <u>see also</u> <u>U.S. v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (<em>en banc</em>).  The party offering expert testimony bears the burden of establishing that such testimony is admissible.  <u>Frazier</u>, 387 F.3d at 1260.

Thus, Cardinal must prove that Dr. Rao is qualified in the consumer research field and that the Rao Survey is reliable before a jury may be exposed to such evidence.

      B.    <u>Dr. Rao is Not Qualified in the Field of Consumer Survey Research</u>

          1.    *An Expert Must Be Qualified in the Relevant Field*

The first consideration in assessing the admissibility of expert testimony is whether the proposed expert is qualified in the relevant field.  <u>See</u> Fed. R. Evid. 702; <u>Daubert</u>, 509 U.S. at 589.  While a witness may qualify as an expert in one field, it does not follow that he will be permitted to testify as an expert in other fields.  <u>See, e.g.</u>, <u>Montgomery v. Noga</u>, 168 F.3d 1282, 1302 (11th Cir. 1999) (excluding testimony from proffered expert whose knowledge and experience pertained to the commercial software licensing field when he sought to testify regarding shareware and utility licensing, which was a "totally distinguishable" field); <u>Increase Minority Participation by Affirmative Change Today of Northwest Fla., Inc. (IMPACT) v. Firestone</u>, 893 F.2d 1189, 1195 (11th Cir. 1990) (upholding trial court's rejection of expert testimony regarding statistical disparity between black and white job applicants on ground that expert was a political scientist, not a statistician); <u>Trilink Saw Chain, LLC v. Blount, Inc.</u>, 583 F. Supp. 2d 1293, 1304-05 (N.D. Ga. 2008) (*Pannell, J.*) (excluding expert testimony relating to the

interpretation of consumer research data when witness was neither a consumer survey expert nor a market research expert).

### 2.    *Dr. Rao is Not Qualified as a Consumer Survey Expert*

Dr. Rao describes himself as "an economist and Managing Director at Navigant Economics and an Adjunct Professor in the Department of Industrial Engineering and Management Sciences at Northwestern University." (Rao Report, ¶ 1.)  He has an undergraduate degree in engineering and a Ph.D in economics. (Rao Report, Tab 1 at 2.)  His Navigant profile extensively touts his experience with economic analysis and valuation, while saying nothing about consumer research or consumer surveys.  (Id. at 1.)

Dr. Rao testified that he took two classes on survey analysis, taught a class on statistical sampling, and has written articles and given presentations on surveys.[3] (Rao Dep. at 13, 57-58, 60-61).  He also testified that he has designed only about a dozen consumer surveys in his career, which number appears to include five currently pending matters (including this one).  (Id. at 15-16).

---

[3] Dr. Rao admitted, however, that the classes he took and taught did not focus on consumer surveys.  (Rao Depo. at 58-59).  Of the articles and presentations he identified, several are unrelated to survey design and instead concern the analysis of survey results.  See, e.g., "Inferring Micro- from Macrolevel Change: Ecological Panel Inference in Surveys." Working Paper, UCLA and New York University, 2001 (with Alexander A. Schuessler), attached as Exhibit 5; "Overtime Inference in Cross Sectional Surveys," attached as Exhibit 6.

In an apparent attempt to bolster his credibility, Dr. Rao mistated his consumer survey experience in at least 3 litigation matters.  For example, Dr. Rao testified at deposition that he opined about a consumer survey testing advertising claims about toothbrushes that was conducted by an opposing consumer research expert in Procter & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d 339 (S.D.N.Y. 2008).  (Id. at 36-37, 39-40).  The opinion in that case shows otherwise.  In fact, while the court relied on Dr. Rao's opinions addressing a market forecast done by another economist relating to damages, the consumer survey relating to the alleged false advertising was addressed by an entirely different set of experts.  See Ultreo, 574 F. Supp. 2d at 350-52.

Similarly, Dr. Rao claimed that he opined on numerous surveys in a case involving steam dryers for LG and that he selected which surveys were relevant and discussed design issues.  (Rao Dep. at 19).  Yet, the court described Dr. Rao as a damages expert and expressly noted that his opinions did not pertain to consumer perceptions.  LG Elecs. U.S.A., Inc. v. Whirlpool Corp., 2010 WL 3397358, at *3, 5 (N.D. Ill. Aug. 24, 2010).  As in the Ultreo case, a separate set of experts dealt with the consumer survey issues.  Id. at *11-12, 15.

