# Exhibit 1

## Excerpts From Mohan Rao Report

## (Pages 1-29 & Tabs 1, 4-11)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

|  |  |  |
|---|---|---|
|  | : |  |
| **KIMBERLY-CLARK CORPORATION,** | : |  |
| *Plaintiff,* | : |  |
|  | : |  |
| *v.* | : | **Civil Action No. 1:10 CV-0034-CAP** |
|  | : | **Judge Charles Pannell, Jr.** |
| **CARDINAL HEALTH 200, LLC f/k/a** | : |  |
| **CARDINAL HEALTH 200, INC.,** | : |  |
| *Defendant.* | : |  |

**EXPERT REPORT OF MOHAN RAO, PH.D.**

# Contents

I  INTRODUCTION                                                        3

II  ASSIGNMENT                                                          3

III SUMMARY OF OPINIONS                                                 6

IV BASIS FOR OPINIONS                                                   7

    A    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7

        i       Surgical Gown Performance Standards . . . . . . . . . . . . .    7

        ii      Overview of Products . . . . . . . . . . . . . . . . . . . . . .   11

        iii     Allegations . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

    B    Survey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        i       Description . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

        ii      Population . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

        iii     Sampling Design . . . . . . . . . . . . . . . . . . . . . . . .   19

        iv      Sample Size . . . . . . . . . . . . . . . . . . . . . . . . . .   20

        v       Questionnaire . . . . . . . . . . . . . . . . . . . . . . . . .   21

        vi      Implementation . . . . . . . . . . . . . . . . . . . . . . . . .   22

        vii     Survey Responses . . . . . . . . . . . . . . . . . . . . . . . .   24

    C    Damages Analysis . . . . . . . . . . . . . . . . . . . . . . . . . .   30

        i       Distribution Channels . . . . . . . . . . . . . . . . . . . . .   30

        ii      Surgical Gown Purchasing Process . . . . . . . . . . . . . .   33

        iii     Competition . . . . . . . . . . . . . . . . . . . . . . . . . .   36

        iv      Lost Profits . . . . . . . . . . . . . . . . . . . . . . . . . .   43

        v       Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . .   49

V  CONCLUSION                                                         50

# I   INTRODUCTION

**1.** I am an economist and Managing Director at Navigant Economics and an Adjunct Professor in the Department of Industrial Engineering and Management Sciences at Northwestern University.

**2.** I have a Bachelor of Science in Engineering from the University of Michigan, a pre-doctoral fellowship from Harvard University, and a Ph.D. from the University of Colorado. I was previously a professor at UCLA and a Teaching Fellow at Harvard University. I teach financial economics at Northwestern University. I also taught advanced courses on intellectual property valuation at the Licensing Executives Society, the leading professional organization for intellectual property valuation and licensing. I have designed surveys and performed economic, survey, and damages analyses as an expert in a wide range of matters, including cases involving claims of false advertising.

**3.** I am a member of the American Economic Association, the IEEE, and the Licensing Executives Society. I served as the Chair of the Valuation and Taxation Committee of the Licensing Executives Society. A copy of my curriculum vitae is attached as Tab 1. Navigant Economics bills $825 per hour for my work on this matter. I also have been assisted by my team at Navigant. Navigant's compensation is not dependent on the outcome of the case or the substance of my opinions.

# II   ASSIGNMENT

**4.** I have been asked by Ungaretti & Harris, counsel to Cardinal Health 200, LLC and Cardinal Health 200, Inc. (collectively "Cardinal"), to provide economic analysis related to certain allegations asserted by Kimberly-Clark Corporation ("Kimberly-Clark") against Cardinal in this matter. I have also been asked to evaluate the economic harm to Cardinal resulting from Kimberly-Clark's alleged false advertising of its KC-400 MicroCool Surgical Gown and KC-300 MicroCool Surgical Gown.

**5.** Kimberly-Clark is a global company organized under four business segments: Personal Care, Consumer Tissue, K-C Professional & Other, and Health Care.[1] The Health Care segment manufactures health care products such as infection control products, surgical drapes and gowns, face masks, exam gloves, respiratory products, pain management products, and other disposable medical products under the Kimberly-Clark, Ballard, and ON-Q brand names.[2] In the fiscal year ended December 31, 2011, Kimberly-Clark achieved net sales of $20.8 billion, of which $1.6 billion were from its Health Care segment.[3]

**6.** Cardinal is a global health care services company and a leading manufacturer of medical and surgical products, including gloves, surgical apparel, and fluid management products.[4] Major brands include Convertors clinical apparel with surgical gowns such as SmartGown, Astound, and RoyalSilk.[5] In the fiscal year ended June 30, 2012, Cardinal achieved $107.6 billion in revenue, of which $9.6 billion was from its Medical segment.[6]

**7.** On January 1, 2008, Kimberly-Clark and Cardinal entered into a national brand distribution agreement, in which Cardinal was an authorized, non-exclusive distributor of Kimberly-Clark health care products.[7] As a distributor, Cardinal was responsible for offering Kimberly-Clark's products through its general distribution.[8]

---

[1] "Kimberly-Clark: Our Company," "Kimberly-Clark: Global Locations," <www.kimberly-clark.com>; and Kimberly-Clark Annual Report 2011, page 1. Kimberly-Clark's Health Care business unit is located in Georgia. See Second Amended Complaint, dated February 16, 2010, at paragraph 1.

[2] Kimberly-Clark Annual Report 2011, page 1; and Kimberly-Clark Annual Report 2010, page 2.

[3] Kimberly-Clark Annual Report 2011, pages 11 and 14.

[4] "Cardinal Health: Investor overview," <www.cardinalhealth.com>; and Cardinal Health Annual Report 2011, page 18.

[5] "Cardinal Health: Products and Services," <www.cardinalhealth.com>.

[6] Cardinal Health, Inc., SEC Form 10-K, for the fiscal year ended June 30, 2012, pages 13 and 15.

[7] The original termination date of December 31, 2010 was extended by a third amendment to June 30, 2013. "National Brand Distribution Agreement," January 1, 2008, KCp0010742–KCp0010769; and "National Brand Distribution Agreement Third Amendment," July 1, 2011, KCp0012682. Randall Tracey — Global Sourcing Manager at Cardinal — describes Kimberly-Clark and Cardinal's formal relationship as Kimberly-Clark being the supplier and Cardinal being the customer who resells the Kimberly-Clark gowns. See Deposition of Randall Tracey, September 30, 2010, pages 49-50.

[8] Other duties included providing non-technical distribution support to customers, submitting

Confidential                                                                                          5

As a supplier, Kimberly-Clark was responsible for shipping to all Cardinal centers, providing and bearing all costs related to labeling, packaging and delivering products, and providing advanced rebates to distributors.[9]

8.  In addition, on July 1, 2008, Kimberly-Clark and Cardinal entered into a Presource Purchase Agreement to set parameters by which Kimberly-Clark would sell its products to Cardinal.[10]  The following surgical products were included in this agreement:  various drapes such as Orthoarts, Cvarts and Ocuarts; various gowns such as MicroCool and Ultra; back table covers; towels; extremity prep pads; and fluid collection pouches.[11]

9.  In conducting my analysis, members of my team and I have reviewed pleadings; documents and economic information produced by the parties; and publicly available information.  I also interviewed Cardinal personnel.  A list of materials which I considered in forming the opinions set forth in this Expert Report is attached as Tab 2.  I reserve the right to modify or supplement this Expert Report as appropriate.

---

orders for products via EDI (electronic data interchange), paying promptly for the orders, participating in business reviews, providing daily sales tracing and rebate reports, and maintaining complete and accurate records.  "National Brand Distribution Agreement," January 1, 2008, KCp0010742–KCp0010769, at KCp0010742-44.  According to Randall Tracey — Global Sourcing Manager at Cardina — Cardinal is responsible for informing Kimberly-Clark of the customers that purchase its products on a regular basis through trace sales. See Deposition of Randall J. Tracey, September 30, 2010, pages 59-60.

[9]Other duties included notifying distributors about any defects or shortages in the products and providing return services for customers. "National Brand Distribution Agreement," January 1, 2008, KCp0010742–KCp0010769, at KCp0010742-44.  The payment terms set forth in the agreement were 1 percent/15 days (net 30 days from the invoice date), and as a distributor, Cardinal deducted an administrative fee of 0.75 percent of net sales for a calendar month.  The administrative fee covered costs of trace sales reporting, the rebate process, contract administration, master merchandise file costs, and other costs to administer the procurement of inventory. See "National Brand Distribution Agreement," January 1, 2008, KCp0010742–KCp0010769, at KCp0010742.

[10]This agreement was set for termination on June 30, 2011, with the option for two one-year extensions.  This agreement required that Kimberly-Clark invoiced all orders on the date shipped, and that Kimberly-Clark provided a 1 percent net invoice value for payments issued by Cardinal within 15 days from the date of the invoice (net 30 days).  "Presource Purchase Agreement," July 1, 2008, KCp0010771–KCp0010795, at KCp0010771-72 and KCp0010775.

[11]"Presource Purchase Agreement," July 1, 2008, KCp0010771–KCp0010795, at KCp0010780-89.

# III   SUMMARY OF OPINIONS

10.   Based on my review and analysis of the information produced in this matter and the results of a statistical survey of surgeons, surgical nurses, and procurement personnel, I have reached the following conclusions:

- Surgeons, surgical nurses, and procurement personnel understood "impervious" to mean that a surgical gown's sleeve seams do not allow the passage of liquid or liquid-borne microorganisms. Surgeons, surgical nurses, and procurement personnel further believed that a surgical gown would not be considered "impervious" or "fully impervious" if it allowed the passage of liquid or liquid-borne microorganisms. They were confused by Kimberly-Clark's color-key system and the impervious description of its MicroCool Surgical Gown. This confusion was material to decisions to purchase the KC-400 MicroCool Surgical Gown. A majority of surgeons, surgical nurses, and procurement personnel would have switched to a different gown had they known that the sleeve seams of the KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms.

- Cardinal lost sales and, in turn, profits as a result of Kimberly-Clark's false advertising associated with its KC-400 MicroCool Surgical Gown.

  - Under Mor-Flo analysis, these lost profits are $23.9 million between September 2009 and September 2012.

  - Without using Mor-Flo analysis, these lost profits are $36.6 million between September 2009 and September 2012.

- Cardinal lost sales and, in turn, profits as a result of Kimberly-Clark's false advertising associated with its KC-300 MicroCool Surgical Gown.

  - Under Mor-Flo analysis, these lost profits are $10.1 million between January 2008 and September 2012.

– Without using Mor-Flo analysis, these lost profits are \$18.4 million between January 2008 and September 2012.

- Kimberly-Clark gained sales and, in turn, profits as a result of its false advertising associated with its KC-400 MicroCool Surgical Gown. Kimberly-Clark's unjust enrichment is \$6.9 million between September 2009 and September 2012.

- Kimberly-Clark gained sales and, in turn, profits as a result of its false advertising associated with its KC-300 MicroCool Surgical Gown. Kimberly-Clark's unjust enrichment is \$5.2 million between January 2008 and September 2012.

# IV   BASIS FOR OPINIONS

## A   Background

### i   Surgical Gown Performance Standards

**11.** Cardinal alleges that Kimberly-Clark falsely advertised certain of the surgical gowns that it sells. Surgical gowns are primarily worn by medical personnel working in operating rooms ("ORs") to prevent the transmission of pathogenic microorganisms between medical staff and patients during procedures.[12] Surgical gowns are available in both disposable and reusable varieties, with reusable gowns primarily employed in less invasive procedures.[13]

**12.** The U.S. Food and Drug Administration ("FDA") classifies surgical gowns as Class II medical devices which, due to the potential risk they pose to patients and practitioners, are subject to both the "general controls" and "special controls" requirements of the Federal Food, Drug, and Cosmetic Act in order to assure safety and effectiveness. The FDA requires that manufacturers of these medical devices

---

[12]"Industry Study 2196: Disposable Medical Supplies," May 2007, LSCHU52091–LSCHU52539, at LSCHU52310.

[13]"Industry Study 2196: Disposable Medical Supplies," May 2007, LSCHU52091–LSCHU52539, at LSCHU52311.

meet performance criteria such as penetration resistance and tear resistance.[14] This class of medical devices must gain clearance from the FDA through the premarket notification process known as a 510(k) program.[15]

**13.** Since the 1980s HIV/AIDS epidemic, standards and tests to assess liquid barrier protection and help surgeons make more informed decisions when selecting surgical apparel have gained greater prominence.[16] The American Association of Textile Chemists and Colorists ("AATCC") was the first association to establish tests in 1945.[17] AATCC established its Water Resistance Impact Penetration Test (AATCC 42) and Water Resistance Hydrostatic Pressure Test (AATCC 127) to measure the resistance of materials to the penetration of fluids by impact.[18]

**14.** In 1995, the American Society for Testing and Materials ("ASTM") began implementing the ASTM F1671 test ("The Standard Test Method for Resistance of Materials Used in Protective Clothing to Penetration by Blood-Borne Pathogens Using Phi-X174 Bacteriophage Penetration as a Test System") to measure the resistance of fabrics to the penetration of blood-borne pathogens under continuous contact.[19] The ASTM F1671 test states that "[i]f, in the design of an item of protective clothing, seams are claimed to offer the same protection as the material, test additional specimens containing such seams."[20]

---

[14] "Medical Devices: Medical Gloves and Gowns," <www.fda.gov>.

[15] "Draft Guidance for Industry and Food and Drug Administration Staff – The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)]," <www.fda.gov>.

[16] Deborah Gardner and J. J. Hedden Jr., "Critical Solutions for Essential Draping," *Managing Infection Control*, November 2007, page 84.

