# Exhibit 2

# EXPERT REPORT OF
# DR. KENNETH L. BERNHARDT

*Kimberly-Clark Corporation*
*v.*
*Cardinal Health 200, LLC f/k/a; Cardinal Health 200, Inc.*

Prepared by:
Dr. Kenneth L. Bernhardt
Georgia State University
January 4, 2013

## INTRODUCTION

1.  I am Regents Professor of Marketing Emeritus at the J. Mack Robinson College of Business at Georgia State University. I teach Strategic Marketing Management and Consumer Behavior. During 1983-84, I was Visiting Professor of Business Administration at the Harvard Business School. I have also taught at the University of Michigan and Virginia Tech (V.P.I.), and have served as Visiting Research Professor at the Marketing Science Institute in Cambridge, MA.

2.  My work experience includes consulting and research assignments for a number of organizations including Chick-fil-A, HoneyBaked Ham, Skanska, AirTran Airways, Carter's/OshKoshB'gosh, BellSouth, IBM, UPS, Holiday Inns, Southern Mills, Coca-Cola, Snapper, Information America, CheckFree, Century 21, Engauge Digital, Centers for Disease Control & Prevention, and The Federal Trade Commission. My other activities include service as past Chairman of the Board of the 45,000 member American Marketing Association, past President and former Executive Secretary of the Association for Consumer Research, and past Chairman of the Board of Trustees of the American Marketing Association Foundation. I currently serve on the Boards of Directors and executive committees of the Atlanta Convention and Visitors Bureau (past chair), Junior Achievement of Georgia, Leadership Atlanta (immediate past chair), Community Foundation of Greater Atlanta (chair), and the Georgia State University Foundation (chair).

3.  I have published more than a dozen books and monographs (including two leading marketing textbooks) and numerous articles on marketing and consumer behavior in the JOURNAL OF BUSINESS RESEARCH, the JOURNAL OF PUBLIC POLICY AND MARKETING, the JOURNAL OF RETAILING, JOURNAL OF SERVICES MARKETING, BUSINESS, AMERICAN EDUCATION RESEARCH JOURNAL, and the Proceedings of the Annual Conferences of the Association for Consumer Research, the American Marketing Association and the American Psychological Association.

4.     I serve on the Council of Better Business Bureaus' National Advertising Review Board and am a past chair of the U.S. Census Bureau Marketing Advisory Board.

5.     My qualifications are set forth in further detail in Appendix A.

6.     I am submitting this report at the request of Bryan Cave LLP, counsel for Kimberly-Clark, in the matter of *Kimberly-Clark Corporation v. Cardinal Health 200, LLC f/k/a; Cardinal Health 200, Inc.*, Case No. 10-cv-0034-CAP, United States District Court, Northern District of Georgia.

7.     I have been asked to opine on the sampling process and results of analysis for the survey conducted by Dr. Mohan Rao (the "Rao survey") submitted by Cardinal in this litigation. The Rao survey was purportedly designed to "determine consumer awareness and understanding of the terms 'impervious' and 'fully impervious' and to measure the impact on the purchase decisions of surgical gown consumers" (paragraph 26).

8.     For purposes of this report, I have reviewed the Rao report dated 17 December 2012 and the documents listed in Appendix B.

## SUMMARY OF CONCLUSIONS

9.     Based on my review of these documents, it is my professional opinion that the sampling process and analysis violates many of the tests of trustworthiness associated with accepted practices of survey research as well as the measures of trustworthiness upon which courts generally rely.

10.    The results are unreliable because the Rao survey procedures reflect major flaws, including:

- The population or universe was not properly defined and the sample is not appropriate to the stated purpose.

- Because he relies on the wrong sample base, Dr. Rao's estimates of the consumers who were allegedly misled are highly inflated.

For my report, all references to the screener and questionnaire use the actual numbers on the surgeons/surgical nurses/procurement personnel surveys (Tab 8 and 9). This is instead of the numbers assigned those questions in Dr. Rao's Survey Conclusions (Tab 10 and 11), which inexplicably reorders questions and omits some questions.