Publicly available material from a third case in which Dr. Rao claims to have participated as a survey expert also belies his testimony.  In another case for LG

involving refrigerators, Dr. Rao again served as a damages expert while a different witness, Hal Poret, opined about consumer perception of various ads.  See LG Electronics' Letter in LG Elecs. U.S.A., Inc. v. Whirlpool Corp., Case No. 1:08-cv-00234-GMS (Oct. 8, 2009), at 5-6, attached as Exhibit 7.

Dr. Rao's qualifications pale in comparison to the experience expected of true consumer experts.  For example, Mr. Hollander has an MBA in Marketing, has worked in the marketing research field since 1959, founded his own marketing research company in 1973, and has designed over 3000 consumer surveys, approximately 150 of which have been for litigation.  (Hollander Report, ¶¶ 2, 3). Dr. Bernhardt has a Ph.D in Business Administration, is the Regents Professor of Marketing Emeritus at the J. Mack Robinson College of Business at Georgia State University, served as the Consumer Research Advisor at the Federal Trade Commission, and has designed numerous consumers surveys for organizations such as:  Chick-Fil-A, HoneyBaked Ham, AirTran Airways, BellSouth, IBM, UPS, Coca Cola. Century 21, and the Federal Trade Commission, among others.  Dr. Bernhardt has published more than a dozen books and monographs and numerous articles on marketing and consumer behavior.  Consumer surveys designed by both Mr. Hollander and Dr. Bernhardt have been admitted in federal courts, including by this Court.  See, e.g., Atlanta Allergy and Asthma Clinic, P.A. v. Allergy & Asthma of

Atlanta, LLC, 685 F. Supp. 2d 1360, 1375 (N.D. Ga. 2010) (*Duffey, J.*) (admitting survey by Dr. Bernhardt) Nightlight Sys., Inc. v. Nitelites Franchise Sys., Inc., 2007 WL 4563873, at *10 (N.D. Ga. July 17, 2007) (*Pannell, J.*) (admitting survey by Mr. Hollander); Quantum Capital Corp. v. MBNA Am. Bank, N.A., 2003 WL 25672802, at *1 (N.D. Ga. Apr. 16, 2003) (*Thrash, J.*) (admitting trademark confusion survey conducted by Mr. Hollander).

Dr. Rao simply is not qualified to testify as a consumer survey research expert.  The serious flaws in the Rao Survey, discussed below, demonstrate what happens when a non-expert exceeds his capabilities.

C.    The Rao Survey and Related Testimony Are Not Reliable

As detailed in the expert reports of Dr. Bernhardt and Mr. Hollander, the Rao Survey is so severely flawed that it cannot be relied upon.  In order for a consumer survey (and related testimony) to be deemed reliable, it must have been designed and implemented in accordance with generally accepted survey principles and its results must be reported in a statistically accurate way.  SHARI SEIDMAN DIAMOND, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, Reference Guide to Survey Research at 364 (3d ed. 2011) (hereinafter "REFERENCE GUIDE"), attached as

6267491.6

Exhibit 8; <u>Nightlight Sys.</u>, 2007 WL 4563873, at *5 (citing the REFERENCE GUIDE).[4]

Factors relevant to assessing the reliability of surveys include:

(1)  whether the survey population was appropriately defined;

(2)  whether the sample surveyed was representative of that population;

(3)  whether the questions asked were clear, precise and not leading;

(4)  whether the survey was designed and implemented to ensure objectivity and minimize error and bias;

(5)  whether the data gathered was accurately reported;

(6)  whether the data was analyzed consistent with accepted statistical principles.

<u>See</u> DAVID F. HERR, ANNOTATED MANUAL FOR COMPLEX LITIGATION § 11.493 (4th ed. 2009); <u>Smith v. Wal-Mart Stores, Inc.</u>, 537 F. Supp. 2d 1302, 1322 (N.D. Ga. 2008) (listing similar factors); <u>Quantum Capital</u>, 2003 WL 25672802, at *1 (reciting similar factors and citing the REFERENCE GUIDE).  The Rao Survey is deficient in all of these factors.