[17] AATCC Test Method 42: Impact Penetration Test, 1945.

[18] AATCC Test Method 42: Impact Penetration Test, 1945; and AATCC Test Method 127: Hydrostatic Pressure Test, 1968. The AATCC 42 measures the resistance of fabrics to penetration of water by spray impact, while the AATCC 127 measures the resistance of fabrics to the penetration of water under constantly increasing pressure (this simulates the act of leaning on the drape and/or gown in the OR). See "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18833-36.

[19] "The Standard Test Method for Resistance of Materials Used in Protective Clothing to Penetration by Blood-Borne Pathogens Using Phi-X174 Bacteriophage Penetration as a Test System," 1995, page 327; "ANSI/AAMI PB70: Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities," 2012, page 6; and "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18837.

[20] "The Standard Test Method for Resistance of Materials Used in Protective Clothing to Pene-

**15.** The Association for the Advancement of Medical Instrumentation ("AAMI") consists of healthcare professionals, professional organizations, trade organizations, and medical device manufacturers. Technical committees within AAMI create standards and recommended practices to increase the safety and efficacy of medical instrumentation.[21] In 2003, AAMI created the AAMI PB70 Standard ("Liquid Barrier Performance and Classification of Protective Apparel and Drapes Intended for Use in Health Care Facilities") to establish a classification system and the associated minimum requirements for the liquid barrier performance of protective apparel and drapes based on industry-accepted test methods.[22] The AAMI PB70 Standard applies the AATCC and ASTM test methods to critical zones (and critical zone components) of surgical apparel and provides a classification system for the performance based on the results. AAMI classifies surgical apparel on the basis of barrier protection into four levels: Level 1 through Level 4 (with Level 4 being the highest level of barrier protection).[23] AAMI defines critical zones for surgical gowns to be areas "A" and "B" in the image below or "at a minimum, comprise the front area of the gown from chest to knees and the sleeves from the cuff to above the elbow," and critical zone components to be an "[e]lement, constituent, or item incorporated into the critical zone, including the materials, seams, and points of attachment."[24]

---

tration by Blood-Borne Pathogens Using Phi-X174 Bacteriophage Penetration as a Test System," 1995, page 332.

[21] "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18828.

[22] "ANSI/AAMI PB70: Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities," 2012, page ix.

[23] "ANSI/AAMI PB70: Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities," 2012, page 6.

[24] "ANSI/AAMI PB70: Liquid barrier performance and classification of protective apparel and drapes intended for use in health care facilities," 2012, pages 3 and 7. See also Tab 3.



AAMI Level 4 gowns provide the strongest barrier protection, preventing the penetration of both liquid- and air-borne pathogens in all critical zones of the gown, including the sleeves. Gowns are classified as Level 4 if they pass the ASTM F1671 test in all critical zones (areas "A" and "B" above).[25] AAMI Level 2 and AAMI Level 3 gowns provide fluid barrier protection, but do not provide protection against air-borne pathogens.[26] AAMI Level 1 gowns meet basic laboratory testing standards for liquid resistance and are intended for less invasive, low fluid procedures.[27]

---

[25] "Industry Study 2196: Disposable Medical Supplies," May 2007, LSCHU52091–LSCHU52539, at LSCHU52310-11 and "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18837-39.

[26] "Industry Study 2196: Disposable Medical Supplies," May 2007, LSCHU52091–LSCHU52539, at LSCHU52310-11 and "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18833-39.

[27] "Industry Study 2196: Disposable Medical Supplies," May 2007, LSCHU52091–LSCHU52539, at LSCHU52310-11 and "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18833-39.

## ii   Overview of Products

**16.** Cardinal offers three product lines of surgical gowns for distribution to its customers: Astound, RoyalSilk, and SmartGown.[28] Cardinal's Astound Surgical Gowns are rated as AAMI Level 3 and AAMI Level 4, RoyalSilk Surgical Gowns are rated as AAMI Level 3, and SmartGown Surgical Gowns are rated as AAMI Level 4.[29] According to Caroline Gullion — former Product Line Manager of Surgical Gowns at Cardinal — the SmartGown and some forms of the Astound gown that are AAMI Level 4 have been tested under the AAMI PB70 and are considered impervious gowns.[30] Cardinal began selling its SmartGown Surgical Gowns in 2001.[31]

**17.** Kimberly-Clark offers three product lines of surgical gowns for distribution: Standard, Ultra, and MicroCool.[32] The Standard gown line includes the KC-100 Surgical Gown as well as the Evolution 4 (KC-200) Surgical Gown.[33] It is my understanding that Kimberly-Clark's KC-400 MicroCool and KC-300 MicroCool Surgical Gowns are rated as AAMI Level 3 and that the Ultra Surgical Gown has forms that are rated as AAMI Level 2 and AAMI Level 3. I understand that the Evolution and Standard Surgical Gowns have not been tested for an AAMI level.[34] Kimberly-Clark's website states that certain forms of its Ultra line of surgical gowns are rated AAMI Level 3

---

[28]Cardinal's surgical gowns have the following gown fabric breakdown: Astound and RoyalSilk gowns are spunbond-meltblown-spunbond ("SMS"), while SmartGown is spunbond-film-spunbond ("SFS"). The Optima Surgical gown exited the market on June 30, 2009. See "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18841-42. "Surgical Gowns Messaging Guide," August 2009, CAH001138–CAH001155, at CAH001141.

[29]"Surgical Gowns Messaging Guide," August 2009, CAH001138–CAH001155, at CAH001145-49.

[30]Ms. Gullion is currently a Project Manager of Anesthesia at Cardinal. She testified that RoyalSilk is not considered an impervious gown. Deposition of Caroline Gullion, October 1, 2010, pages 61-63. "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18844.

[31]Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, page 25.

[32]Kimberly-Clark's surgical gowns have the following gown fabric breakdown: Standard and Ultra gowns are spunbond-meltblown-spunbond ("SMS"), while MicroCool is spunbond-film-spunbond ("SFS"). "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18841.

[33]"Kimberly-Clark Standard Gowns Overview," <www.kchealthcare.com>; and Cardinal Competitive Analysis: SRI Gowns, cgull00542–cgull00549, at cgull00545.

[34]Cardinal Competitive Analysis: SRI Gowns, cgull00542–cgull00549, at cgull00545.

and AAMI Level 4.[35]  Kimberly-Clark began selling its MicroCool Surgical Gowns in 1999.[36]

**18.**  Medline offers four product lines for distribution: Eclipse, Aurora, Sirus, and Prevention/Prevention Plus.[37]  According to Cardinal documents, the Eclipse and Aurora Surgical Gowns have forms that are rated as AAMI Level 2 and AAMI Level 3, the Sirus Surgical Gown is rated as AAMI Level 2, and the Prevention Plus Surgical Gown is rated as AAMI Level 3.[38]

### iii   Allegations

**19.**  I understand that Kimberly-Clark alleges that Cardinal falsely advertised its SmartGown as being "'the only breathable, fully impervious surgical gown in the industry' based on ASTM F1671 testing," and that this advertising created a "false, misleading and deceptive impression that Kimberly-Clark MicroCool Brand gowns are not breathable and impervious gowns based on ASTM standardized testing."[39]  In addition, Kimberly-Clark alleges that the Cardinal SmartGown claims have not been cleared by the U.S. Food and Drug Administration ("FDA").[40]

**20.**  Kimberly-Clark claims to be the first in the industry to develop and manufacture "breathable, impervious surgical gowns, meeting ASTM F1671 standards," a category of surgical gowns which includes its MicroCool line.[41]  I understand that Cardinal alleges that Kimberly-Clark presents false claims, in advertising and labeling materials, that its MicroCool surgical gowns meet the requirements of both

---

[35] "KC Ultra Surgical Gowns Overview," <www.kchealthcare.com>.

[36] Second Amended Complaint, dated February 16, 2010, at paragraph 11.

[37] Medline's surgical gowns have the following gown fabric breakdown: Eclipse is spunlace, Aurora and Sirus gowns are spunbond-meltblown-spunbond ("SMS"), and Prevention Plus is spunbond-film-spunbond ("SFS").  Medline has a fifth line of gowns called CoolZone, however, this line makes up less than one percent of Medline's total gown sales and the company is not actively marketing the line.  "Surgical Apparel CAST II Training," CHALL18825–CHALL18875, at CHALL18841 and CHALL18860.  Cardinal Competitive Analysis: SRI Gowns, cgull00542–cgull00549, at cgull00548.

[38] Cardinal Competitive Analysis: SRI Gowns, cgull00542–cgull00549, at cgull00548.

[39] Second Amended Complaint, dated February 16, 2010, at paragraphs 20-23.

[40] Second Amended Complaint, dated February 16, 2010, at paragraphs 23-25.

[41] Second Amended Complaint, dated February 16, 2010, at paragraph 11.

AAMI Level 4 and/or ASTM F1671; and deceptively markets its MicroCool surgical gowns as "impervious."[42]

**21.** I understand that Cardinal claims that Kimberly-Clark falsely advertises its MicroCool surgical gowns — including its KC-300 and KC-400 lines of gowns — as "impervious" because, as early as 2002, the sleeve seams of Kimberly-Clark's Micro-Cool line of surgical gowns did not pass ASTM F1671 testing.[43] In 2009, Kimberly-Clark submitted a 510(k) premarket notification to the FDA for clearance to market a new version of MicroCool Surgical Gowns using the name "KC-400," which Kimberly-Clark represented "meets the AAMI Level 4 liquid barrier requirement."[44] Cardinal claims that Kimberly-Clark never commercialized the designs cleared by the FDA in 2009, but rather just used the "KC-400" name to market its existing MicroCool Surgical Gown which did not pass ASTM F1671 testing in the sleeve seams.[45]

**22.** In addition to the false advertising claims on the MicroCool brand, Cardinal alleges that the use of the "KC-400" name misled consumers to believe that the gown met AAMI Level 4 requirements. Kimberly-Clark business documents that I have reviewed support the contention that it associated the KC-400 MicroCool Surgical Gown with AAMI Level 4. For instance, in internal communications, Kimberly-Clark notes that "[t]he only major change is that the names will be different than what we reviewed in order to match AAMI codes: KC 100 will be called KC 200 – AAMI-2; Ultra will be called KC 300 – AAMI-3; MicroCool will be called KC 400 –

---

[42]Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, pages 20-22.

[43]In a 2008 comparison study of surgical gowns, Kimberly-Clark's MicroCool gowns' sleeve seams failed ASTM 1671 testing. Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, pages 20 and 32-33. Around 2009, Kimberly-Clark began the transfer of its Microcool brand to the KC-400 name, where previously it had "resided in KC300." See Deposition of Judson Boothe, November 7, 2011, page 268-269. Kimberly-Clark does not differentiate internally between the different names under the MicroCool brand. Deposition of Linda Harris, December 14, 2010, page 197.

[44]Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, pages 20-21.

[45]According to independent testing, the KC-400 MicroCool gown also fails ASTM F1671 testing at the sleeve seams. Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, page 21.

AAMI-4."[46] A Kimberly-Clark drape and gown portfolio presentation also discussed the "KC200/300/400 Rationale":

> Numbering parallels AAMI rating structure — aids recall. . . Allows stronger competitive response to Cardinal and Medline, diffuses AAMI claims while allowing reference to other performance advantages (Flammability, etc.)[47]

**23.** However, Cardinal alleges that independent testing verified that the "KC-400" gown sold on the market in 2010 did not meet AAMI Level 4 (failing at the sleeve seams when subjected to the test method of ASTM F1671) and was, therefore, not "impervious."[48] Despite failure in ASTM F1671 testing, Kimberly-Clark continued to market the KC-400 MicroCool gown as "impervious."[49] Further, Cardinal alleges that Kimberly-Clark's false advertising misled consumers who purchased the KC-400 MicroCool Gown to provide critical barrier protection when, in fact, these gowns do not have such safety attributes.[50]

**24.** In addition, Kimberly-Clark advertises its MicroCool line of surgical gowns using a color-key system consisting of a colored neck band, colored packaging, and a tie-card of the color coded gown attached to its MicroCool gowns. Kimberly-Clark assigns a red color-key code to its MicroCool Surgical Gowns, which designates the gown as "[i]mpervious, for lengthy, fluid-intensive procedures."[51] Cardinal alleges

---

[46]"BC II Accomplishments_Next Steps_26Jun09.pptx," June 29, 2009, KCe0620122–KCe0620127, at KCe0620122.

[47]"Aligning Drape and Gown Portfolios," June 2009, KCe0022038–KCe0022043, at KCe0022043.

[48]Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, page 21. A Kimberly-Clark discussion on "new" gown positioning also supports this view: "The new MicroCool has no new performance claims to offer, it is just a cheaper replacement for us with equal performance to the customer. does it really merit a KC 400 label?. . . In general we should be choiceful before we add or change nomenclature/sub brands/tiers. If we are not careful we are just talking to ourselves and will confuse our customers . . . I am very uncomfortable and do not feel that we are aligned on our positioning strategy in light of the available claims and/or product portfolio to support the positioning[.]"' "RE: Surgical Gown positioning," March 4, 2009, KCe0794593–KCe0794594.

[49]Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, pages 20-22.

[50]Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint, dated March 2, 2010, pages 20-22.

[51]Order, September 7, 2012, page 5. See also "Introducing the Kimberly-Clark Color-Key for In-

Confidential                                                                      15

that Kimberly-Clark's color-key system, specifically through its tie-card attachment, constitutes false representation as the red column of the tie-card depicts a gown with a sleeve that is impervious.[52]

**25.** I understand that the key issues in this dispute are the meaning of "impervious" and "fully impervious" to surgical gown consumers, whether consumers perceive the sleeve seams of the Kimberly-Clark KC-400 and KC-300 MicroCool Surgical Gowns to be impervious, and if so, whether they would have switched to a different gown had they known that the sleeve seams of the Kimberly-Clark KC-400 and KC-300 MicroCool Surgical Gowns were not impervious or fully impervious.