## AN IMPROPER SAMPLE

11.   Dr. Rao states his purpose in sampling is "to obtain a sample that represents the population and estimate[s] the unknown parameters accurately from the sample statistics" (paragraph 30). According to the MANUAL FOR COMPLEX LITIGATION (2004), surveys conducted for such purposes must use sampling methods that "conform to generally recognized statistical standards. Relevant factors include whether:

• the population was properly chosen and defined;

• the sample chosen was representative of that population;

• the data gathered were accurately reported; and

• the data were analyzed in accordance with accepted statistical principles." §11.492-493.

12.   "Courts have criticized research that included respondents who should not have been part of the sample frame and other studies that failed to sample from the universe of all relevant consumers"   Fred W. Morgan, "Judicial Standards for Survey Research: An Update and Guidelines." JOURNAL OF MARKETING, Vol. 54 (January 1990), 59-70.

13.   Dr. Rao's survey fails on both points, as he includes within his sample people without any meaningful (and some without any at all) influence into the selection of surgical gowns and excludes people who plainly do have such influence.

14.   In his report, Dr. Rao defines the target population as "consumers who influence or make purchase decisions of surgical gowns" Paragraph 31. He defines these as surgeons, surgical nurses and procurement personnel (the RAO REPORT paragraph 31).  However,

he offers no evidence of how purchasing decisions in hospitals for single-use fluid-resistant surgical gowns are made or the degree of influence that each of these parties typically has in the process. In business-to-business research, it is common to identify the degree and type of influence people have in a particular decision by asking degree, if any, of influence (i.e., a primary decision-maker, one of the decision-makers, minor role, etc.) and on what aspect of the purchase (i.e., attributes, brand).

15.  In terms of degree of influence, Dr. Rao asks respondents whether they have <u>any</u> influence in the types of surgical gown or drapes or brands that are supplied in the OR. This likely resulted in a population containing people whose views are irrelevant. First, <u>any</u> influence could mean a trivial role in the actual decision. Second, the question asks about products not at issue – drapes. Thus, if a person influences drapes, but not gowns, they would not be relevant respondents. Third, given that the key issues are alleged false advertising and labeling, the relevant person would not only have to influence the decision but be in a role in which they were exposed to the alleged advertising or labeling and thus potentially misled. Instead of identifying these relevant people, Dr. Rao relies on whether respondents merely "have heard" of Kimberly-Clark's gown being described as "impervious," which does not indicate the source or context of such hearsay.

16.  The survey results clearly show that Dr. Rao included some surgeons and surgical nurses who do not even meet his standard of having <u>any</u> influence. In the screener, 16% of the surgeons and surgical nurses (62/385) said they had no influence in the type or brand of drapes or gowns (Screener Q.10). Yet these respondents were included in Dr. Rao's results. Thus, Dr. Rao's sample is overly-inclusive just by his own standards.

17.  Dr. Rao does not include in his sample several categories of people who appear to meet his criteria of influencing gown selection, such as hospital staff who have direct responsibility for infection prevention or staff and patient safety. In fact, some purchasing agents took the time to list others from whom they seek input on ordering surgical gowns (Question 2), and these include value analysis team/committee, material management, and infection control/prevention. Even Dr. Rao's own report, in footnote

59, acknowleges employee health/safety groups, infection control management, and material management/procurement as part of the decision-making.  A Google search reveals national associations for such groups, suggesting that these roles in hospitals are common enough to merit inclusion.

- Association of Healthcare Value Analysis Professionals is a group comprised of clinicians and professionals who are associated with virtually all facets of the procurement and management of hospital supplies and equipment. (http://ahvap.org/)

- Association for Healthcare Resource & Materials Management (AHRMM) of the American Hospital Association is the premier organization for healthcare supply chain and materials management professionals (http://www.ahrmm.org/)

Thus, despite seeking to include surgeons, surgical nurses and procurement personnel with merely trivial influence into surgical gown selection, Dr. Rao's sample is clearly under-inclusive too.  According to Rivera, "Surveys that fail to include part of the relevant population (under-inclusive) and surveys that include more than the relevant population (over-inclusive) introduce bias and fail to produce the proper factual basis for the results" Artemio Rivera, "Testing the Admissibility of Trademark Surveys after Daubert," JOURNAL OF THE PATENT AND TRADEMARK OFFICE SOCIETY, (September 2002), 84, 661.