> 1.  *Dr. Rao Improperly Defined his Survey Population*

> **a.    The Rao Survey Includes Irrelevant Respondents**

Dr. Rao defined his survey universe as "consumers who influence or make purchasing decisions of surgical gowns."  (Rao Report, ¶ 31).  Though he correctly

---

[4] Dr. Rao agreed that the REFERENCE GUIDE is authoritative, and he cited it numerous times in his report.  (Rao Dep. at 78-79, Rao Report at 15, 18-19).

recognized the importance of surveying purchasers, (Rao Report, ¶ 28, stating "[t]he objective of the survey was to assess among surgeons, surgical nurses, and procurement personnel (*i.e.*, **purchasers of surgical gowns**)" (emphasis added)), Dr. Rao failed to ask proper screening questions that would allow him to do so, resulting in a population that included people who had no meaningful influence. Specifically, in his screening questionnaire, Dr. Rao asked respondents:

> Do you have ***any influence*** in the types of surgical gowns and drapes or brands that are supplied in the OR specifically surgical gowns and drapes? ____ Yes ____ No

(Rao Report, Tab 4, Qs. 10 & 15 (emphasis added).[5]  This question is terrible for a myriad of reasons.  Most importantly, Dr. Rao made no attempt to determine the level of influence and has no idea what level of influence *any* respondent has into the purchasing decision at his respective hospital.  (Rao Dep. at 207-08).   The opinion of a person who has but a trivial level of influence is irrelevant.  (Bernhardt Rep., ¶ 15).  "Even if proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."  J. THOMAS MCCARTHY, 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:159 (4th ed. 2012)

---

[5] Dr. Rao instructed the vendors who implemented his survey to "terminate," meaning exclude from the substantive survey, purchasing personnel who answered that they had "No" influence.  (Rao Report, Tab 4, Q. 15).  No such instruction was given for surgical staff, (Id., Q. 9), and, in fact, 62 surgeons and nurses were included who said they had "No" influence.  (Bernhardt Rep., ¶ 23).

(hereinafter "MCCARTHY ON TRADEMARKS"); see also Wells Fargo & Co. v. WhenU.com, Inc., 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003) (survey that failed to survey the appropriate universe could not be extrapolated); J & J Snack Food Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 371-72 (D.N.J. 2002) (excluding survey due to improper universe).  This defect alone renders the Rao Survey inadmissible.[6]

### b.   The Rao Survey Failed to Include Certain Relevant Respondents

In addition to the Rao Survey population being over-inclusive, it also failed to include groups of people that Dr. Rao acknowledged influence the surgical gown purchasing decision.  Dr. Rao identified numerous groups of hospital personnel beyond merely surgeons, surgical nurses and procurement personnel as having influence upon the supply of surgical gowns.  (Rao Rep., ¶ 31, n.59).  In response to a question asking procurement personnel from whom they sought input when

---

[6] Dr. Rao's "any influence" question is also remarkably imprecise.  For example, Dr. Rao equates the term "supplied" with "purchased" when they are not synonymous.  A clerk may be responsible for "supplying" gowns to an OR; that does not mean he influences what gowns are purchased.  The question also unnecessarily introduces drapes, which are not at issue, confusingly isolates the term "brands" from "types" instead of saying "types or brands" of surgical gowns, and confusingly repeats the phrase "specifically surgical gowns and drapes" at the end.  (Bernhardt Rep. ¶¶ 15, 20 at 8).  The cumulative effect of these and other errors render the Rao Survey unreliable and highlight Dr. Rao's lack of expertise.

ordering surgical gowns, over 22 percent wrote in groups like infection control personnel, OR managers, and material managers, confirming Dr. Rao's belief that they too were relevant.  (Bernhardt Rep. ¶ 17).  Dr. Rao admitted that he could have found panels with these groups of people to survey, but he excluded them anyway.  (Rao Dep. at 162).   The failure to include a known, relevant segment of the population violates a basic principle of survey research.  See REFERENCE GUIDE at 378; (Bernhardt Rep. ¶ 17).