## B   Survey

**26.** In order to determine consumer awareness and understanding of the terms "impervious" and "fully impervious" and to measure the impact on the purchase decisions of surgical gown consumers, I designed and implemented a survey of surgical gown consumers. I discuss the survey methodology, questionnaire, and results below.

### i   Description

**27.** The survey methodology provides an economical and systematic way to gather information and draw inferences about a large number of individuals. Surveys are used widely in business, government, and in judical proceedings.[53] As part of my economic analysis, I conducted a scientific survey of surgeons, surgical nurses, and procurement personnel.

**28.** The objective of the survey was to assess among surgeons, surgical nurses, and procurement personnel (i.e. purchasers of surgical gowns):

---

stant Gown Recognition," KCe0630946–KCe0630951, at KCe0630947 and KCe0630949; and "Instant Gown Recognition with the Kimberly-Clark Color-Key," KCp0001207.

[52]Order, September 7, 2012, page 5.

[53]Shari Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, 3rd edition, pages 364-365.

- Awareness of AAMI Standards and Understanding of Impervious and Fully Impervious:[54]

  – Understanding of "impervious" and "fully impervious" as it relates to surgical gowns;

  – Awareness of the Association for the Advancement of Medical Instrumentation ("AAMI") standards for liquid barrier protection of surgical gowns;

- Awareness of Color-Key Systems and Their Relationship to AAMI Levels:[55]

  – Awareness of color-key systems used by manufacturers to differentiate surgical gowns based on their barrier protection;

  – Existence of confusion, if any, about the Kimberly-Clark KC-400 Micro-Cool Surgical Gown due to Kimberly-Clark's use of the color-key system;

- Awareness and Use of KC-400 MicroCool Surgical Gown and Understanding of its Performance:

  – Awareness of the Kimberly-Clark KC-400 MicroCool Surgical Gown and it being described as "impervious;"

  – Importance of "barrier protection" attribute when selecting the Kimberly-Clark KC-400 MicroCool Surgical Gown; and

- Switching Preferences if Sleeve Seams are Not Impervious:

  – Impact of confusion, if any, on the selection and purchase decision of the KC-400 MicroCool Surgical Gown.[56]

---

[54] "...the fact to be established is whether a gown is 'impervious'[.]" Order, September 7, 2012, page 21.

[55] "If Kimberly-Clark's advertising creates an impression among its consumers that its seams are secure, and that impression was in fact false, then there could be a viable claim." Order, September 7, 2012, page 22, footnote 8.

[56] "The damages study restates the plaintiff's position "but for" the harmful event; this part is often called the but-for analysis." See Robert Hall and Victoria Lazear, "Reference Guide on

**29.** I designed the survey questionnaire and I engaged WorldOne — a global healthcare research company — to conduct a "double-blind" survey.[57]

**30.** To obtain a sample that represents the population and estimate the unknown parameters accurately from the sample statistics, statisticians need to explore the following key factors:[58]

- The definition of the population;

- The sampling design; and

- The size of the sample.

## ii   Population

**31.** As discussed below, the target consumers who influence or make purchasing decisions of surgical gowns include surgeons, surgical nurses, and procurement personnel.[59]

---

Estimation of Economic Losses in Damages Awards," *Reference Manual on Scientific Evidence*, 2nd Edition, Federal Judicial Center 2000, page 481. See also "Proving Antitrust Damages: Legal and Economic Issues," *ABA Section of Antitrust Law*, 2nd Edition, 2010, page 53.

[57]When a study is conducted using a "double blind" approach, both the interviewers and interviewees would neither consciously nor subconsciously bias the survey findings. See Kirk-Smith, M. and Strech, D.D., "Evidence-based medicine and randomized double-blind clinical trials: a study of flawed implementation," *Journal of Evaluation in Clinical Practice*, 2001, pages 119 - 123.

[58]Chava Frankfort-Nachmias and David Nachmias, *Research Methods in the Social Sciences*, 6th Edition, Worth Publishers, 1999, page 163.

[59]See "Surgical Gown Marketing Plan:   FY10 Roadmap," CHALL23011–CHALL23040, at CHALL23028 and CHALL23034.   This internal marketing plan confirms that Cardinal's target audience for "Market Research/Voice of Customer" includes surgeons and "RN/Scrub tech/PA that scrubs at least twice a week." See also "Surgical Gowns Messaging Guide," August 2009, CAH001138–CAH001155, at CAH001144; and "Draft 3: For Sales Focus Group Review," March 22, 2010, cgull05591–cgull05604, at cgull05597. These messaging guides include the following under "Audience Focus" for SmartGown messaging: "OR managers/OR educators; Employee health/safety group (responsible for infection control with staff); Infection control management (responsible for infection control with patients); Material management/procurement[.]" See also "Barrier Performance Standard and Classification for Protective Apparel and Drapes in Health Care Facilities Study," *SurveyResource Group*, January 6, 2000, Sw-Image_AAMI000607, at page 2.   This market assessment study commissioned by AAMI in 2000 to gather research on the number of levels of barrier protection needed to be identified for surgical gowns was targeted to "primarily operating room managers/head nurses and directors and operating room staff nurses[.]" Similarly Kimberly-Clark documents include OR Managers, Scrub Nurses, and Surgeons among the most influential "Cus-

**32.** According to the American College of Surgeons Institute for Health Policy Research, there were approximately 135,854 active surgeons in the U.S. in 2008.[60] The three largest surgical specialties were obstetrics and gynecology ("OB-GYN"), general surgery, and orthopedic surgery, which together accounted for 58 percent of active surgeons that year.[61] According to an American Board of Surgery study, during 2007-2009, 88 percent of surgeons seeking recertification were men who performed an average of 506 operative cases per year, and 12 percent of surgeons seeking recertification were women who performed an average of 375 operative cases per year.[62]

**33.** According to the American Nurses Association, in 2008, the total number of licensed registered nurses ("RNs") in the U.S. employed in nursing was 2.6 million, with 62.2 percent of those nurses working in hospitals.[63]

**34.** A well-executed survey first needs to identify the *relevant* population.[64] Although Cardinal's target customers include surgeons, surgical nurses, and procurement personnel, it is unlikely that *every* surgeon, surgical nurse, or procurement personnel has enough information to give an opinion on this survey's objectives.[65] Therefore, I screened participants in the survey so that they meet the following criteria: they work in a clinic, surgery center, or an academic, community, or military hospital; their institution currently uses single-use surgical drapes or gowns; they currently use or purchase surgical gowns that could be classified as "fluid-resistant" or

tomers/Shoppers/Users." See "Surgical Gown Business Unit Strategic Plan 2009-2011," May 15, 2008, KCe0386471–KCe0386503, at KCe0386473.

[60]"The Surgical Workforce in the United States: Profile and Recent Trends," *American College of Surgeons Health Policy Research Institute,* April 2010, page 15.

[61]"The Surgical Workforce in the United States: Profile and Recent Trends," American College of Surgeons Health Policy Research Institute, April 2010, page 15.

[62]This represents an average of approximately 42 operative cases per month for male surgeons seeking recertification, and an average of approximately 31 operative cases per month for female surgeons seeking recertification. See Bruce Jancin, "Spike Seen in General Surgeons' Caseloads," *American College of Surgeons*, Vol. 7, No. 5, May 2011, page 4.

[63]American Nurses Association Fact Sheet, May 2011, at page 1.

[64]Shari Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, 3rd edition, page 377.

[65]For example, a surgeon who participates in few surgical procedures per month is unlikely to have an opinion on the issue of impervious surgical gowns.

"impervious" for surgeries where surgical staff is exposed to blood and other bodily fluids; surgeons and surgical nurses' specialty falls within general surgery, cardio-thoracic surgery, surgical oncology, neurosurgery, genitourinary surgery, orthopedic surgery and OB/GYN surgery; surgeons must participate in a minimum of 15 surgical procedures per month; surgical nurses must participate in a minimum of 15 surgical procedures per month; surgeons have between 3-30 years in practice (post-residency); nurses have been working in the OR between 3-35 years; procurement personnel responsible for ordering supplies work in a hospital or clinic that has at least 8 ORs; and procurement personnel who have influence in the types of gowns and drapes or brands that are supplied in the OR.

**35.** To evaluate each respondent's eligibility, I screened the population to determine if they are members of the target population based on the attributes above.[66] The survey screener is attached as Tab 4.

### iii   Sampling Design

**36.** I conducted the survey on a subset of the consumer base that was selected using stratified sampling.

**37.** Stratified sampling is a scientifically sound and widely accepted technique that provides an efficient and cost-effective method to assess the views of an entire population using only a sample of consumers.  The population is first divided into subgroups called *strata*, then the stratified random sample is independently selected from each stratum.[67] Elements in the same stratum tend to be more similar than randomly selected elements from the whole population, so stratification often increases precision.  Such a sample allows us to *project* the results from a survey of a sample to the entire population (in this instance, all surgeons, surgical nurses, and procurement

---

[66]Shari Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, 3rd edition, pages 386-387.

[67]For the survey fielded by WorldOne, the sample is stratified using participants' activity levels (based on responses and invitations).

personnel involved in the selection or purchase of surgical gowns).[68]

**38.** Tab 5 provides detailed information on the demographics of the survey respondents.

## iv    Sample Size

**39.** As the results from the sample are used to project to the population, sample responses (on such measures as awareness of AAMI standards for liquid barrier protection of surgical gowns) are *estimates* of the measures observed in the "true" population. Statisticians use specific formulas to calculate the sample size needed to obtain reliable estimates of the population. The formulas use two key factors:[69]

- *Margin of error* is the risk the researcher is willing to accept in the study, or the error the researcher is willing to accept; and

- *Confidence level* describes the accuracy of an estimate or the uncertainty associated with a sampling method.[70]

**40.** I treated the population of surgeons and surgical nurses as a large population of about a million members or so.[71]  In general, for a margin of error of ± 5 percent for a 95 percent level of confidence (the benchmark in social science research), one would need a sample size of approximately 384 for a population size of 1,000,000 or more.[72]  Therefore, I instructed WorldOne to recruit 384 surgeons and surgical nurses who meet the screening criteria that I described above.  See Tab 6. The final survey of surgeons and surgical nurses included 385 respondents.

---

[68]Sharon Lohr, "Sampling: Design and Analysis", Duxbury Press, 1999, page 24.

[69]Chava Frankfort-Nachmias and David Nachmias, *Research Methods in the Social Sciences*, Sixth Edition, Worth Publishers, 1999, pages 179-181.

[70]Suppose I used the same sampling method to select different samples and to compute a different interval estimate for each sample. Some interval estimates would include the true population parameter and some would not. A 95 percent confidence level means that 95 percent of the intervals would include the true population parameter.

[71]Robert Krejcie and Daryle Morgan, "Determining Sampling Size for Research Activities," *Educational and Psychological Measurement*, 1970, 30, pages 607-610.

[72]Cohen, J., *Statistical Power Analysis for the Behavioral Sciences*, Second Edition, 1998.

**41.** I treated the population of procurement personnel responsible for ordering "fluid-resistant" or "impervious" surgical gowns as a small population (assuming approximately 5,000). To calculate the sample size of procurement personnel, I used the normal approximation to the hypergeometric distribution for more accuracy in determining sample size for a small population.[73] For a margin of error of ± 10 percent for a 95 percent level of confidence, the procurement personnel sample size is 94. Therefore, I instructed WorldOne to recruit 94 procurement personnel who meet the screening criteria that I described above. See Tab 7. The final survey of procurement personnel included 100 respondents.

## v   Questionnaire

**42.** The questionnaire was designed with the primary goal of assessing awareness, confusion, and materiality with regard to the allegations of false advertising related to the Kimberly-Clark KC-400 MicroCool Surgical Gown. The entire questionnaires are attached as Tab 8 and Tab 9.

**43.** The questionnaire was essentially identical for surgeons, surgical nurses and procurement personnel except for minor differences in phrasing as appropriate; for example, "use" for surgeons and surgical nurses, as opposed to "purchase" for procurement personnel.

**44.** I included open-ended questions in the surveys, as appropriate, to allow respondents to form their own responses.[74] The advantages of using the open-ended form for these exploratory questions are to reveal the responses that individuals might give spontaneously.[75] I also included questions with the option to choose "Don't Know" as the appropriate answer.[76] The advantages of using "Don't Know" as one

---

[73]Evan Morris, "Sampling from Small Populations," working paper, pages 1-4.

[74]See Questions 10, 16, 18 and 19 in Questionnaire for Surgeons and Surgical Nurses; Questions 12, 18, 20 and 21 in Questionnaire for Procurement Personnel.

[75]Sharon Lohr, "Sampling: Design and Analysis", Duxbury Press, 1999, pages 12-13.

[76]See Questions 6, 10, 13, 16, 17 and 18 in the Questionnaire for Surgeons and Surgical Nurses (Tab 8) and Questions 8, 12, 15, 18, 19 and 20 in Questionnaire for Procurement Personnel (Tab 9)

of the options is to reduce guessing.[77]

## vi   Implementation

**45.**  The survey was fielded under my direction by WorldOne, a global health-care research company based in New York.  WorldOne has access to a panel of over 1.7 million healthcare professionals, including surgeons, surgical nurses, and procurement personnel.[78]  The work of WorldOne related to this engagement was supervised by William Monteith — Manager of Client Development at WorldOne — and Nicki Toro — Senior Account Executive at WorldOne.  WorldOne partnered with the following companies to accelerate the recruitment process: Survey HealthCare, a healthcare data collection firm based in New York; MedQuery, a medical recruitment firm based in Illinois; and Ricca Group, a medical market research firm based in Pennsylvania.[79] The survey firms were independently contracted by Navigant without any involvement by Cardinal or counsel for Cardinal.