18.     When the research designs a survey so it "represents the population and estimate the unknown parameters accurately from the sample statistics" (the RAO REPORT paragraph 30),[1] one would expect a probability sample in which "every element in the population has a known, equal probability of being included" Shari Seidman Diamond. REFERENCE GUIDE ON SURVEY RESEARCH (2011), (hereinafter, "REFERENCE GUIDE") at 243.  "While

---

[1] Many consumer surveys for litigation use non-probability studies because their purpose is simply to understand how reasonable consumers may interpret a given claim.

each type of sample can reasonably be projected to the universe at large, only a probability sample can be projected to the entire universe by the use of definite mathematical and statistical probability models. Importantly, the familiar 'sampling error' or 'margin of error' computation is appropriate only for a probability sample" MCCARTHY§ 32:164.

19.    Dr. Rao's is <u>not</u> a probability sample.  It is a non-probability sample that lacks the above advantages.  The respondents are members of voluntary panels, meaning they agree to sign up to complete surveys in exchange for cash, reward points, etc., rather than being chosen at random from a list of the universe. Typically solicitation emails are sent to a large group of potentially-qualified members and then respondents "opt-in" to a given survey.  According to the website of one of the panels Dr. Rao utilized, panel members can refer others to the study.[2]  In addition to the potential of referrals being informed a priori about the survey's topic, the survey may be completed by multiple respondents from the same practice or hospital, biasing the results.

20.    Even with a non-probability sample, one can make efforts to assure it is reasonably representative. There are several reasons to question the representativeness of Dr. Rao's final survey results.

- Dr. Rao uses a stratified sample to assure that his sample includes elements (respondents) from each of the three groups.  However, in his final results, he combines surgeons and surgical nurses without consideration for their proportions in the population.  According to his statistics on page 18, there are more than 10 times as many hospital nurses as doctors.  Yet, surgeons are 54% of the surgical staff results and, therefore, their opinions have more weight in the survey results.

---

[2]http://www2.leadphysician.com/faq.aspx

- 30% of respondents come from academic hospitals when the American Association of Medical Colleges says that academic or teaching hospitals represent only 6% of U.S. hospitals[3].

In justifying his sample, Dr. Rao emphasizes the percentages of surgeons by specialty and gender. As one can see in the table below, his final sample, underrepresents the most common specialty (OB/GYN) by more than half and overrepresents general surgeons. Given "The Surgical Workforce" report includes cardiothoracic surgeons as general surgeons, the sample has double the percentage of general surgeons as are in the population. Dr. Rao provides no information on gender distribution in the sample or geographic representativeness to demonstrate its representativeness of the nation's hospitals.

### Population and Sample Percentages by Surgical Specialty

| Specialty | Population[1] | Sample |
|---|---|---|
| Obstetrics/Gynecology | 26.9% | 10.8% |
| General | 21.3% | 33.1% |
| Orthopedic | 15.0% | 12.2% |
| Cardiothoracic[1] | 3.2% | 16.2% |

[1] "The Surgical Workforce in the United States: Profile and Recent Trends," American College of Surgeons Health Policy Research Institute, April 2010, page 15.

- Dr. Rao eliminates those in private practice without explanation. According to a recent study, more surgeons are becoming employees, but they may be employees of a practice, particularly large practices, not just a hospital. Eliminating those

[3] https://www.aamc.org/about/teachinghospitals/

who are in private practice presumes they have no influence in hospitals where they routinely practice.[4]

- To qualify, surgical personnel had to participate in a minimum of 15 surgical procedures per month. However, the screener asked "how many <u>surgical cases</u> do you have a month"(S5/S7). The term "surgical cases" is not defined, and it appears at least some respondents were confused. The range of surgical cases <u>per month</u> varied dramatically from 15 to 540 for surgeons and 15 to 830 for surgical nurses. Dr. Rao recognizes that there is a issue and merely hypothesizes a rationale (Rao survey, footnotes 2a and 3, Tab 5)..

- For procurement personnel, he asserts that this is a small population of about 5,000, though he offers no evidence in support. Given that the American Hospital Association says that are 5754 U.S. Registered Hospitals,[5] this means Dr. Rao believes the number of purchasing personnel less than one per hospital.