### 2.   *Dr. Rao's Sample Was Not Representative of the Population*

Even if the Rao Survey contained a properly defined population, Dr. Rao failed to draw a representative sample from it.  When a researcher purports to design a survey so that it "represents the population and estimate[s] the unknown parameters accurately from the sample statistics," (Rao Report, ¶ 30), one would expect a probability sample to be used "in which every element of the population has a known, equal probability of being included."  (Bernhardt Rep, ¶ 18, quoting the REFERENCE GUIDE at 243).  Dr. Rao, however, did not use a probability sample.

Numerous facts show that Dr. Rao's sample was not representative.  First, without regard for their proportions in the population, Dr. Rao combined the responses from surgeons and surgical nurses.  According to the statistics Dr. Rao cited, there are more than ten times as many surgical nurses as surgeons, yet his

14

survey results reflect that surgeons' responses represent 54 percent of the surgical staff results. (Bernhardt Rep. ¶ 20 at 6). Therefore, Dr. Rao gave far more weight to surgeons' opinions in comparison to the population. Second, 30 percent of the respondents to the Rao Survey came from academic hospitals, but the American Association of Medical Colleges indicates that academic or teaching hospitals represent only 6 percent of U.S. hospitals. (Id. at 7). Third, Dr. Rao employed no screen to ensure that multiple respondents did not work at the same hospital, which would bias the results. (Id. at 6). Fourth, the Rao Survey significantly under-represents the most common surgical specialty (OB-GYN) while over-representing general surgeons. (Id. at 7) Fifth, Dr. Rao eliminated all surgical staff in private practice. In so doing, Dr. Rao presumes, without basis, that such physicians have no influence in the hospitals where they routinely practice. (Id. at 7-8). Sixth, Dr. Rao provides no information about the gender or geographic distribution of his sample, so it is unknown whether the sample is representative on these factors. (Id. at 8).

The errors in Dr. Rao's selection of a sample of procurement personnel are equally problematic. He required no amount of experience for procurement personnel, meaning someone with only limited buying experience could be included in his sample. (Id. at 8). Further, the only qualification he set was that the

15

respondents "order surgical gowns," not that they be actively involved in either evaluating the features that drive purchasing decisions of surgical gowns or actually deciding which surgical gowns to select.  (<u>Id</u>. at 8).  Thus, there is no way to know whether these respondents' opinions are even relevant, much less representative.

Dr. Rao's sample was simply not representative of the population he defined, further tainting his survey's results.

> 3.   *The Survey Questions Were Biased and Leading on Key Issues*

### a.   Dr. Rao Biased Respondents in the Screening Questionnaire on the Very Issue He Claimed to Test

Though it was ostensibly intended merely to identify qualified respondents, the screening questionnaire prejudiced respondents from the outset by supplying a meaning of "impervious."  (Hollander Report, ¶¶ 26, 31).  Specifically, respondents were asked:

> Do you use [or order] surgical gowns for your institution **that could be classified as 'fluid-resistant' or 'impervious'** in surgeries where you [or the surgical staff] are exposed to blood or other bodily fluids.

(Rao Report, Tab 4, Qs. 9 & 14) (emphasis added).  The question plainly suggested that "impervious" means, or is analogous to, "fluid-resistant," despite the fact that Dr. Rao claimed to be testing consumers' understanding of "impervious."  (Rao Report, ¶ 26).  The entire bolded phrase was unnecessary if the intent was merely to determine if a respondent was part of the defined population, *i.e.*, a user or

16

purchaser of surgical gowns.  And there was absolutely no objective reason to include the term "fluid-resistant" in this question.[7]  (Hollander Rep., ¶ 31).

When discussing this issue at deposition, Dr. Rao claimed the question illustrated contrast and was no different than if he had asked respondents if they purchased apple juice or orange juice.  (Rao Dep. at 74-75).  This contention is silly.

### b. The Substantive Questions Were Severely Leading

After qualifying via the screener questionnaire, respondents took the substantive survey.  None were asked to provide their understanding of the meaning of the terms "impervious" or "fully impervious" or to explain the meaning they took from Kimberly-Clark's color-key label.  Rather, respondents were bombarded with closed-ended yes/no questions that effectively told them what to answer.  (Hollander Rep., ¶¶ 37, 38).  For example, the Rao Survey asked:

> If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-bourne microorganisms, would you consider that gown to be impervious?