**46.**  The survey was conducted using Computer-Assisted Web Interviewing ("CAWI"), a data collection method in which respondents complete the survey via the internet.  The questionnaire appears on the computer, or any device connected to the internet, as a webpage that interviewees can access in many ways.  Interviewees can login via username and password, a direct link with an ID number, or a non-authenticated, anonymous survey.  Instructions along with questions are provided for the interviewee.  Multimedia materials such as pictures, audio, and music files can be integrated into the questionnaire.  The script poses successive questions that monitor the logical consistency of the data collected.  Furthermore, the website is able

---

[77]Norbert Schwarz and Hans-Jurgen Hippler, Response Alternatives: The Impact of Their Choice and Presentation Order, in Measurement Errors in Surveys 41, 45-46 (Paul P. Biemer et al. eds., 1991). Studies indicate that the presentation of an explicit "don't know" or "no opinion" alternative commonly leads to a 20 percent to 25 percent increase in the proportion of respondents who select that response. This reduces the demand for an answer and, as a result, the inclination to hazard a guess. See Howard Schuman and Stanley Presser, Questions and Answers in Attitude Surveys: Experiments on Question Form, Wording and Context 113-46 (1981).

[78]<www.worldone.com>.

[79]<www.surveyhealthcare.com>; <www.medqueryinc.com>; and <www.riccagroup.com>.

Confidential                                                                    23

to customize the flow of the questions based on the answers provided. Upon completion, the answers from the questionnaire are immediately sent to the main server so the data collection and results can be tracked continuously. With the increasing use of the internet, online questionnaires have become a popular way of collecting information.[80]

**47.** Computer-Assisted Web Interviewing has several advantages compared to mail interviews. CAWI can control the order in which the questions are displayed so that the respondent does not see a later question before answering an earlier one, prohibiting the respondent from going back and changing an answer. In addition, the structure permits the questionnaire to remind, or even require, the respondent to answer a question before the next question is presented.[81]

### "Double Blind" Standard

**48.** Potential survey respondents were not told the purpose of the survey. They were only prompted with the following:

> Thank you for agreeing to participate in this survey. The survey should take approximately 15 minutes of your time. The objective of this survey is to evaluate the factors that drive the selection of surgical gowns.

In addition, WorldOne and Survey HealthCare were not informed of this litigation, the purpose of this survey, or about the identity or interests of Kimberly-Clark or Cardinal. This "double blind" approach, referred to as the gold standard in surveys, was used so that both the employees of WorldOne, Survey HealthCare, MedQuery, or Ricca Group and survey respondents would neither consciously nor subconsciously bias the survey findings.[82]

---

[80]Chava Frankfort-Nachmias and David Nachmias, *Research Methods in the Social Sciences*, Sixth Edition, Worth Publishers, 1999, pages 224-225.

[81]For example, the question "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as 'impervious'?" was only displayed if respondent answered "Yes" to the question "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown?"

[82]Kirk-Smith, M. and Strech, D.D., "Evidence-based medicine and randomized double-blind clinical trials: a study of flawed implementation," *Journal of Evaluation in Clinical Practice*, 2001, pages 119 - 123.

## Notification Letter and Incentive Offer

**49.** To encourage our survey respondents to complete the survey conducted by CAWI, respondents were sent an electronic notification letter to participate in the online survey. This notification stressed the confidentiality of each respondent's response to the given survey in a disclaimer stating: "[w]e would like to remind you that the results of our studies will be used for analytical purposes only and will be treated in the strictest confidence."[83] The notification letter explained how to participate in the survey by clicking through links, the estimated length of the survey, the deadline for taking the survey, and also indicated that there will be a honorarium paid for their participation in U.S. dollars.

**50.** According to WorldOne, the incentives for participating in the survey vary between the different specialties of surgeons and nurses. An incentive payment of $25 was paid to participants from general surgery, OB/GYN surgery, and orthopaedic surgery. An incentive payment of $30 was paid to surgical nurses, OR nurses (perioperative nurses), medical-surgical nurses, as well as participants from surgical oncology and genitourinary medicine/surgery fields. An incentive payment of $35 was paid to procurement personnel and purchasers of surgical gowns. The final category of participants from cardiothoracic surgery and neuro/neurological surgery received an incentive payment of $40 for their participation.

## vii   Survey Responses

**51.** A summary of several key questions is provided below. Tab 10 and Tab 11 provide the statistical results of the principal survey questions.

---

[83]Invitation to Online Study − Selection of Surgical Gowns − 110385.

## Awareness of AAMI Standards and Understanding of
## Impervious and Fully Impervious

1. **Are you familiar with the AAMI (Association for the Advancement of Medical Instrumentation) Levels for the fluid resistance of a surgical gown?**

   30 (±5) percent of Surgeons and Surgical Nurses and 61 (±10) percent of Procurement Personnel responded "Yes."[84]

2. **If a surgical gown is made of impervious fabric, and the seams of the gown prevent the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious?**

   92 (±3) percent of Surgeons and Surgical Nurses and 94 (±5) percent of Procurement Personnel responded "Yes."

3. **If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be impervious?**

   93 (±3) percent of Surgeons and Surgical Nurses and 95 (±5) percent of Procurement Personnel responded "No."

---

[84]Throughout this section, 95 percent confidence intervals are shown in parentheses following sample-derived statistics. All the "Yes"/"No" questions in the questionnaire can be viewed as Bernoulli trials whose outcome is random and can be one of two possible outcomes. For a large number ($N > 30$) of statistically independent Bernoulli trials with each having a probability for a "Yes" answer, the population proportion who would answer "Yes" follows the binomial distribution $n \sim (np, np(1-p))$, with n representing the sample size, and p representing the population proportion. One could test the null hypothesis of the population proportion p=0; however, as the actual sample proportion $\hat{p}$ is non-zero for all questions, one can reject the null hypothesis with certainty. See Robert Pisani and Roger Purves, *Statistics*, 4th Edition, 2007.

4. **If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious?**

   97 ($\pm$2) percent of Surgeons and Surgical Nurses and 96 ($\pm$4) percent of Procurement Personnel responded "No."

**Awareness of Color-Key Systems and Relationships to AAMI Levels**

5. **Are you aware of color-key systems used by manufacturers to differentiate surgical gowns based on their barrier protection?**

   25 ($\pm$5) percent of Surgeons and Surgical Nurses and 45 ($\pm$10) percent of Procurement Personnel responded "Yes."

6. **Would you expect the sleeve seams in the red column of the color-key system depicted here to prevent penetration by liquid or liquid-borne microorganisms?**

   84 ($\pm$4) percent of Surgeons and Surgical Nurses and 86 ($\pm$7) percent of Procurement Personnel responded "Yes."

7. **With which AAMI Level do you associate the surgical gown in the image?[85]**

   76 ($\pm$5) percent of Surgeons and Surgical Nurses and 58 ($\pm$11) percent of Procurement Personnel who associate the surgical gown in the red column of the tie-card with AAMI levels responded "AAMI Level 4."

---

[85]This question was only displayed if respondent answered "Yes" to "Do you associate the surgical gown in the image with any of the AAMI Levels?"

## Awareness and Use of KC-400 MicroCool Surgical Gown
## and Understanding of its Performance

**8. Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown?**

31 (±5) percent of Surgeons and Surgical Nurses and 56 (±10) percent of Procurement Personnel responded "Yes."

**9. Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as "impervious"?[86]**

71 (±9) percent of Surgeons and Surgical Nurses and 81 (±11) percent of Procurement Personnel who have heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown responded "Yes."

**10. Which areas of the Kimberly-Clark KC-400 MicroCool Surgical Gown do you understand to be impervious?[87]**

72 (±10) percent of Surgeons and Surgical Nurses and 62 (±15) percent of Procurement Personnel who have heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown and have heard it described as "impervious" responded "[s]leeve seams in the shaded area."

---

[86]This question was only displayed if respondent answered "Yes" to "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown?"

[87]This question was only displayed if respondent answered "Yes" to both "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown?" and "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as 'impervious?'"

11. **Based on Kimberly-Clark's description and its color-key system, what AAMI Level do you understand the KC-400 MicroCool Surgical Gown to be?**[88]

72 (±10) percent of Surgeons and Surgical Nurses and 60 (±16) percent of Procurement Personnel who have heard the KC-400 MicroCool Surgical Gown described as "impervious" responded "AAMI Level 4."

12. **Which of the following surgical gowns have you used? (Select all that apply).**

23 (±4) percent of Surgeons and Surgical Nurses and 38 (±10) percent of Procurement Personnel selected "Kimberly-Clark KC-400 MicroCool Surgical Gown."

13. **Rank the following attributes in order of importance when selecting the Kimberly-Clark KC-400 MicroCool Surgical Gown (Scale is 1-4, where 1 is most important, and 4 is least important).**[89]

79 (±9) percent of Surgeons and Surgical Nurses and 89 (±11) percent of Procurement Personnel who have used or purchased the Kimberly-Clark KC-400 MicroCool Surgical Gown ranked "[b]arrier protection" as most important.

---

[88]This question was only displayed if respondent answered "Yes" to "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown?" and "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as 'impervious'?"

[89]This question was only displayed if respondent answered "Kimberly-Clark KC-400 MicroCool Surgical Gown" to "Which of the following surgical gowns have you used [or purchased]?"

14. **If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have purchased a different surgical gown whose sleeve seams are impervious?**[90]

58 (±11) percent of Surgeons and Surgical Nurses and 57 (±17) percent of Procurement Personnel who have used the Kimberly-Clark KC-400 MicroCool Surgicao Gown, who have heard the gown described as impervious, and ranked barrier protection as most important responded "Yes," they would have switched to another surgical gown whose sleeve seams are impervious.[91]

**52.** Based on my analysis of the survey responses, among the KC-400 MicroCool Surgical Gown users, 57 percent:

- were aware of it being described as "impervious";

- ranked its "[b]arrier protection" as the most important feature when they chose the gown; and

- would have switched to a different gown had they known that the sleeve seems of the KC-400 gown permitted the penetration of liquid or liquid-borne microorganisms.

**53.** Therefore, "but-for" the alleged false advertising related to Kimberly-Clark's MicroCool Surgical Gowns, 57 percent of customers who purchased these gowns would have purchased another gown whose sleeve seams were impervious. As a result, for this portion of consumers, Cardinal suffered lost sales and profits as a result of Kimberly-Clark's false advertising and sales of its MicroCool Surgical Gowns.

---

[90]This question was only displayed if respondent answered "Kimberly-Clark KC-400 MicroCool Surgical Gown" to "Which of the following surgical gowns have you used [or purchased]?"

[91]I dropped the respondents who responded "No" to the question "Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown?" but selected "Kimberly-Clark KC-400 MicroCool Surgical Gown" to the question "Which of the following surgical gowns have you used?"

# Tab 1



**Mohan P. Rao, Ph.D.**
Managing Director

Navigant Economics
30 South Wacker Drive, Suite 3100
Chicago, Illinois 60606

Direct: 312.583.2165
Main: 312.251.5900
Fax: 312.251.5201
mohan.rao@navigant.com

## Summary

Dr. Rao is a Managing Director at Navigant Economics and an Adjunct Professor in the Department of Industrial Engineering and Management Sciences at Northwestern University. He specializes in antitrust, intellectual property, and financial economics.

Dr. Rao has provided economic analysis in antitrust litigation, including in cases involving monopolization, price fixing, and bid rigging, as well as the interplay between antitrust and intellectual property. His intellectual property experience includes valuing patents, trademarks, and trade secrets across a wide range of industries, including computers, information technology, manufacturing, utilities, consumer products, aviation, chemicals, and pharmaceuticals. He has experience in valuing early stage technologies in the pharmaceutical and biotechnology industries. He has studied market structure, competition, and performance of numerous pharmaceutical products, including pricing, marketing and promotion, clinical trials and regulatory approval. He has evaluated commercial success of patented products, including in ANDA actions. Dr. Rao has served as an economics expert in U.S. and foreign courts and in U.S. and international arbitration proceedings.

Dr. Rao teaches finance at Northwestern University and previously taught at UCLA. He also teaches courses on valuing intellectual property at the Licensing Executives Society, where he served as the Chair of the Valuation and Taxation Committee.

Dr. Rao is a partner of Expression Therapeutics LLC, a biotechnology firm focused on advanced therapies for treating hemophilia. He serves on the Board of Directors of the Children's Memorial Hospital in Chicago, on the Board of Trustees of the Rotary/One Foundation, and is a member of the Economic Club of Chicago.