- Dr. Rao has no experience requirements for procurement personnel, meaning someone with limited buying experience might answer the survey. In addition, the qualification required only that the respondent "order surgical gowns" not that s/he is actively involved in evaluating functional attributes or deciding which brands are considered and selected.

- The Rao report provides no indication that he screened for likely bias among respondents. It is common practice to determine whether respondents or their family currently, or in the past, have worked for the Plaintiff, Defendant, or other companies which may reflect conflicts of interest or exceptional knowledge of the litigation issues. Similarly, respondents are typically screened on recent participation in other research to avoid persons who are "professional

---

[4] http://www.medscape.com/viewarticle/776305;
    http://www.medpagetoday.com/HospitalBasedMedicine/WorkForce/36504

[5] http://www.aha.org/research/rc/stat-studies/fast-facts.shtml

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY                    PAGE 8

respondents" J. Michael Dennis, "Are Internet panels creating professional respondents?" MARKETING RESEARCH, Summer 2001, Vol. 13, 2, pages 34- 38.

- There is also no evidence in the Rao report of survey validation that assures the interviews were conducted as prescribed and that answers are valid. For litigation, Diamond says "independent validation of at least 50% of interviews by a third party rather than the field service that conducted the interviews increases the trustworthiness of the survey results" REFERENCE GUIDE at 267. This is particularly important when it is easy for a solicited respondent to allow others to complete the survey. "A researcher has no assurance that the intended subject is the person who fills out the questionnaire. The wrong person answering the questions may be a problem when surveying corporate executives, physicians, and other professionals, who may pass questionnaires on to subordinates to complete" William G. Zikmund and Barry J. Babin, EXPLORING MARKETING RESEARCH, 2007 at 221. One of the panels used, *LeadPhysician,* recognizes this concern and admonishes members not to share the survey link and their password. (Invitation to Online Survey, CAHS 007268-69).

- Dr. Rao provides an extensive description of how he chose the sample size of 384 for surgeons and surgical nurses. However, what he fails to acknowledge is that is the number of valid respondents to adequately represent the population given his desire for a 95 percent confidence interval.

- As he notes, he eliminated 43 surgeons/nurses (footnote 1 Tab 5 and Tab 7 purchasing agents) for inconsistent answers Dr. Rao states that these were respondents who said they had not heard of Kimberly-Clark KC-400 MicroCool Surgical Gown but then reported using/purchasing it (Q14/Q16 of surgeons/nurses and purchasing personnel, respectively). (Rao survey, footnote 91). This reduced the sample size to 342 and 93, respectively.

- Eliminating these respondents, plus those who admitted they had no influence, drops the surgical staff sample from 385 to 280, over 35% less than the number he said was needed.

Ignoring all the biases in his sample selection, the number of valid respondents is 280 surgical staff and 93 procurement personnel.

## CORRECTED RESULTS

21.    Dr. Rao's calculations of the percentage of consumers who were allegedly misled by the advertising at issue are highly inflated because they use the wrong sample base. As noted previously, he defines his universe as "consumers who influence or make purchase decisions of surgical gowns." Based on Dr. Rao's approach, this would be the set of 280 and 93 valid respondents. Yet, in calculating the effect of the alleged false advertising (Page 29), he uses a much narrower subset of this universe: those who used/purchased KC-400 MicroCool Surgical Gowns. According to Dr. Rao's own results reported in Tabs 10 and 11, this subset is only 22.5% (or 77) of all surgeons/nurses interviewed and 37.6% (or 35) of purchasing personnel interviewed. Clearly, the sample sizes of these subsets (77 and 35, respectively) are much smaller than the number Dr. Rao said was needed to provide the degree of certainty he believed necessary based on his own calculations (paragraphs 40 and 41).

22.    Assuming only for this reanalysis purpose that Dr. Rao's survey was valid and his sample defined and drawn appropriately, the correct analysis is shown in the following table. Beginning with Dr. Rao's original sample size of 385 for surgeons/nurses and 100 for purchasing personnel, I eliminated the same 50 respondents (43 surgeons/nurses and 7 purchasing personnel) that I understand Dr. Rao did for inconsistent answers.

23.    Then, as Dr. Rao should have, I removed the 62 surgeons/nurses who themselves admitted they had no influence. This results in a total sample of 280 surgeons/nurses and 93 purchasing personnel. These are Dr. Rao's hypothetically valid respondents or final sample.