(Rao Report, Tab 8, Q. 1, Tab 9, Q. 3, see also Qs. 2-4 and 4-6, respectively).

Translation:  if a product was advertised as X, yet that claim was not true, would you think that claim was true?  Ninety-three (93) percent of surgical staff and

---

[7] In fact, in the substantive survey for procurement personnel, Dr. Rao posed an identical question, except he excluded the term "fluid-resistant."  (Rao Report, Tab 5, Q. 1).  Dr. Rao did not report results for this question.

ninety-five (95) percent of procurement personnel got the answer "right."   (Rao

Report, ¶ 51 (no. 3)).   These questions obviously suggested the answers, rendering

them meaningless.   See REFERENCE GUIDE at 393; Johnson & Johnson–Merck

Consumer Pharma. Co. v. Rhone–Poulenc Rorer Pharma., Inc., 19 F.3d 125, 134

(3d Cir. 1994) ("A survey is not credible if it relies on leading questions which are

'inherently suggestive and invite guessing by those who did not get any clear

message at all.'")  The severely leading nature of Dr. Rao's questions demonstrates

not just a lack of respect but utter contempt for objectivity in survey design.

Further, although Dr. Rao touts that respondents identified "barrier

protection" as the most important feature when selecting surgical gowns, the Rao

Survey improperly led respondents to that result.   While not posing a single

question about the three other gown attributes (comfort, breathability and price) he

listed, Dr. Rao asked at least 13 questions about the related concepts of

imperviousness and barrier protection leading up to asking respondents to rank the

importance of gown attributes to their selection.   This design purposely and

improperly put barrier protection at the top of respondents' minds, leading them to

the answer Cardinal and Dr. Rao sought.  (Hollander Rep. ¶¶ 27, 28).

The error of posing leading questions and using a leading design was

compounded by Dr. Rao's failure to instruct respondents not to guess and that it is

18

ok not to know an answer. It is standard survey protocol to provide such an instruction. (Hollander Rep., ¶ 43); REFERENCE GUIDE at 389-90. Of course, with regard to the questions that only allowed a "yes" or "no" answer, such as those pertaining to the key issues of consumers' understanding of "impervious," the message conveyed by Kimberly-Clark's color-key label, and the switch rate, (see Rao Report, Tab 8, Qs. 1-4, 7-9, 11, 14-15, 20, Tab 9, Qs. 3-6, 9-11, 13, 16-17, 22), respondents had no choice but to provide an answer, whether they had an opinion or not. Even Dr. Rao recognized, but ignored, the impropriety of his yes/no questions. (Rao Report, ¶ 44, n.77, admitting that "the presentation of an explicit "don't know" or "no opinion" alternative commonly leads to a 20 to 25 percent increase in the proportion of respondents who select that response," which "reduces the demand for an answer and, as a result, the inclination to hazard a guess.").[8]

4.   *The Survey Design Failed to Ensure Objectivity and Accuracy*

### a.   The Survey Failed to Replicate Market Conditions

---

[8] Explicitly instructing respondents not to guess, even when questions provide "don't know" or "no opinion" answers, is the better approach. Many respondents faced with questions that suggest they should have an opinion will select even a "fake" answer from a provided list despite having a "no opinion" option. (Hollander Rep., ¶ 46). Dr. Rao agreed with, but did not follow, this accepted survey principle. (Rao Dep. at 167-69).

19

A fundamental principle of survey design is that the conditions in which consumers would encounter the product, trademark or advertising claim at issue should be replicated to the extent reasonable.  (Hollander Rep. ¶ 25); MCCARTHY ON TRADEMARKS § 32:163.  Dr. Rao agreed with this principle.  (Rao Dep. at 70-71).  In false advertising cases, this rule typically means that respondents are shown the challenged advertisement and asked open-ended questions about the message they took from it.  REFERENCE GUIDE at 363; MCCARTHY ON TRADEMARKS § 32:163.  Dr. Rao did not do this.