## Academic and Professional Experience

- **Navigant Economics**
  Managing Director, 2010–present
- **LECG**
  Managing Director, 2005–2010
- **Northwestern University**
  McCormick School of Engineering and Applied Science
  Adjunct Professor, 2006–present
- **Charles River Associates / InteCap, Inc.**
  Vice President, CRA, 2004–2005
  Managing Director, InteCap, 2004–2005
  Director, InteCap, 2000–2003
- **University of California, Los Angeles**
  Assistant Professor, 1994–2001
- **Harvard University**
  Fellow, Government Data Center, 1993–1994
  Teaching Fellow, 1993–1994

## Education

- B.S. (Engineering), 1989, **University of Michigan**
- Pre-Doctoral Fellow, 1993–1994, **Harvard University**
- Ph.D.; M.A. (Economics; Int'l Relations), 1994, **University of Colorado**

## Selected Fellowships and Awards

- Cooley Award, University of Michigan College of Engineering
- Government Data Center Fellowship, Harvard University
- David Cattell Fellowship, UCLA
- Faculty Career Development Award, UCLA



## Selected Affiliations

- Member, American Economic Association
- Member, Licensing Executives Society
- Member, Institute of Electrical and Electronics Engineers (IEEE)

## Expert Testimony

1. Multimedia Patent Trust v. **Apple Inc., LG Electronics, Inc. et al.**
   U.S. District Court — Southern District of California
   Case No. 10-CV-2618 JLS RBB

2. The Swatch Group Ltd. et al. v. **Tiffany and Company et al.**
   Netherlands Arbitration Institute
   NAI Case No. 3905

3. Boston Scientific Corporation et al. v. **Mirowski Family Ventures, LLC.**
   U.S. District Court — Southern District of Indiana (Indianapolis Division)
   Civil Action No. 1:11-cv-0736WTL DKL

4. **Tyco Healthcare Group LP et al.** v. Pharmaceutical Holdings Corp. et al.
   U.S. District Court — District of New Jersey
   C.A. No. 07-cv-1299 (SRC)(MAS)

5. Teva Neuroscience, Inc., et al. v. **Watson Laboratories, Inc., et al.**
   U.S. District Court — District of New Jersey
   C.A. No. 2:10-cv-05078 (CCC) (JAD); C.A. No. 2:11-cv-03076 (CCC) (JAD)

6. PSN Illinois, LLC. v. **Abbott Laboratories, Inc. and Abbott Bioresearch Center, Inc.**
   U.S. District Court — Northern District of Illinois (Eastern Division)
   Case No. 09-cv-05879

7. Hoffman-La Roche Inc. v. **Teva Pharmaceuticals USA, Inc. et al.**
   U.S. District Court — New Jersey
   Civ. Action No. 2:09-cv-05283; Civ. Action No. 2:09-cv-06335

8. Aria Diagnostics, Inc. v. **Sequenom, Inc.**
   U.S. District Court — Northern District of California
   Case No. 3:11-cv-06391-SI



9. In re TFT-LCD (Flat Panel) Antitrust Litigation
   On behalf of: **Dell Inc. and Dell Products L.P.**
   U.S. District Court – Northern District of California (San Francisco Division)
   Case No. 10 1064

10. MPEG-LA, L.L.C. v. **Audiovox Electronics Corporation et al.**
    Supreme Court of the State of New York — County of Suffolk (Judge Emily Pines)
    Index No. 24678/08

11. Genzyme Corporation v. **Seikagaku Corporation, Zimmer Holdings, Inc. et al.**
    U.S. District Court — District of Massachusetts (Judge Douglas P. Woodlock)
    C.A. NO.: 1:11-cv-1-636-DPW

12. Rembrandt Vision Technologies, LP et al. v. **Bausch & Lomb, Inc.**
    American Arbitration Association
    Case No. 14 122 Y 00403 09

13. **DSM Desotech Inc.** v. 3D Systems Corporation and 3D Systems, Inc.
    U.S. District Court — Northern District of Illinois (Eastern Division)
    Civil Case No. 08 C 1531

14. Onyx Pharmaceuticals, Inc. v. **Bayer Corporation et al.**
    U.S. District Court — Northern District of California
    Case No. 3:09-cv-02145-MHP

15. **Sanofi-Aventis Deutschland GMBH et al.** v. Glenmark Pharmaceuticals Inc., USA, et al.
    U.S. District Court – District of New Jersey (Judge Dennis M. Cavanaugh)
    C.A. No. 07-CV-05855 (DMC-JAD)

16. **Advanced Stent Technologies, Inc.** v. Boston Scientific Corporation
    American Arbitration Association
    Case Nos. 65 180 Y 00290 08 and 65 489 00292 08

17. Jayhawk Capital Management LLC, et al. v. **LSB Industries, Inc., et al.**
    U.S. District Court – District of Kansas
    Case No.: 08-CV-2561 EFM/JPO

18. Ortho-McNeil-Janssen Pharmaceuticals, Inc. et al. v. **Watson Laboratories, Inc., Sandoz, Inc., Lupin Pharmaceuticals, Inc. et al.**
    U.S. District Court – District of New Jersey
    Civil No.: 08-5103 (SRC)(MAS)



19. **Bristol-Myers Squibb Company (U.S.A.)** v. Daiichi Sankyo Company
    Limited (Japan)
    International Court of Arbitration
    ICC Case No. 15564/EC/VRO

20. Bayer Healthcare Pharmaceuticals, Inc. v. **Schering Corporation**
    Court of Chancery of the State of Delaware
    C.A. No. 3548-VCS

21. **LG Electronics U.S.A., Inc.** et al. v. Whirlpool Corporation et al.
    U.S. District Court – District of Delaware (Judge Gregory M. Sleet)
    Civil Action No.: 08-CV-234

22. **Microsoft Corporation** v. Franchise Tax Board
    Superior Court of the State of California – For the County of San Francisco
    Case No.: CGC 08-471260

23. Securities and Exchange Commission v. Biovail Corporation et al.
    On behalf of: **John Miszuk**
    U.S. District Court – Southern District of New York
    Civil Action No.: 08 Civ. 02979(LAK)

24. **Claredi Corporation** v. SeeBeyond Technology Corporation
    U.S. District Court – Eastern District of Missouri (Eastern Division)
    Civil Action No.: 4:04-CV-1304RWS

25. **LG Electronics U.S.A., Inc.** v. Whirlpool Corporation
    U.S. District Court – Northern District of Illinois (Eastern District)
    Civil Action No.: 08 C 242

26. Unigene Laboratories, Inc. et al. v. **Apotex, Inc. et al.**
    U.S. District Court – Southern District of New York
    Civil Action No.: 06-CV-5571

27. Sanofi-Aventis Canada Inc. et al. v. **Novopharm Limited**
    Federal Court of Canada – Toronto
    Court File No. T-1161-07 Dated December 5, 2007

28. **3M Company et al.** v. Moldex-Metric, Inc.
    U.S. District Court – District of Minnesota
    Civil Action No.: 03-CV-5292 (MJD/AJB)

29. Boehringer Ingelheim Pharmaceuticals, Inc. v. **Abbott Laboratories et al.**
    Private Arbitration — Chicago, Illinois



30. Thomas Johnson v. **Clark/McHugh/Rausch and Walsh/Riteway**
Circuit Court of Cook County, Illinois (County Department, Law Division)
Case No.: 03 L 015015

31. Aventis Pharma S.A. v. **Baxter Healthcare Corporation**
The International Institute for Conflict Prevention and Resolution
CPR File: G-08-05

32. In re K-DUR Antitrust Litigation
On behalf of: **Schering-Plough Corporation**
U.S. District Court – District of New Jersey
Civil Action No.: 01-1652 (JAG); MDL Docket No. 1419

33. The Procter & Gamble Company v. **Ultreo, Inc.**
U.S. District Court – Southern District of New York
Civil Action No. 07 CIV 8379 (HB) (Judge Richard Sullivan)

34. Church & Dwight Co., Inc. v. **Abbott Laboratories**
U.S. District Court – District of New Jersey
Civil Action No. 05 CV 2142 (GEB) (Judge Garrett E. Brown)

35. **Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc.** v. Barr Laboratories Inc.
U.S. District Court – District of Delaware
C.A. No. 05-700-(KAJ) (Judge Joseph J. Farnan, Jr.)

36. **The Dow Chemical Company** v. Shell Oil Company
Circuit Court of Cook County, Illinois (County Department, Law Division)
Civil Action No.: 00L13873

37. Fresenius Medical Care Holdings, Inc.  and Nabi Biopharmaceuticals, Inc.  v. **Roxane Laboratories, Inc.**
U.S. District Court – Southern District of Ohio (Eastern Division)
Case No.: C2 05 889

38. Dyson Technology Limited and Dyson, Inc. v. **Maytag Corporation**
U.S. District Court – District of Delaware
Civil Action No.: 05-434-GMS

39. Casmier Bobak and Jeanette Bobak v. **The City of Chicago et al.**
Circuit Court of Cook County, Illinois (County Department, Law Division)
Case No.: 02 L 6981

40. **Shuffle Master, Inc.** v. Yehia Awada and Gaming Entertainment, Inc.
U.S. District Court – Northern District of Illinois (Eastern Division)



Case No.: CV-S-05-1112-RCJ-RJJ

41. **Schering-Plough, Ltd.** v. Centocor, Inc.
American Arbitration Association
AAA No.: 50 181 T 00350 05 (Judge Edward N. Cahn)

42. Christopher Boyle et al.  v.  **Advanced Bio Prosthetic Surfaces, Ltd., ABPS Management, L.L.C., et al.**
American Arbitration Association
AAA No.: 70 180 Y 00655 04

43. Diodem, LLC v. **Biolase Technology, Inc.** et al.
U.S. District Court – Central Division of California (Western Division)
CV-03-2142 GAF (RCx)

44. Federal Trade Commission v. Mercury Marketing of Delaware, Inc. et al.
On behalf of: **Mercantile Capital LLC**
U.S. District Court – Eastern District of Pennsylvania
C.A. No. 00-CV-3281 (Judge Clifford Scott Green)

45. **Pfizer, Inc., Warner Lambert Company et al.** v. Ranbaxy Laboratories Limited et al.
U.S. District Court – District of Delaware
Case No.: 03-209-JJF (Judge Joseph J. Farnan, Jr.)

46. **ATI Systems, Inc.** v. PECO Energy Company
American Arbitration Association
AAA No.: 14 117 00892 03 (Judge John J. Gibbons)

47. In re Relafen Antitrust Litigation
**Eon Labs, Inc.** v. GlaxoSmithKline PLC et al.
U.S. District Court – District of Massachusetts
Master File No.: 01-12239-WGY; Civil Action No.: 03-10506-WGY

## Preprints and Publications

1. "Innovation Markets," *Market Definition in Antitrust: Theory and Case Studies*, American Bar Association, 2012, Chapter XIII (with Robert Maness).

2. "The Demise of the 25% Rule," *Intellectual Asset Management*, May/June 2011 (with Jonathan Tomlin).

3. "25 Percent Rule Rest in Peace," *Viewpoints*, Vol. XVIII No. 2, April 2011.



4. "Valuing Intellectual Property in Licensing Transactions," *The Licensing Journal*, June/July 2008.

5. "Economic Analysis in Securities Class Certifications," *Litigation Services Handbook: The Role of the Financial Expert*, 2008 Supplement, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2008 (with Cathy M. Niden).

6. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, Fourth Edition, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2007 (with Christian Tregillis).

7. "A Primer on Trademarks and Trademark Valuation," *Economic Damages in Intellectual Property*, Daniel Slottje, Editor, New York: John Wiley, 2006 (with Michaelyn Corbett and David Teece).

8. "What Experts Should Fear Most," *Expert Alert*, Vol. 1, No. 1, Winter 2005, American Bar Association (with John Bone).

9. "Econometric Analysis," *Litigation Services Handbook: The Role of the Financial Expert*, 2003 Supplement, Roman L. Weil, Michael J. Wagner, and Peter B. Frank, Editors, New York: John Wiley, 2004 (with Christian Tregillis).

10. "Inferring Micro– from Macrolevel Change: Ecological Panel Inference in Surveys." Working Paper, UCLA and New York University, 2001 (with Alexander A. Schuessler).

11. "The Dynamics of the Democratic Peace," *Journal of Conflict Resolution*, Vol. 45(6), p. 818–833, 2001 (with Lars–Erik Cederman).

12. "Intellectual Property Protection Improves as India Implements the TRIPS Agreement," *India Business & Investment Report*, June 2000.

13. "TRIPS and Global Trade in Pharmaceuticals," Working paper, UCLA, 2000.

14. "Democratie et Commerce International," *Arès*, Vol. XVIII(46), November 2000 (with Michael D. Ward).

15. "Intellectual Property Rights and Foreign Direct Investment," Working paper, UCLA, 1998 (with Keith Maskus).

16. "Indian Defense Expenditures in a Changed Global Security Environment." *International Studies*, 1998.

17. "The Strategic Design of Trade Policy Outcomes," Working paper, UCLA, 1997 (with Susanne Lohmann).



18. "Patents and International Trade: An Empirical Study." In Robert M. Stern, Edward E. Leamer, and Keith E. Maskus, editors, *Quiet Pioneering*. Ann Arbor: University of Michigan Press, 1997 (with Keith E. Maskus).

19. "Market Openness and Trade Conflict," Working paper, UCLA, 1996.

20. "How Trade–Related are Intellectual Property Rights?" *Journal of International Economics*, Vol. 39, p. 227–248, 1995 (with Keith E. Maskus).

21. "Guns and Growth Around the Globe." *International Interactions*, Vol. 21(2), p. 181–201, 1995 (with Michael D. Ward et al).

22. "North American Trade in the Post Debt Crises Era." In Khosrow Fatemi, editor, *North American Free Trade Agreement: Opportunities and Challenges*. London: Macmillan, 1993, p. 84–97 (with Barry W. Poulson).

23. "Canons et croissance dans le monde," *Arès*, Vol. XIV(4), p. 15–31, 1993 (with Michael D. Ward).

24. "Economic Growth, Investment, and Military Spending in India." In Steve Chan and Alex Mintz, editors, *Defense, Welfare, and Growth*. London: Routledge, 1992, p. 119—136 (with Michael D. Ward et al).

25. "Military Spending in India." *Defence Economics*, Vol. 3, p. 41–64, 1991 (with Michael D. Ward et al).

## Presentations and Speeches

1. "Game Theory Applications to BioPharma Deal Negotiations," Annual Meetings of the Licensing Executives Society, Chicago, September 29, 2010.