24. Of these, only 67 surgeons/nurses and 35 purchasing personnel claim to have used/purchased the KC-400 MicroCool Surgical Gown. Of this group, only 39 and 20 respondents have 1) heard it described as impervious, and 2) ranked barrier protection #1 when selecting KC-400, and 3) said they would switch to a different gown.

25. As shown in the table, when I divide by the adjusted sample (n=280), this represents 14% of surgical staff and 22% of procurement personnel, far below what Dr. Rao claims. Dr. Rao instead chose to report the percentage of only a subset of the population he defined as relevant. Using these revised numbers, he would divide the 39 by the 67 (or 20 by the 35) to make it appear that the percentages were 58% and 57% respectively. This manipulation of the data is improper and inconsistent with even Dr. Rao's definition of the relevant universe (*i.e.*, surgical gown users/purchases).

### Analysis Using Correct Base Numbers

|  | Surgeons/ OR Nurses | Purchasing Agents |
|---|---|---|
| Dr. Rao's Desired Sample | 385 | 100 |
|    Inconsistent answers | - 43 | - 7 |
|    No purchase influence | - 62 | - 0 |
| Adjusted Sample | 280 | 93 |
| "Yes" used/purchased KC-400 (Q18/20) | 67 | 35 |
| *And* "Yes" heard KC-400 described as impervious (Q15/Q17) | 53 | 29 |
| *And* Ranked "barrier protection" #1 when selecting KC-400 (Q19/Q21) | 42 | 26 |
| *And* "Yes" would use different gown (Q20/Q22) | 39 | 20 |
| Percentage of valid respondents that would meet all criteria | 14% | 22% |
| Margin of error | ±4.06% | ±8.34% |

## EXPERT DISCLOSURE

26.     I have testified either at trial or by deposition twice in the past four years.  These cases
        are found in Appendix B.  I am being paid $450 per hour for my time.  My fees are not
        contingent upon the outcome of the litigation.

## CONCLUSION

27.     Based on my review of these documents, it is my professional opinion that Dr. Rao's
        sampling and analysis are deeply flawed.  As a result, it should not be relied upon in this
        case.

28.     In addition to the analysis of the RAO REPORT, this opinion is based on my knowledge
        and experience, which includes over 35 years teaching and working in marketing and
        marketing research (Resume in Appendix A).

29.     If provided with additional data, I reserve the right to supplement my opinion.


        *Ken Bernhardt*

        Kenneth L. Bernhardt, Ph.D.

# APPENDIX A
# RESUME OF
# KENNETH L. BERNHARDT

Dr. Bernhardt is Regents Professor Emeritus at the Robinson College of Business at Georgia State University in Atlanta where he has been a member of the faculty since 1972. He previously served as Chairman of the Marketing Department from 1989 to 1993 and 2003 to 2005 and was Assistant Dean for Corporate Relations from 2005-2008. He teaches courses in Strategic Marketing Management and Consumer Behavior. During 1983-84, Professor Bernhardt was Visiting Professor of Business Administration at the Harvard Business School. He has also taught at the University of Michigan and Virginia Tech (V.P.I.), and has served as Visiting Research Professor at the Marketing Science Institute in Cambridge, MA.

From 1978 to 1980, Dr. Bernhardt served as Consumer Research Advisor at the Federal Trade Commission. In that position, he was responsible for the Impact Evaluation Program to assess the effectiveness of the FTC's consumer protection programs and for the design and implementation of the FTC's marketing research activity. He received the Chairman's Award for Meritorious Service when he left the FTC to return to teaching.

His other work experience includes consulting and research assignments for a number of organizations including Chick-fil-A, HoneyBaked Ham, Skanska, AirTran Airways, BellSouth, IBM, UPS, The Federal Trade Commission, Holiday Inn, Southern Mills, Coca-Cola, Snapper, Information America, CheckFree, Center for Disease Control & Prevention, Century 21, Engauge Digital, and several law firms. He serves on the Board of Advisors for HoneyBaked Ham Company, ICx Technologies Platforms Division, Matchstic, and What's Up Interactive, an interactive marketing agency. Previously he served on the board of UPS Capital Corporation, and Sanders Financial management.