Not only did Dr. Rao not show respondents the very Kimberly-Clark advertisement touting its "impervious" surgical gowns that Cardinal challenges as false, Dr. Rao testified that he was unaware of its existence.  (Rao Dep. at 29-31.)  This advertisement was attached to Cardinal's counterclaim.  It is absurd that the person Cardinal tasked with testing consumers' understanding of Kimberly-Clark's allegedly false advertising has never seen the challenged ad.

Nevertheless, Dr. Rao contends he sufficiently replicated market conditions by showing respondents Kimberly-Clark's color key label.  (Rao Dep. at 70-71).  While he did display the color key label, he did not ask a single open-ended

question seeking the message consumers took from it.  Instead, he posed closed-ended, leading questions, many of which improperly allowed only yes/no answers.[9]

Dr. Rao recognizes the value of open-ended questions, (Rao Report, ¶ 44; Rao Dep. at 75), but he did not ask a single one.  (Hollander Rep., ¶ 34).  He testified that a question that provides a list of answers is open-ended if it also provides a space for respondents to write in an answer.  (Rao Dep. at 121-22); (see also Rao Report, ¶ 44, n.74, identifying the questions he believes are open-ended, which all provide lists of answers).  This understanding is dead wrong.  An open-ended question is one "that requires the respondent to formulate his or her own response."  REFERENCE GUIDE, Glossary at 420.  Dr. Rao simply does not understand this basic survey concept.

### b.    Dr. Rao Failed to Follow Several Other Standard Survey Procedures

The Rao Survey failed to follow a number of other standard survey procedures.  For example, Dr. Rao made no attempt to employ a control group or even control questions, rendering him unable to distinguish between genuine

---

[9] The Rao Survey posed 7 questions about color-key labeling, though Dr. Rao did not report results for 4 of them.  (Rao Report, Tab 8, Qs. 7-13, Tab 9, Qs. 9-15).  The only opinion he proffers regarding Kimberly-Clark's color key label is that consumers are confused by it, but he does not explain how.  Whatever his opinion is, the biased questions about the color key cannot reliably support it.

responses and those that were the result of noise or error.  (Hollander Rep. ¶¶ 48-51); REFERENCE GUIDE at 401; see also Ultreo, Inc., 574 F.Supp.2d at 351-52 ("without a control, one cannot rely on the results of the study for any purpose"). Nevertheless, Dr. Rao claimed at deposition that controls were not necessary to his survey and that he was confident his results were valid.  (Rao Dep. at 80-83).

Dr. Rao also failed to screen respondents for potential preexisting bias or extraordinary knowledge.  It is common survey practice to determine whether respondents or their family members work for any of the parties or companies involved in the survey and to ask about the respondents' recent participation in surveys to weed out potential conflicts of interest and professional respondents. (Bernhardt Rep. ¶ 20 at 8-9).  Dr. Rao further failed to even attempt to validate that respondents were who they claimed to be and were the persons who took the survey, another common survey procedure.  (Id. at 9).  This is a recognized concern with physician surveys, and even one of the vendors Dr. Rao used admonished its members not to share the link to the Rao Survey with others.  (Id.)

Dr. Rao also did not report all of the results of his survey.  In fact, he did not report results for 6 of the 20 questions he asked surgical staff and 8 of the 22 questions he asked procurement personnel.  This is improper, at least in surveys intended for use in litigation.  (Hollander Rep. ¶ 53).  Further, with regard to the

22

results he did report, Dr. Rao improperly mixed up the question numbers as asked and as reported, making it difficult to match the data to the actual questions and to determine which questions he did not report.  (Hollander Rep. ¶¶ 54-57).

### 5. Dr. Rao's Switch Rate is Manufactured

Dr. Rao's switch rate not only is the product of improper questions posed to the wrong people, the calculation he performed to get it is bogus.  As Dr. Bernhardt explains, (Bernhardt Rep. ¶¶ 21-25), rather than calculate his switch rate using the universe that he himself defined as relevant, *i.e.*, users and purchasers of surgical gowns, Dr. Rao artificially narrowed his universe to only users and purchasers of Kimberly-Clark's specific gown.   He then asked only that sub-group his hypothetical switching question in a yes/no format.  Had Dr. Rao used the universe he defined as relevant, the "switch rate" would have been only 14 percent for surgical staff and 22 percent for procurement personnel.