2. "Valuing Pharmaceutical and Biotechnology Pipelines," a Professional Development Series Workshop at the Annual Meetings of the Licensing Executives Society, Chicago, September 26, 2010.

3. "Commercializing Technology Through the Power of IP Licensing," a Professional Development Series Course, Licensing Executives Society, Chicago, April 26, 2010.

4. "How to Value High Risk Early Stage Technologies," Mornings@McCormick, Northwestern University, Evanston, April 13, 2010.

5. "Valuation of Early Stage Pharmaceutical and Biotechnology Pipelines," Workshop at the Annual Meetings of the Licensing Executives Society, San Francisco,



October 21, 2009.

6. "Valuation, Taxation, and Pricing Issues with Intellectual Property," Workshop at the Annual Meetings of the Licensing Executives Society, Orlando, October 19, 2008.

7. "Valuation of Early Stage Technologies," Indian School of Business, Hyderabad, India, August 19, 2008.

8. "Valuation of Intellectual Property," 2nd Annual Patent Law Institute, Practising Law Institute, New York, New York, January 14-15, 2008.

9. "Economic Analysis in Class Actions," Seminar on Innovative Strategies for Litigating Class Actions, Law Seminars International, Los Angeles, California, November 12–13, 2007.

10. Recent Key Developments in Intellectual Property Law and Applicability at the Global Level, XPRT Forum, Sonoma, California, October 3-6, 2007.

11. Effective Development and Presentation of Expert Testimony, Law Seminars International, Chicago, Illinois, September 24–25, 2007 (co-chair w/ Alan Silberman).

12. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Chicago, July 10, 2007.

13. "Intellectual Asset Management: Advanced Valuation Skills," a Professional Development Series Advanced Course, Licensing Executives Society, Philadelphia, June 13–14, 2007.

14. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Philadelphia, March 13, 2007.

15. "Intellectual Asset Management: Advanced Valuation Skills," a Professional Development Series Advanced Course, Licensing Executives Society, San Francisco, November 1–2, 2006.

16. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, New York, September 12, 2006.

17. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, San Francisco, April 25, 2006.



18. Effective Development and Presentation of Expert Testimony, Law Seminars International, Chicago, Illinois, March 20–21, 2006 (co-chair w/ Alan Silberman).

19. "Lost Profits When the Patent is Only Part of the Whole," Seminar on Calculating and Proving Patent Damages, Law Seminars International, San Francisco, California, February 27–28, 2006.

20. "The Use and Misuse of Statistics," The American Institute of Certified Public Accountants, Jersey City, New Jersey, December 2, 2005.

21. "Use of Statistics in IP Litigation" Presentation to McAndrews, Held & Malloy, Chicago, December 1, 2005.

22. "Intellectual Asset Management: The Deal," a Professional Development Series Fundamentals Course, Licensing Executives Society, Arlington, Virginia, November 8-9, 2005.

23. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, Phoenix, October 18, 2005.

24. "Damages and Antitrust Issues in Intellectual Property Litigation" Presentation to Dykema Gossett, Chicago, July 21, 2005 (w/ Kathi Kedrowski).

25. "Intellectual Asset Management: Valuation," a Professional Development Series Intermediate Course, Licensing Executives Society, Chicago, July 19, 2005.

26. "Implementing Valuation Methods," a Professional Development Series Intermediate Workshop at the Annual Meetings of the Licensing Executives Society, Boston, October 17, 2004.

27. "Use of Surveys and Statistics in Litigation," Workshop at the Advanced Business Litigation Institute, Palm Springs, May 9, 2003.

28. "Real Option Valuation," Presented at the 2002 Winter Meeting of the Licensing Executives Society, Lake Las Vegas, February 14, 2002.

29. "Networked Computer Simulations," CyberSpace@UCLA, UCLA Anderson School of Management, Los Angeles, May 2, 2002.

30. "Improving IP Financial Performance." Presentation to Jones, Day, Reavis & Pogue, Los Angeles, June 20, 2001 (w/ David Haas).

31. "Intellectual Property: The New Global Currency," Jacob Marschak Colloquium, UCLA Anderson School of Management, June 8, 2001.



32. "Commerce and Democracy."  Presented at the conference on Spatial Analysis for Political Methodology, University of Colorado, Boulder, March 2000.

33. "Determinants of International Trade Flows in an Era of Globalization."  Presented at the UCLA Conference on International Institutions, Lake Arrowhead, February 2000.

34. "Exploring the Dynamics of Interstate Conflict."  Presented at the Meetings of the International Studies Association, Des Moines, Iowa, October 1999.

35. "Exploring the Dynamics of Interstate Conflict."  Presented at the UCLA Conference on Norms in International Relations, Los Angeles, October 1999.

36. "Globalization and the Decline of Power Politics."  Presented at the Annual Meetings of the APSA, Atlanta, September 1999.

37. "Inferring Micro– from Macrolevel Change."  Presented at the Annual Meetings of the MPSA, Chicago, April 1998 (with Alexander A. Schuessler).

38. "Overtime Inference in Cross Sectional Surveys."  Presented at California Institute of Technology, November 7, 1997.

39. "Overtime Inference in Cross Sectional Surveys."  Presented at UCLA, October 8, 1997.

40. "Ecological Inference in Cross Sectional Surveys."  Presented at the Annual Meetings of the APSA, Washington, D.C., August 1997 (with Alexander A. Schuessler).

41. "Governance in a Multinational World."  Presented at the Workshop on Global and Regional Governance, Institute of Global Conflict and Cooperation, UC San Diego, May 1997.

42. "The Strategic Design of Trade Policy Outcomes: The Politics of Section 301."  Presented at the Annual Meetings of the APSA, San Francisco, August 1996 (with Susanne Lohmann).

43. "Polarization and Political Violence."  Presented at the Summer Methods Conference, Ann Arbor, Michigan, July 1996 (with Patrick Asea).

44. "How Trade–Related are Intellectual Property Rights?"  Presented at the International Economics Workshop, UCLA, April 3, 1996.

45. "The Politics of Section 301: Institutional Design and Policy Outcomes."  Presented at the Annual Meetings of the International Studies Association, San Diego, March 1996 (with Susanne Lohmann).



46. "Military Spending in India."  Presented at the Conference on Security in South Asia, Jawaharlal Nehru University, New Delhi, January 1996.

47. "Patents, Trade, and Foreign Direct Investment."  Presented at the Annual Meetings of the Allied Social Science Associations, San Francisco, January 1996 (with Keith E. Maskus).

48. "Forecasting the Collapse of the Soviet Union."  Presented at the Annual Meetings of the Peace Science Society International, Urbana–Champaign, November 1994 (with Michael D. Ward).

49. "Trade and Market Openness."  Presented at the International Colloquium on Defining a New Partnership Between North America and Europe, Institute of Behavioral Science, Boulder, July 1994.

50. "Guns and Growth Around the World."  Presented at the Annual Meetings of the International Studies Association, Washington, D.C., March 1994 (with Michael D. Ward).

51. "Trade and Patents: An Empirical Study."  Presented at the National Bureau of Economic Research Universities Research Conference on International Trade Rules and Institutions, Cambridge, December 1993 (with Keith E. Maskus).

52. "The Trade Crises That Never Happened."  Presented at the 6th Hispanic Symposium on Business and the Economy, Boulder, October 1992 (with Barry W. Poulson).

53. "Export Orientation and Economic Growth: Stylized Facts for Select Developing Countries."  Presented at the Annual Meetings of the International Studies Association, Atlanta, April 1992 (with David R. Davis).

Tab 4

**WEB SURVEY – Impervious Surgical Gowns**

Participants are prompted by the following:

**Thank you for agreeing to participate in this survey.  The survey should take approximately 15 minutes of your time.  The objective of this survey is to evaluate the factors that drive the selection of surgical gowns.**

*SCREENING AND BASELINE QUESTIONS*

1.  Please select the work setting in which you spend the majority of your time.
    \_\_\_\_\_ Academic Hospital
    \_\_\_\_\_ Community Hospital
    \_\_\_\_\_ Military Hospital
    \_\_\_\_\_ Private Practice
    \_\_\_\_\_ Clinic
    \_\_\_\_\_ Surgery Center
    \_\_\_\_\_ Other (Specify)
    **[PROGRAMMER NOTE:  IF PRIVATE PRACTICE OR OTHER, THANK AND TERMINATE]**

2.  Which of the following best describes your role in the hospital?
    \_\_\_\_\_ Surgeon
    \_\_\_\_\_ OR Nurse
    \_\_\_\_\_ Purchaser of supplies/Supply Chain Materials Management for OR
    \_\_\_\_\_ Other
    **IF SURGEON, PROCEED TO QUESTION 3**
    **IF OR NURSE, PROCEED TO QUESTION 6**
    **IF PURCHASER OF SUPPLIES FOR OR, PROCEED TO QUESTION 11**
    **[PROGRAMMER NOTE:  IF OTHER, THANK AND TERMINATE]**

**SURGEON ONLY**

3.  Please indicate your surgical specialty.
    \_\_\_\_\_ General Surgery
    \_\_\_\_\_ Cardiothoracic Surgery
    \_\_\_\_\_ Surgical Oncology
    \_\_\_\_\_ Neurosurgery
    \_\_\_\_\_ Genitourinary Surgery
    \_\_\_\_\_ Orthopedic Surgery
    \_\_\_\_\_ OB/GYN Surgery
    \_\_\_\_\_ Other
    **[PROGRAMMER NOTE:  IF OTHER, THANK AND TERMINATE]**

**SURGEON ONLY**

4.  How many years have you been in practice (post-residency)?
    \_\_\_\_\_ Years
    **[PROGRAMMER NOTE: Open numeric 0-60]**
    **[PROGRAMMER NOTE:  IF LESS THAN 3 OR GREATER THAN 30, THANK AND TERMINATE]**

**SURGEON ONLY**

5.  On average, how many surgical cases do you have per month?
    \_\_\_\_
    **[PROGRAMMER NOTE:  IF LESS THAN 15, THANK AND TERMINATE]**

**NURSE ONLY**

6.  How many years have you been working in the OR?

_____ Years

[PROGRAMMER NOTE: Open numeric 0-60]

[PROGRAMMER NOTE:  IF LESS THAN 3 OR GREATER THAN 35, THANK AND TERMINATE]

**NURSE ONLY**

7.  On average, how many surgical cases do you participate in per month?
_____

[PROGRAMMER NOTE:  IF LESS THAN 15, THANK AND TERMINATE]

**NURSE AND SURGEON**

8.  Does your institution currently use single-use (i.e., disposable) surgical drapes or gowns?
_____ YES
_____ NO

[PROGRAMMER NOTE:  IF NO, TERMINATE]

**NURSE AND SURGEON**

9.  Do you use surgical gowns for your institution that could be classified as "fluid-resistant" or "impervious" in surgeries where you are exposed to blood and other bodily fluids?
_____ **YES**
_____ **NO**

[PROGRAMMER NOTE:  IF NO, TERMINATE]

**NURSE AND SURGEON**

10.  Do you have any influence in the types of surgical gowns and drapes or brands that are supplied in the OR specifically surgical gowns and drapes?
_____ YES
_____ NO

[PROGRAMMER NOTE: COUNT SURGEON AND OR NURSE QUOTAS AFTER Q10; END SCREENER]

**PURCHASING**

11.  What is your title?
_____

[PROGRAMMER NOTE: OPEN FIELD TEXT BOX]

**PURCHASING**

12.  How many ORs are there in your hospital that you are responsible for ordering supplies?
_____

[PROGRAMMER NOTE:  IF Q12 < 8 TERMINATE]

**PURCHASING**

13.  Does your institution currently use single-use (i.e., disposable) surgical drapes or gowns?
_____ YES
_____ NO

[PROGRAMMER NOTE:  IF NO, TERMINATE]

**PURCHASING**

14.  Do you order surgical gowns for your institution that could be classified as "fluid-resistant" or "impervious" for use in surgeries where the surgical staff are exposed to blood and other bodily fluids?
_____ YES
_____ NO

[PROGRAMMER NOTE:  IF NO, TERMINATE, OTHERWISE COUNT TOWARDS QUOTA FOR PURCHASING AGENT]

**PURCHASING**

15.  Do you have any influence in the types of surgical gowns and drapes or brands that are supplied in the OR specifically surgical gowns and drapes?
_____ YES
_____ NO

[PROGRAMMER NOTE:  IF NO, TERMINATE]

# Tab 5

Tab 5

# Demographics of Survey Sample

| Population Category | Proportion of Sample / Mean | Survey Sample | | Standard Deviation |
| --- | --- | --- | --- | --- |
| | | Minimum | Maximum | |

**Surgeons & Nurses[1]**

Work setting

| | | | | |
| --- | --- | --- | --- | --- |
| Community Hospital | 61% | | | 3% |
| Clinic | 1% | | | 1% |
| Academic Hospital | 30% | | | 2% |
| Surgery Center | 6% | | | 1% |
| Military Hospital | 2% | | | 0% |
| Private Practice | 0% | | | 0% |

**Surgeons Only**

Surgical Specialty

| | | | | |
| --- | --- | --- | --- | --- |
| Cardiothoracic Surgery | 14% | | | 3% |
| General Surgery | 35% | | | 4% |
| Genitourinary Surgery | 10% | | | 2% |
| Neurosurgery | 9% | | | 2% |
| OB/GYN Surgery | 10% | | | 2% |
| Orthopedic Surgery | 14% | | | 3% |
| Surgical Oncology | 9% | | | 2% |
| Other | 0% | | | 0% |
| Years in Practice (Post-Residency) | 14.6 | 3 | 30 | 7.6 |
| Surgical Cases / Month[2] | 40.4 | 15 | 540 | 42.5 |

Confidential

| Population Category | Survey Sample | | | |
| --- | --- | --- | --- | --- |
| | Proportion of Sample / Mean | Minimum | Maximum | Standard Deviation |
| **Surgical Nurses Only** | | | | |
| Years working in OR | 16.3 | 4 | 35 | 8.6 |
| Surgical Cases / Month[3] | 99.1 | 15 | 830 | 111.8 |
| **Procurement Personnel[4]** | | | | |
| Work setting | | | | |
| *Community Hospital* | 76% | | | 4% |
| *Clinic* | 0% | | | 0% |
| *Academic Hospital* | 23% | | | 4% |
| *Surgery Center* | 1% | | | 1% |
| *Military Hospital* | 0% | | | 0% |
| *Private Practice* | 0% | | | 0% |
| ORs Supplied | 15.7 | 8 | 52 | 9.6 |

**Notes and Sources:**

[1] The total survey sample of surgeons and nurses (after dropping 43 respondents with inconsistent responses) includes 342 respondents (185 surgeons and 157 surgical nurses).