His other activities include service as past Chairman of the Board of the 45,000 member American Marketing Association, past President and former Executive Secretary of the Association for Consumer Research, and past Chairman of the Board of Trustees of the American Marketing Association Foundation. He currently serves on the Boards of Directors and executive committees of the Atlanta Convention and Visitors Bureau (past chair), Junior Achievement of Georgia, Leadership Atlanta (past chair), Community Foundation of Greater Atlanta (chair), and the Georgia State University Foundation (chair). He is a past chair of the board and a Life Director of the Alliance Theatre. He is a former Chair of the U.S. Census Bureau Marketing Advisory Committee and serves on the National Advertising Review Board.

Dr. Bernhardt has published twelve books and monographs (including 2 leading marketing textbooks) and numerous articles on marketing and consumer behavior in the Journal of Business Research, the Journal of Public Policy and Marketing, the Journal of Retailing, Journal of Services Marketing, Business, American Education Research Journal, and the Proceedings of the Annual Conferences of the Association for Consumer Research, the American Marketing Association and the American Psychological Association. His current research interests involve consumer attitudes and behavior, public policy issues in marketing, and the marketing of services. He writes a bi-monthly column on marketing for the Atlanta Business Chronicle.

Professor Bernhardt has won four Outstanding Teacher Awards and has won the Alumni Distinguished Professor Award as the best professor in the GSU College of Business. In 1995 he received the University's first Exceptional Service Award given for outstanding service to the community. He is a recipient of the Arts and Business Council's ABBY Award for volunteerism in the arts, the Atlanta Convention and Visitors Bureau President's Award for outstanding contributions to the marketing of Atlanta, WABE's Lexus Leader in the Arts Award, the American Marketing Association's Lemburg Award for outstanding contributions to the marketing profession, and the Atlanta Chapter of AMA's Lifetime Achievement Award.

Dr. Bernhardt received a B.S. degree from Washington and Lee University, and he is a graduate of the Harvard Business School M.B.A. program. He received the Ph.D. in Business Administration from the University of Michigan.


**Books and Monographs**

Enhancing Knowledge Development in Marketing, Volume 15 (co-edited with James Boles and Pam Ellen), American Marketing Association, 2004.

Cases in Marketing Management, Seventh Edition (with Thomas C. Kinnear), Business Publications, Inc., 1997, 815 pages. (The previous editions were published in 1978, 1981, 1985, 1988, 1991 and 1994).

Principles of Marketing, Fourth Edition (with Thomas C. Kinner and Kathleen Krentler, Scott, Foresman and Company, 1995, 808 pages. (The previous editions were published in 1993, 1990, 1986).

Consumer Reactions to Legal Services Advertising in the State of Georgia (with Cathy Cobb-Walgren), Atlanta: State Bar of Georgia, October 1995.

Designing and Measuring Effective Retention Marketing Techniques, Atlanta: Cable Television Administrative and Marketing Society, August 1984.

The Changing Marketing Environment: New Theories and Applications (co-editor), Chicago: American Marketing Association, August 1981.

Marketing in the 1980's Changes and Challenges (co-editor), Chicago: American Marketing Association, 1980 (538 pages).

Marketing 1776-1976 and Beyond: 1976 Educators Conference Proceedings (editor), Chicago: American Marketing Association, 1976.

Qualitative research in Marketing (with Danny N. Bellenger and Jac Goldstucker), American Marketing Association, 1976. Reviewed in Journal of Marketing Research, November 1976. Chapter 2, "Qualitative Research Techniques: Focus Group Interviews," reprinted in Keith Cox and James Higginbotham (eds.), Focus Group Interviews: A Reader, American Marketing Association, 1979, 13-28.

**Journal Articles**

"Effects of Age, Dispositional Time Perceptions, and Time View Manipulations on Product Attribute Evaluation," (with Yujie Wei and Naveen Donthu), <u>Journal of Business Research</u>, forthcoming.

"Volunteerism of Older Adults in the United States," (with Yujie Wei and Naveen Donthu), <u>International Review on Public and Nonprofit Marketing</u>, forthcoming.