Moreover, Dr. Rao seeks to opine that his switch rate applies to the entire population of surgical gown purchasers, but such a projection cannot be reliably made on his data.  Dr. Rao identified the relevant population as comprising over 1.7 million people; yet, only 59 people total (10 surgeons, 29 nurses and 20 procurement personnel) of the 485 people Dr. Rao initially surveyed said they

would, hypothetically, switch gowns.  These numbers are statistically too small and too unrepresentative to rely upon.

Perhaps the most egregious flaw in Dr. Rao's switch rate, however, is the assumption he makes with regard to his alleged switchers.  Specifically, Dr. Rao assumes that each of the 59 people who said they would switch gowns could single-handedly do so, but no data supports this.  The only question Dr. Rao asked that addresses decision-making authority is whether the respondent had "**any influence**" in the types of surgical gowns that are supplied to the operating room.  Even a "Yes" response says nothing about whether that person has the ability to influence the purchasing decision in a meaningful way, let alone to actually decide.

Dr. Rao's assumption fails to reflect the multi-decision-maker reality that he himself expressly described.  At deposition, Dr. Rao defended his definition of a population that included respondents who had "any influence" into surgical gown supply by arguing that lots of people influence a hospital's purchasing decision and there is no one decision-maker when it comes to surgical gowns.  (Rao Dep. at 197-201).  Nonetheless, Dr. Rao's switch rate presumes a single decision-maker – the opposite of the truth he knows well.

Finally, though significantly, Dr. Rao improperly included within his sample 62 surgical staff who said they had "No" influence into the supply of surgical

24

gowns.  Incredibly, 6 of those respondents (2 surgeons and 4 nurses) were counted as part of the 39 surgical staff (59 total respondents) that Dr. Rao claims would have switched gowns.  In other words, 15 percent of the surgical staff alleged switchers, *i.e.*, 6 of 39 (and 10 percent of all alleged switchers, *i.e.*, 6 of 59), had no ability to switch by their own admission.

Thus, Dr. Rao's switch rate, the basis for his damages theory, is junk science.

D.    <u>The Rao Survey and His Related Testimony Will Mislead the Jury</u>

To be admissible, expert testimony must be helpful to the trier of fact. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1299 (11th Cir. 2004).  In light of the above, the Rao Survey could only serve to mislead the jury.  Federal Rule of Evidence 403 provides that even relevant evidence will not be admitted if its probative value is substantially outweighed by the danger of unfair prejudice.  The Rao Survey has no probative value, so it is plainly not admissible.

## IV.    Conclusion

For the foregoing reasons, Kimberly-Clark requests that its motion be granted and that the Rao Survey, along with all related testimony, be excluded.

Respectfully submitted this 11th day of February, 2013.

**/s/ Ryan T. Pumpian**
Christopher P. Galanek

25

6267491.6

Georgia Bar No. 282390
chris.galanek@bryancave.com
Ryan T. Pumpian
Georgia Bar No. 589822
ryan.pumpian@bryancave.com
Damon J. Whitaker
Georgia Bar No. 752722
damon.whitaker@bryancave.com

BRYAN CAVE LLP
One Atlantic Center, Fourteenth Floor
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309-3488
Tel:   (404) 572-6600
Fax:   (404) 572-6999

J. Bennett Clark *(admitted pro hac vice)*
ben.clark@bryancave.com

One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000   phone
(314) 259-2020   facsimile

*Attorneys for Kimberly-Clark Corporation*

## Local Rule 7.1(D) Certification of Compliance

I hereby certify that the foregoing pleading has been prepared with Times New Roman font, 14 point, one of the font and point selections approved by the Court in L.R. 5.1B, N.D. Ga.

**/s/ Ryan T. Pumpian**
Georgia Bar No. 589822

26

6267491.6

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that on February 11, 2013 a true and correct copy of the foregoing **KIMBERLY-CLARK'S MEMORANDUM OF LAW IN SUPPORT OF MOTION IN *LIMINE* TO EXCLUDE THE SURVEY AND TESTIMONY OF MOHAN RAO** was electronically filed with the Clerk of Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

**/s/ Ryan T. Pumpian**
Georgia Bar No. 589822