[2a] Some answers may represent annual rather than monthly estimates, so average may be overstated. I note that the median number of reported monthly cases is 32.

[2b] According to an American Board of Surgery study, during 2007-2009, 88 percent of surgeons seeking recertification were men who performed an average of 506 operative cases per year, and 12 percent of surgeons seeking recertification were women who performed an average of 375 operative cases per year. This represents an average of approximately 42 operative cases per month for male surgeons seeking recertication, and an average of approximately 31 operative cases per month for female surgeons seeking recertication. See Bruce Jancin, "Spike Seen in General Surgeons' Caseloads," American College of Surgeons, Vol. 7, No. 5, May 2011, page 4.

[3] Some answers may represent annual rather than monthly estimates, so average may be overstated. I note that the median number of monthly cases is 75.

[4] The total survey sample of procurement personnel (after dropping 7 respondents with inconsistent responses) includes 93 respondents.

Tab 5

Confidential

Tab 6

Tab 6

# Formula for Calculating Sample Size for a Large Sample

The appropriate sample size for a desired confidence level and margin of error can be calculated as:

$$n \geq \frac{z^2(p)(1-p)}{d^2}$$

where:

- "n" is the sample size;

- "z" is the confidence level;

- "d" is the margin of error or the precision of the result provided by the random sample; and

- "p" is a number between 0 and 1 and refers to the likelihood of occurrence of the pertinent outcome.

For a confidence interval of 95 percent and a margin of error of ± 5 percent, the appropriate sample size is:

$$n \geq \frac{(1.96)^2(0.5)(1-0.5)}{(0.05)^2} \approx 384$$

Confidential

Tab 7

Tab 7

# Formula for Calculating Sample Size for a Small Sample

$$n = \frac{N\,z^2 pq}{[E^2(N-1) + z^2 pq]}$$

where:

- "n" is the sample size;

- "N" is the population size;

- "z" is the confidence level;

- "E" is the margin of error or the precision of the result provided by the random sample; and

- "p" and "q" is a number between 0 and 1 and refers to the likelihood of occurrence of the pertinent outcome.

For a confidence interval of 95 percent and a margin of error of ± 10 percent, the appropriate sample size is:

$$n = \frac{(5,000)(1.96)^2(0.50)(0.50)}{[(0.10)^2(5,000-1)+1.96^2(0.50)(0.50)]} \approx 94$$

**Notes and Sources:**

[1] Hypergeometric distribution used.   See Evan Morris, "Sampling from Small Populations," pages 1-4.

Tab 8

# Surgeon and Surgical Nurse Survey

**Background**

The objective of this survey is to evaluate the factors that drive the selection of surgical gowns.

1. If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be impervious? [Yes / No]

2. If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

3. If a surgical gown is made of impervious fabric, and the seams of the gown prevent the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

4. If a surgical gown is made of impervious fabric, but the seams of the gown allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

5.  Are you familiar with the AAMI (Association for the Advancement of Medical Instrumentation) Levels for the fluid resistance of a surgical gown? [Yes / No]

---

The AAMI PB70 standard establishes a classification system and the associated minimum requirements for the liquid barrier performance of protective apparel and drapes based on industry-accepted test methods. Under AAMI PB70, surgical gowns are classified and labeled according to the barrier performance properties of their critical zones. Those critical zones are the front area of the gown from chest to knees (area A) and the sleeves from the cuff to above the elbow (area B). AAMI PB70 requires that all critical zone components—the materials, the seams, and the points of attachments—be tested. For a surgical gown to qualify as AAMI Level 4, AAMI PB70 requires that all critical zone components must prevent the passage of liquid and liquid-borne microorganisms.



6.  If a surgical gown prevents the passage of liquid or liquid-borne microorganisms in the shaded areas depicted, then what AAMI Level does that gown meet?
    a.  AAMI Level 1
    b.  AAMI Level 2
    c.  AAMI Level 3
    d.  AAMI Level 4
    e.  None
    f.  Don't know

7.  Are you aware of color-key systems used by manufacturers to differentiate surgical gowns based on their barrier protection? [Yes / No]

8.  Does the red color in the color-key system depicted here convey any message about which areas of the gown are impervious? [Yes / No]






9.  Would you expect the shaded areas in the red column of the color-key system depicted here to allow the passage of liquids or liquid-borne microorganisms? [Yes / No]



10. Which areas of the gown in the color-key system depicted here do you understand to be impervious? (Select all that apply)
    a.  Front of gown in the shaded area
    b.  Sleeve material in the shaded area
    c.  Sleeve seams in the shaded area
    d.  Other (please describe): _____
    e.  None
    f.  Don't know
    **[PROGRAMMING NOTE: REPEAT IMAGE FROM Q9]**

11. Would you expect the sleeve seams in the red column of the color-key system depicted here to prevent penetration by liquid or liquid-borne microorganisms? [Yes / No]
    **[PROGRAMMING NOTE: REPEAT IMAGE FROM Q9]**

12. Do you associate the surgical gown in the image with any of the AAMI Levels? [Yes / No]



13. With which AAMI Level do you associate the surgical gown in the image?
   a.   AAMI Level 1
   b.   AAMI Level 2
   c.   AAMI Level 3
   d.   AAMI Level 4
   e.   None
   f.   Don't Know

**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q12]**
**[PROGRAMMING NOTE: ONLY DISPLAY Q13 IF Q12 IS "Yes"]**

14. Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown? [Yes / No]

15. Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as "impervious"? [Yes / No]
**[PROGRAMMING NOTE: ONLY DISPLAY Q15 IF Q14 IS "Yes"]**

16. Which areas of the Kimberly-Clark KC-400 MicroCool Surgical Gown do you understand to be impervious?
   a.   Front of gown in the shaded area
   b.   Sleeve material in the shaded area
   c.   Sleeve seams in the shaded area
   d.   Other (please describe): _____
   e.   None
   f.   Don't know

**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q9]**
**[PROGRAMMING NOTE: ONLY DISPLAY Q16 IF Q14 IS "Yes" AND Q15 IS "Yes"]**

17. Based on Kimberly-Clark's description and its color-key system, what AAMI Level do you understand the KC-400 MicroCool Surgical Gown to be?

   a. AAMI Level 1
   b. AAMI Level 2
   c. AAMI Level 3
   d. AAMI Level 4
   e. None
   f. Don't know

   **[PROGRAMMING NOTE: ONLY DISPLAY Q17 IF Q15 IS "Yes"]**

18. Which of the following surgical gowns have you used? (Select all that apply)

   a. Cardinal Health  SmartGown
   b. Kimberly-Clark KC-400 MicroCool Surgical Gown
   c. Medline PreventionPlus
   d. Other (please describe): _____
   e. None
   f. Don't know

19. Rank the following attributes in order of importance when selecting the Kimberly-Clark KC-400 MicroCool Surgical Gown. (Scale is 1-4, where 1 is most important, and 4 is least important, however if you write a response in "Other," please rank from 1-5 where 5 is least important).

   ____ Comfort
   ____ Breathability
   ____ Barrier protection
   ____ Price
   ____ Other (please describe): _____

   **[PROGRAMMING NOTE: ONLY DISPLAY Q19 IF Q18(b) IS SELECTED]**

20. If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have used a different surgical gown whose sleeve seams are impervious? [Yes / No]

   **[PROGRAMMING NOTE: ONLY DISPLAY Q20 IF Q18(b) IS SELECTED]**

# Tab 9

# Procurement Personnel Survey

**Background**

The objective of this survey is to evaluate the factors that drive the selection of surgical gowns.

1. Do you order surgical gowns for your institution that could be classified as "impervious" for use in surgeries where the surgical staff are exposed to blood and other bodily fluids? [Yes / No]

2. When ordering surgical gowns, do you seek input from any of the following? (Select all that apply)
   a. Surgeons and/or Nurses
   b. Administrators
   c. Other (please describe): _____
   d. None

3. If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be impervious? [Yes / No]

4. If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

5. If a surgical gown is made of impervious fabric, and the seams of the gown prevent the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

6. If a surgical gown is made of impervious fabric, but the seams of the gown allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

7. Are you familiar with the AAMI (Association for the Advancement of Medical Instrumentation) Levels for the fluid resistance of a surgical gown? [Yes / No]

The AAMI PB70 standard establishes a classification system and the associated minimum requirements for the liquid barrier performance of protective apparel and drapes based on industry-accepted test methods. Under AAMI PB70, surgical gowns are classified and labeled according to the barrier performance properties of their critical zones. Those critical zones are the front area of the gown from chest to knees (area A) and the sleeves from the cuff to above the elbow (area B). AAMI PB70 requires that all critical zone components—the materials, the seams, and the points of attachments—be tested. For a surgical gown to qualify as AAMI Level 4, AAMI PB70 requires that all critical zone components must prevent the passage of liquid and liquid-borne microorganisms.



8.  If a surgical gown prevents the passage of liquid or liquid-borne microorganisms in the shaded areas depicted, then what AAMI Level does that gown meet?
    a.  AAMI Level 1
    b.  AAMI Level 2
    c.  AAMI Level 3
    d.  AAMI Level 4
    e.  None
    f.  Don't know

9.  Are you aware of color-key systems used by manufacturers to differentiate surgical gowns based on their barrier protection? [Yes / No]

10. Does the red color in the color-key system depicted here convey any message about which areas of the gown are impervious? [Yes / No]

 



11. Would you expect the shaded areas in the red column of the color-key system depicted here to allow the passage of liquids or liquid-borne microorganisms? [Yes / No]



12. Which areas of the gown in the color-key system depicted here do you understand to be impervious? (Select all that apply)
   a.   Front of gown in the shaded area
   b.   Sleeve material in the shaded area
   c.   Sleeve seams in the shaded area
   d.   Other (please describe): _____
   e.   None
   f.   Don't know
   **[PROGRAMMING NOTE: REPEAT IMAGE FROM Q11]**

13. Would you expect the sleeve seams in the red column of the color-key system depicted here to prevent penetration by liquid or liquid-borne microorganisms? [Yes / No]
   **[PROGRAMMING NOTE: REPEAT IMAGE FROM Q11]**

14.  Do you associate the surgical gown in the image with any of the AAMI Levels? [Yes / No]



15.  With which AAMI Level do you associate the surgical gown in the image?
   a.  AAMI Level 1
   b.  AAMI Level 2
   c.  AAMI Level 3
   d.  AAMI Level 4
   e.  None
   f.  Don't Know

**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q14]**
**[PROGRAMMING NOTE: ONLY DISPLAY Q15 IF Q14 IS "Yes"]**

16.  Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown? [Yes / No]

17.  Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as "impervious"? [Yes / No]
**[PROGRAMMING NOTE: ONLY DISPLAY Q17 IF Q16 IS "Yes"]**

18.  Which areas of the Kimberly-Clark KC-400 MicroCool Surgical Gown do you understand to be impervious?
   a.  Front of gown in the shaded area
   b.  Sleeve material in the shaded area
   c.  Sleeve seams in the shaded area
   d.  Other (please describe): _____
   e.  None
   f.  Don't know

**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q11]**
**[PROGRAMMING NOTE: ONLY DISPLAY Q18 IF Q16 IS "Yes" AND Q17 IS "Yes"]**

19. Based on Kimberly-Clark's description and its color-key system, what AAMI Level do you understand the KC-400 MicroCool Surgical Gown to be?

   a.   AAMI Level 1
   b.   AAMI Level 2
   c.   AAMI Level 3
   d.   AAMI Level 4
   e.   None
   f.   Don't know

**[PROGRAMMING NOTE: ONLY DISPLAY Q19 IF Q17 IS "Yes"]**

20. Which of the following surgical gowns have you purchased? (Select all that apply)

   a.   Cardinal Health  SmartGown
   b.   Kimberly-Clark KC-400 MicroCool Surgical Gown
   c.   Medline PreventionPlus
   d.   Other (please describe): _____
   e.   None
   f.   Don't know

21. Rank the following attributes in order of importance when selecting the Kimberly-Clark KC-400 MicroCool Surgical Gown. (Scale is 1-4, where 1 is most important, and 4 is least important, however if you write a response in "Other," please rank from 1-5 where 5 is least important).