"Consumer Responses to Service Recovery Strategies: The Moderating Role of Online versus Offline Environment," (with Kathy Harris, Lois Mohr and Dhruv Grewal), <u>Journal of Business Research</u>, 2007.

"Online Service Failure, Consumer Attributions and Expectations," (with Katherine Harris and Lois Mohr), <u>Journal of Services Marketing</u>, Vol. 20, No. 7, 2006, pp. 453-458.

"Examining Customer Value Perceptions of Organizational Buyers When Sourcing From Multiple Vendors," (with Annie Liu and Mark Leach), <u>Journal of Business Research</u>, Volume 58, No. 5, May 2005, pp. 559-568.

"A Longitudinal Analysis of Satisfaction and Profitability" (with Naveen Donthu and Pamela Kennett), <u>Journal of Business Research</u>, 2000, pp.161-171.

"The Impact of Service Guarantees on Consumers' Assessments of Service Providers," <u>Journal of Customer Service Management</u>, 1999 (with Pamela Kennett and Julie Sneath).

"Dynamics of Marketing Case Discussions," <u>Marketing Education Review</u>, 1 (3), 1991, pp. 43-48.

"A Field of Study of Corrective Advertising Effectiveness" (with T.C. Kinnear and M. B. Mazis), <u>Journal of Public Policy and Marketing</u>, 5, (1986), 146-62.

"Day-After Recall of Listerine Commercials," (with M. Mazis and D. McNeil), <u>Journal of Public Policy and Marketing</u>, 2, (1983), 29-37.

"Will There Be Consumer Protection in Federal Government in the 1980's?" (with Patrick Murphy), in Paul Bloom (ed.), <u>Consumerism and Beyond:  Research Perspectives on the Future Social Environment, Marketing Science Institute</u>, (1982), 33-37.

"An Analysis of The Impact of Commercial Test Preparation Courses on SAT Scores,"  (with Michael Sesnowitz and Matthew Kanain), <u>American Education Research Journal</u>, 1982.

"Consumer Problems and Complaint Actions of Older Americans:  A National View," <u>Journal of Retailing</u>, (Fall 1981), 107-23

"Consumer Research in Government," in M. Mokwa and S. Permut (eds.), <u>Government Marketing Theory and Practice</u>, New York:  Praeger Publishing Company, (1981), 252-63.

"Communication to High-IQ Consumers," (with Danny Bellenger and Don Hendon), <u>Business</u>, (May-June 1980), 43-47.  Reprinted in R. Robicheaux et al. (eds.), Marketing:  Contemporary Dimensions, 3rd Edition, 1983.

"Government and the Energy-Conscious Consumer:  The Appliance Energy Labeling Program," in Karl
Hension and Thomas Kinnear (eds.), <u>The Conserver Society, American Marketing Association</u>,
(1979), 120-31.

"Evaluating Consumer Protection Programs," (with Michael B. Mazis), in C. Frey, Thomas Kinnear, and
Bonnie B. Reece (eds.), <u>Public Policy Issues in Marketing</u>,  University of Michigan, Division of
Research, (1979), 48-61.

"Innovative Role-Playing Exercises for Pragmatic Learning," (with John S. Wright), in  M. W. Delozier
et al. (eds.), <u>Experiential Learning in Marketing Education</u>, Columbia, SC:  University of South
Carolina, College of Business Administration, Division of Research, (1977), 106-11.

"Recruiting Black Salesmen," (with Danny Bellenger and Wilbur S. Wayman, Jr.), <u>Atlanta Economic
Review</u>, (March-April 1977), 28-31.

"Categorical Regression in Marketing," (with Thomas C. Kinnear), <u>Journal of Business Research</u>,
(November 1976), 297-312.

"American Auto, Inc.:  Case Study of a False Start in Personalist Decision Analysis," <u>Marketing Science
Institute Technical Report</u>, Cambridge, MA:  Marketing Science Institute, 1972.


## Papers in Proceedings

"Consumer Responses to Service Recovery Strategies: The Moderating Role of On-Line vs. Off-Line
Environments," (co-authored with Kathy Harris, DhruvGrewal, and Lois Mohr), Proceedings of
the Direct Marketing Educational Foundation, October 2005.

"Customer Satisfaction and Loyalty Measurement: A Two-Sided Approach," (co-authored with Yujie
Wei), Proceedings of the Academy of Marketing Science Annual Conference, 2004.