   ____   Comfort
   ____   Breathability
   ____   Barrier protection
   ____   Price
   ____   Other (please describe): _____

**[PROGRAMMING NOTE: ONLY DISPLAY Q21 IF Q20(b) IS SELECTED]**

22. If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have purchased a different surgical gown whose sleeve seams are impervious? [Yes / No]

**[PROGRAMMING NOTE: ONLY DISPLAY Q22 IF Q20(b) IS SELECTED]**

# Tab 10

Tab 10

# Survey Conclusions
## Surgeons and Surgical Nurses

| Surgeons and Surgical Nurses Questions | Response | % of Respondents | 95% Confidence Interval | Total Number of Respondents |
|---|---|---|---|---|
| **Awareness** | | | | |
| Q1: Are you familiar with the AAMI (Association for the Advancement of Medical Instrumentation) Levels for the fluid resistance of a surgical gown? | Yes | 29.8% | +/- 4.9% | 342 |
| Q2: If a surgical gown is made of impervious fabric, and the seams of the gown prevent the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? | Yes | 92.1% | +/- 2.9% | 342 |
| Q3: If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be impervious? | No | 93.0% | +/- 2.7% | 342 |
| Q4: If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? | No | 96.8% | +/- 2.1% | 283 |
| **Confusion** | | | | |
| Q5: Are you aware of color-key systems used by manufacturers to differentiate surgical gowns based on their barrier protection? | Yes | 24.9% | +/- 4.6% | 342 |
| Q6: Would you expect the sleeve seams in the red column of the color-key system depicted here to prevent penetration by liquid or liquid-borne microorganisms? | Yes | 83.9% | +/- 3.9% | 342 |
| Q7: With which AAMI Level do you associate the surgical gown in the image?[1] | AAMI Level 1 | 3.4% | +/- 2.1% | 291 |
| | AAMI Level 2 | 5.5% | +/- 2.6% | 291 |
| | AAMI Level 3 | 10.7% | +/- 3.6% | 291 |
| | AAMI Level 4 | 76.3% | +/- 4.9% | 291 |
| | Don't Know | 4.1% | +/- 2.3% | 291 |

Confidential

Tab 10

| Surgeons and Surgical Nurses Questions | Response | % of Respondents | 95% Confidence Interval | Total Number of Respondents |
|---|---|---|---|---|
| **Materiality** | | | | |
| **Q8:** Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown? | Yes | 31.3% | +/- 4.9% | 342 |
| **Q9:** Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as "impervious?"[2] | Yes | 71.0% | +/- 8.7% | 107 |
| **Q10:** Which areas of the Kimberly-Clark KC-400 MicroCool Surgical Gown do you understand to be impervious?[3] | Front of gown in the shaded area | 94.7% | +/- 5.1% | 76 |
| | Sleeve material in the shaded area | 85.5% | +/- 8.1% | 76 |
| | Sleeve seams in the shaded area | 72.4% | +/- 10.3% | 76 |
| | Other (please describe): | 0.0% | | 76 |
| | None | 0.0% | | 76 |
| | Don't know | 3.9% | +/- 4.2% | 76 |
| **Q11:** Based on Kimberly-Clark's description and its color-key system, what AAMI Level do you understand the KC-400 MicroCool Surgical Gown to be?[4] | AAMI Level 1 | 6.6% | +/- 5.7% | 76 |
| | AAMI Level 2 | 5.3% | +/- 5.1% | 76 |
| | AAMI Level 3 | 10.5% | +/- 7.1% | 76 |
| | AAMI Level 4 | 72.4% | +/- 10.3% | 76 |
| | Don't know | 5.3% | +/- 5.1% | 76 |
| **Q12:** Which of the following gowns have you used? | Cardinal Health  SmartGown | 39.2% | +/- 5.2% | 342 |
| | Kimberly-Clark KC-400 MicroCool Surgical Gown | 22.5% | +/- 4.4% | 342 |
| | Medline PreventionPlus | 30.4% | +/- 4.9% | 342 |
| | Other (please describe): | 6.4% | +/- 2.6% | 342 |
| | None | 1.8% | +/- 1.4% | 342 |
| | Don't know | 31.9% | +/- 5.0% | 342 |

Confidential

Tab 10

| Surgeons and Surgical Nurses Questions | | Response | % of Respondents | 95% Confidence Interval | Total Number of Respondents |
|---|---|---|---|---|---|
| **Q13:** Rank the following attributes in order of importance when selecting the Kimberly-Clark KC-400 MicroCool Surgical Gown (scale is 1-4, where 1 is most important, and 4 is least important, however if you write a response in "Other," please rank from 1-5 where 5 is least important.).[5] | 1 | Comfort | 11.7% | +/- 7.3% | 77 |
| | | Breathability | 7.8% | +/- 6.1% | 77 |
| | | Barrier Protection | 79.2% | +/- 9.3% | 77 |
| | | Price | 1.3% | +/- 1.9% | 77 |
| | | Other (please describe): | 0.0% | | 77 |
| | 2 | Comfort | 45.5% | +/- 11.4% | 77 |
| | | Breathability | 31.2% | +/- 10.6% | 77 |
| | | Barrier Protection | 14.3% | +/- 8.0% | 77 |
| | | Price | 9.1% | +/- 6.6% | 77 |
| | | Other (please describe): | 0.0% | | 77 |
| | 3 | Comfort | 28.6% | +/- 10.3% | 77 |
| | | Breathability | 48.1% | +/- 11.4% | 77 |
| | | Barrier Protection | 5.2% | +/- 5.1% | 77 |
| | | Price | 18.2% | +/- 8.8% | 77 |
| | | Other (please describe): | 0.0% | | 77 |
| | 4 | Comfort | 14.3% | +/- 8.0% | 77 |
| | | Breathability | 13.0% | +/- 7.7% | 77 |
| | | Barrier Protection | 1.3% | +/- 1.9% | 77 |
| | | Price | 71.4% | +/- 10.3% | 77 |
| | | Other (please describe): | 0.0% | | 77 |
| **Q14:** If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have used a different surgical gown whose sleeve seams are impervious? | | Yes | 90.9% | +/- 6.6% | 77 |
| **Q14*:** If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have used a different surgical gown whose sleeve seams are impervious? | | Yes, additionally: **Q9:** Yes, aware of KC-400 as impervious **Q13:** Barrier Protection ranked #1 | 58.4% | +/-11.3% | 77 |

**Notes:**
[1] **Q7** was only asked if respondent answered "Yes" to "Do you associate the surgical gown in the image with any of the AAMI Levels?" See Tab 8, question number 12 for the image of the surgical gown.
[2] **Q9** was only asked if respondent answered "Yes" to **Q8**.
[3] **Q10** was only asked if respondent answered "Yes" to **Q8** and **Q9**.
[4] **Q11** was only asked if respondent answered "Yes" to **Q9**.
[5] **Q13** was only asked if respondent selected "Kimberly-Clark KC-400 MicroCool Surgical Gown" in **Q12**.
[6] **Q14** was only asked if respondent selected "Kimberly-Clark KC-400 MicroCool Surgical Gown" in **Q12**. One respondent supplied his/her own response as a fifth most important attribute: "Availability".
[7] The total survey sample (after dropping 43 respondents with inconsistent responses) includes 342 respondents (185 surgeons and 157 surgical nurses).
[8] For **Q10** and **Q12**, respondents were permitted to select several of the provided answers.

Confidential

# Tab 11

# Survey Conclusions
## *Purchasing Personnel*

| Purchasing Personnel Questions | Response | % of Respondents | 95% Confidence Interval | Total Number of Respondents |
|---|---|---|---|---|
| **Awareness** | | | | |
| **Q1:** Are you familiar with the AAMI (Association for the Advancement of Medical Instrumentation) Levels for the fluid resistance of a surgical gown? | Yes | 61.3% | +/- 10.1% | 93 |
| **Q2:** If a surgical gown is made of impervious fabric, and the seams of the gown prevent the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? | Yes | 93.5% | +/- 5.1% | 93 |
| **Q3:** If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be impervious? | No | 94.6% | +/- 4.7% | 93 |
| **Q4:** If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? | No | 95.7% | +/- 4.2% | 93 |
| **Confusion** | | | | |
| **Q5:** Are you aware of color-key systems used by manufacturers to differentiate surgical gowns based on their barrier protection? | Yes | 45.2% | +/- 10.3% | 93 |
| **Q6:** Would you expect the sleeve seams in the red column of the color-key system depicted here to prevent penetration by liquid or liquid-borne microorganisms? | Yes | 86.0% | +/- 7.2% | 93 |
| **Q7:** With which AAMI Level do you associate the surgical gown in the image?[1] | AAMI Level 1 | 6.3% | +/- 5.4% | 80 |
| | AAMI Level 2 | 10.0% | +/- 6.7% | 80 |
| | AAMI Level 3 | 23.8% | +/- 9.5% | 80 |
| | AAMI Level 4 | 57.5% | +/- 11.1% | 80 |
| | Don't Know | 2.5% | +/- 3.0% | 80 |

Tab 11

**Materiality**

| Purchasing Personnel Questions | Response | % of Respondents | 95% Confidence Interval | Total Number of Respondents |
|---|---|---|---|---|
| **Q8:** Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown? | Yes | 55.9% | +/- 10.3% | 93 |
| **Q9:** Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as "impervious"?[2] | Yes | 80.8% | +/- 11.1% | 52 |
| **Q10:** Which areas of the Kimberly-Clark KC-400 MicroCool Surgical Gown do you understand to be impervious?[3] | Front of gown in the shaded area | 88.1% | +/- 10.2% | 42 |
| | Sleeve material in the shaded area | 78.6% | +/- 12.9% | 42 |
| | Sleeve seams in the shaded area | 61.9% | +/- 15.3% | 42 |
| | Other (please describe): | 2.4% | +/- 3.6% | 42 |
| | None | 0.0% | +/- 0.0% | 42 |
| | Don't know | 4.8% | +/- 5.7% | 42 |
| **Q11:** Based on Kimberly-Clark's description and its color-key system, what AAMI Level do you understand the KC-400 MicroCool Surgical Gown to be?[4] | AAMI Level 1 | 4.8% | +/- 5.7% | 42 |
| | AAMI Level 2 | 2.4% | +/- 3.6% | 42 |
| | AAMI Level 3 | 23.8% | +/- 13.4% | 42 |
| | AAMI Level 4 | 59.5% | +/- 15.5% | 42 |
| | Don't know | 9.5% | +/- 9.3% | 42 |
| **Q12:** Which of the following gowns have you purchased? | Cardinal Health  SmartGown | 58.1% | +/- 10.2% | 93 |
| | Kimberly-Clark KC-400 MicroCool Surgical Gown | 37.6% | +/- 10.0% | 93 |
| | Medline PreventionPlus | 60.2% | +/- 10.1% | 93 |
| | Other (please describe): | 2.2% | +/- 2.6% | 93 |
| | None | 1.1% | +/- 1.6% | 93 |
| | Don't know | 2.2% | +/- 2.6% | 93 |

Confidential

Tab 11

Tab 11

| Purchasing Personnel Questions | | Response | % of Respondents | 95% Confidence Interval | Total Number of Respondents |
|---|---|---|---|---|---|
| **Q13:** Rank the following attributes in order of importance when selecting the Kimberly-Clark KC-400 MicroCool Surgical Gown (scale is 1-4, where 1 is most important, and 4 is least important, however if you write a response in "Other," please rank from 1-5 where 5 is least important).[5] | 1 | Comfort | 11.4% | +/- 11.1% | 35 |
| | | Breathability | 0.0% | | 35 |
| | | Barrier Protection | 88.6% | +/- 11.1% | 35 |
| | | Price | 0.0% | | 35 |
| | | Other (please describe): | 0.0% | | 35 |
| | 2 | Comfort | 28.6% | +/- 15.7% | 35 |
| | | Breathability | 37.1% | +/- 16.8% | 35 |
| | | Barrier Protection | 2.9% | +/- 4.3% | 35 |
| | | Price | 28.6% | +/- 15.7% | 35 |
| | | Other (please describe): | 50.0% | +/- 50.0% | 35 |
| | 3 | Comfort | 42.9% | +/- 17.2% | 35 |
| | | Breathability | 28.6% | +/- 15.7% | 35 |
| | | Barrier Protection | 8.6% | +/- 9.2% | 35 |
| | | Price | 20.0% | +/- 13.9% | 35 |
| | | Other (please describe): | 0.0% | | 35 |
| | 4 | Comfort | 17.1% | +/- 13.1% | 35 |
| | | Breathability | 34.3% | +/- 16.5% | 35 |
| | | Barrier Protection | 0.0% | | 35 |
| | | Price | 48.6% | +/- 17.4% | 35 |
| | | Other (please describe): | 0.0% | | 35 |
| **Q14:** If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have purchased a different surgical gown whose sleeve seams are impervious? | | Yes | 74.3% | +/- 15.2% | 35 |
| **Q14':** If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have purchased a different surgical gown whose sleeve seams are impervious? | | Yes, additionally: **Q9:** Yes, aware of KC-400 as impervious **Q13:** Barrier Protection ranked #1 | 57.1% | +/-17.2% | 35 |

**Notes:**

[1] **Q7** was only asked if respondent answered "Yes" to "Do you associate the surgical gown in the image with any of the AAMI Levels?"
See Tab 9, question number 14 for the image of the surgical gown.
[2] **Q9** was only asked if respondent answered "Yes" to **Q8**.
[3] **Q10** was only asked if respondent answered "Yes" to **Q8** and **Q9**.
[4] **Q11** was only asked if respondent answered "Yes" to **Q9**.
[5] **Q13** was only asked if respondent selected "Kimberly-Clark KC-400 MicroCool Surgical Gown" in **Q12**.
One respondent supplied his/her own response: "Surgeon Preference."
[6] **Q14** was only asked if respondent selected "Kimberly-Clark KC-400 MicroCool Surgical Gown" in **Q12**.
[7] The total survey sample (after dropping 7 respondents with inconsistent responses) includes 93 respondents.
[8] For **Q10** and **Q12**, respondents were permitted to select several of the provided answers.

Confidential