"The Importance of Studying Service Quality," (with others), in Mary Jo Bitner (ed.), *Designing A
Winning Service Strategy, American Marketing Association*, 1989.

"How Environmental Pressures Impact Marketing Strategy:  The Suburban Cable Vision Case," (with
James Novo), in J. Czepiel et al. (eds.), *The Service Challenge:  Integrating for Competitive
Advantage, American Marketing Association*, (1987), 105-08.

"Correlates of Successful Advertising Campaigns of Services:  A Survey of Advertising Professionals,"
(with P. Korgaonkar and D. Bellenger), in C. Marshall et al. (eds.), *Creative Services Marketing,
American Marketing Association*, 1986.

"Keys to Successful Services Marketing:  Customer Orientation Creed and Consistency," (with D.
Schmalensee and N. Gust), in T. Block et al. (eds.), *Services Marketing in a Changing
Environment, American Marketing Association*, (1985), 15-18.

"Association for Consumer Research 1983 Presidential Address:  ACR -- Yesterday, Today and
Tomorrow," *Advances in Consumer Research*, 11 (1983), 1-3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Public Policy Update:  Perspectives on the Federal Trade Commission," (with Ron Stiff), in Kent Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, (1981), 452-54.

"Impact o Publicity on Corrective Advertising Effects," (with Thomas C. Kinnear et al.), in Kent Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, (1981), 414-15.

"Issues in the Ethical Treatment of Subjects in Consumer Research:  Progress Report," (with Steven Permut and Donald Vinson), in M. Goldberg and G. Gorn (eds.), *Proceedings of the 1980 Division 23 American Psychological Association Conference*, (1981), 215-22.

"Problems to Avoid in Evaluating Consumer Protection Programs," *Proceedings of the 1980 Division 23 American Psychological Association Conference*, (1981), 100-04.

"THAID in Marketing Research:  An Illustrative Study, " (with Thomas C. Kinnear), in Betsy Gelb (ed.) Marketing Expansion in a Shrinking World, *American Marketing Association*, (1978), 91-95.

"The Graduate Marketing Curriculum:  The Attitudes of Managers and Educators," (with Danny Bellenger), in Robert Franz et al. (eds.), *Proceedings of the Southern Association Conference*, (1978), 195-98.

"Exploratory Analysis of Consumer Response to Retail Shopping Problems," (with Elizabeth C. Hirschman and Thomas Stanley), in Douglas Hawes and Robert Tamilia (eds.), *Proceedings of the Academy of Marketing Science International Marketing Conference*, (1978).

Highly Confidential – Attorneys' Eyes Only

## APPENDIX B

### Index of Documents Consulted

| Document | Bates Stamp (if any) |
|---|---|
| Expert Report of Mohan RaoPh D | |
| Doc 30-1 (2nd Amended Complaint) | |
| Doc 30-2 (Exhibit A to 2nd Amended Complaint) | |
| Doc 34-1 (Cardinal's Answer and Ctrclaim) | |
| Doc 34-3 (Exhibit B to Cardinal's Answer and Ctrclaim) | |
| Doc 133 (Answer and Affirmative Defenses to Cardinal's Amended Counterclaims) | |
| Doc 202 (Kimberly's Clark's Opposition to Cardinal's Rule 11 motion) | |
| Doc 224 (7 September 2012 Order) | |
| Microsoft Excel spreadsheet containing the survey respondents' answers to the Rao survey | |
| Microsoft Excel spreadsheet containing a "key" showing the correspondence of the questions asked to the tabulated responses | |
| Invitation to Online Survey | CAHS 007268-69 |
| November 12, 2012 email from Leadphysician to WorldOne | CAHS 007270-71 |

**APPENDIX C**

**Kenneth L. Bernhardt**
**Depositions or Testimony in Past Four Years**
(bold indicates client)

**Schütz Container Systems, Inc.** v. Mauser Corp. and National Container Group, LLC. (2011) - Jones Day  (deposition only)

**Atlanta Allergy and Asthma Clinic, P.A.** v. Allergy & Asthma of Atlanta, LLC, MaziarRezvani, M.D., and LuqmanSeidu, M.D. (2010) - Wargo& French  (deposition only)