# Exhibit 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KIMBERLY-CLARK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:10-CV-0034-CAP |
| | ) | |
| CARDINAL HEALTH 200, LLC f/k/a | ) | |
| CARDINAL HEALTH 200, INC., | ) | |
| Defendant. | ) | |

### DECLARATION AND EXPERT REPORT OF KENNETH HOLLANDER

I, Kenneth A. Hollander, declare as follows:

### MY ENGAGEMENT

1. I have been retained by Bryan Cave LLP, the outside legal firm for the Plaintiff Kimberly-Clark Corporation, to review and comment upon Defendant's survey conducted by Mohan Rao, PhD and described in his report dated December 17, 2012. My opinions related to that survey and the reasons for those opinions are included in the following report.

### MY QUALIFICATIONS

2. I graduated from The Ohio State University with a Bachelor of Science degree in Marketing. I then obtained a Masters of Business Administration degree in Marketing from the University of Missouri.

3. Prior to starting my own marketing research company, Kenneth Hollander Associates, in 1973, my employment history included the following:

   a.   Research Brand Manager, The Procter & Gamble Company, in which I served in a two-man Experimental Research and Technique Development team

responsible for all unique, non-recurring survey research issues concerning all P&G brands.

  b. <u>Associate Research Director, Hallmark Cards</u>, in which I was responsible for all greeting card survey research as well as acquisitions and mergers explorations.

  c. <u>Director of Research, Young & Rubicam, Chicago</u>, in which I was responsible for all survey research for all of the agency's clients, including Allied Van Lines, American Paper Corporation, Armour Dial, International Harvester, and U.S. Naval Recruiting.

  d. <u>Vice President, Director of Communications Planning Group, The Interpublic Group of Companies</u>, in which I was responsible for all communications survey research for the Coca-Cola Company, both domestic and international.

  e. I have lectured on survey research applications and methods at the Graduate Schools of Business at Emory University and Georgia State University in Atlanta, Georgia; the University of Georgia in Athens, Georgia; and Stanford University in Palo Alto, California.

  f. At the University of Georgia, I was Chairman of the Board of Advisors for the Masters of Marketing Research Program and a Distinguished Practitioner Lecturer in the Department of Marketing.

  g. I was a Contributing Editor to the textbook, <u>Advertising</u>.

  h. I have spoken on marketing research and survey research at events sponsored by the American Marketing Association, The Association of National Advertisers, The Advertising Research Foundation, and the Marketing Research Association.

4. Over the past approximately 40 years, I have conducted consumer surveys for many of the world's largest and most prominent companies including but not limited to: Anheuser Busch, Bank of America, The Coca-Cola Company, Delta Air Lines, Eastman Kodak, Ford Motor Company, General Electric, Hublein, IBM, Johnson & Johnson, Lever Brothers,

Kimberly-Clark, Mattel, No Nonsense, Pillsbury, Quaker Oats, Ralston-Purina, STP, Texas Instruments, Uncle Ben's, and Xerox.

5. I am an acknowledged expert witness in the United States Federal Court System on matters pertaining to survey research, having conducted over 3,000 surveys of which over 150 were intellectual property surveys for purposes of litigation. I have been deposed or testified as an expert survey research witness approximately 40 times in trademark infringement and deceptive advertising lawsuits. This substantial experience provides me with the background necessary to analyze Dr. Rao's survey.

6. In forming my opinions and preparing this report, I considered the following materials: the Rao Expert Report; Plaintiff's Second Amended Complaint and Exhibit A thereto (Doc. 30); Defendant's Answer, Affirmative and Other Defenses and Counterclaims to Second Amended Complaint and Exhibit B thereto (Doc. 34); the Plaintiff's Answer and Affirmative Defenses to Defendant's Amended Counterclaims (Doc. 133); the Plaintiff's Opposition to Defendant's Motion for Rule 11 Sanctions (Doc. 202); the September 7, 2012 District Court Order (Doc. 224);; <u>McCarthy on Trademarks and Unfair Competition</u> (<u>McCarthy</u>), the <u>Manual for Complex Litigation: Fourth Edition (2004)</u>; the <u>Reference Guide on Survey Research</u> (<u>Reference Guide</u>) chapter of the <u>Reference Manual on Scientific Evidence: Third Edition (2011)</u>; and Jon A. Krosnick, "Survey Research," <u>Annual Review of Psychology</u> (1999), vol. 50.

7. A list of cases in which I testified since 2007 is attached as Exhibit A.

8. I am being compensated at the rate of $450 per hour for my work on this matter. My compensation is not dependent on the outcome of the litigation.

**DESCRIPTION OF THE RAO SURVEY**

9. According to his expert report, Dr. Rao designed his survey "to determine consumer awareness and understanding of the terms 'impervious' and 'fully impervious' and to measure the impact on the purchase decisions of surgical gown consumers." (Rao Report, ¶ 26)

10. Dr. Rao implemented his survey by conducting Internet interviews with 485 respondents: 385 surgeons and nurses and 100 purchasing agents.

11. Surgeons and nurses were screened for their employment setting, surgical specialties, years in practice, and minimum number of "surgical cases" per month. Purchasing agents were screened for their employment setting and minimum number of operating rooms (ORs) in their institution.

12. Surgeons and nurses had to use surgical gowns that could be classified as "fluid resistant" or "impervious" in surgeries where they are exposed to blood and other bodily fluids, and purchasing agents had to order such surgical gowns.

13. Once eligibility was established, respondents were administered a survey and told the objective of that survey was "…to evaluate the factors that drive the selection of surgical gowns." (Rao Report, ¶ 48)

14. The questions asked of both groups were identical other than minor wording differences to reflect either surgical usage or purchasing agent function, as follows:

   1. If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be impervious? [Yes / No]

   2. If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

   3. If a surgical gown is made of impervious fabric, and the seams of the gown prevent the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious?[Yes / No]

   4. If a surgical gown is made of impervious fabric, but the seams of the gown allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

   5. Are you familiar with the AAMI (Association for the Advancement of Medical Instrumentation) Levels for the fluid resistance of a surgical gown? [Yes / No]

   The AAMI PB70 standard establishes a classification system and the associated minimum requirements for the liquid barrier performance of protective apparel and drapes based on industry accepted test methods. Under AAMI PB70, surgical gowns are classified and labeled according to the barrier performance properties of their critical zones. Those critical zones are the front area of the gown from chest to knees (area A) and the sleeves from the cuff to above the elbow (area B). AAMI PB70 requires that all critical zone components—the materials, the seams, and the points of attachments—be tested. For a surgical gown to qualify as AAMI Level 4, AAMI PB70 requires that all critical zone components must prevent the passage of liquid and liquid-borne microorganisms.

**(GOWN PORTRAYED WITH SHADED AREAS FOR "A" FRONT AREA OF THE
GOWN FROM CHEST-TO-KNEES AND "B" SLEEVES FROM CUFF TO ELBOW)**

6. If a surgical gown prevents the passage of liquid or liquid-borne microorganisms in the shaded areas depicted, then what AAMI Level does that gown meet?
a. AAMI Level 1
b. AAMI Level 2
c. AAMI Level 3
d. AAMI Level 4
e. None
f. Don't know

7. Are you aware of color-key systems used by manufacturers to differentiate surgical gowns based on their barrier protection? [Yes / No]

8. Does the red color in the color-key system depicted here convey any message about which areas of the gown are impervious? [Yes / No]

**(KC COLOR-KEY SYSTEM DEPICTED)**

9. Would you expect the shaded areas in the red column of the color-key system depicted here to allow the passage of liquids or liquid-borne microorganisms? [Yes / No]

10. Which areas of the gown in the color-key system depicted here do you understand to be impervious?
(Select all that apply)
a. Front of gown in the shaded area
b. Sleeve material in the shaded area
c. Sleeve seams in the shaded area
d. Other (please describe):
e. None
f. Don't know
**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q9]**

11. Would you expect the sleeve seams in the red column of the color-key system depicted here to prevent penetration by liquid or liquid-borne microorganisms? [Yes / No]
**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q9]**

12. Do you associate the surgical gown in the image with any of the AAMI Levels? [Yes / No]
**(IMAGE DEPICTS SURGICAL GOWN)**

13. With which AAMI Level do you associate the surgical gown in the image?
a. AAMI Level 1
b. AAMI Level 2
c. AAMI Level 3
d. AAMI Level 4
e. None
f. Don't Know
**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q12]**
**[PROGRAMMING NOTE: ONLY DISPLAY Q13 IF Q12 IS "Yes"]**

14. Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown? [Yes / No]

15. Have you heard of the Kimberly-Clark KC-400 MicroCool Surgical Gown being described as "impervious"? [Yes / No]
**[PROGRAMMING NOTE: ONLY DISPLAY Q15 IF Q14 IS "Yes"]**

16. Which areas of the Kimberly-Clark KC-400 MicroCool Surgical Gown do you understand to be impervious?
a. Front of gown in the shaded area
b. Sleeve material in the shaded area
c. Sleeve seams in the shaded area
d. Other (please describe)
e. None
f. Don't know
**[PROGRAMMING NOTE: REPEAT IMAGE FROM Q9]**
**[PROGRAMMING NOTE: ONLY DISPLAY Q16 IF Q14 IS "Yes" AND Q15 IS "Yes"]**

17. Based on Kimberly-Clark's description and its color-key system, what AAMI Level do you understand the KC-400 MicroCool Surgical Gown to be?
a. AAMI Level 1
b. AAMI Level 2
c. AAMI Level 3
d. AAMI Level 4
e. None
f. Don't know
**[PROGRAMMING NOTE: ONLY DISPLAY Q17 IF Q15 IS "Yes"]**

18. Which of the following surgical gowns have you used? (Select all that apply)
a. Cardinal Health SmartGown
b. Kimberly-Clark KC-400 MicroCool Surgical Gown
c. Medline PreventionPlus
d. Other (please describe):
e. None
f. Don't know

19. Rank the following attributes in order of importance when selecting the Kimberly-Clark KC-400 MicroCool Surgical Gown. (Scale is 1-4, where 1 is most important, and 4 is least important, however if you write a response in "Other," please rank from 1-5 where 5 is least important).
Comfort
Breathability
Barrier protection
Price
Other (please describe):
**[PROGRAMMING NOTE: ONLY DISPLAY Q19 IF Q18(b) IS SELECTED]**

20. If you found out that the sleeve seams of the Kimberly-Clark KC-400 MicroCool Surgical Gown permitted the penetration of liquid or liquid-borne microorganisms, would you have used a different surgical gown whose sleeve seams are impervious? [Yes / No]
 **[PROGRAMMING NOTE: ONLY DISPLAY Q20 IF Q18(b) IS SELECTED]**

## OVERVIEW OF THE DEFECTS OF THE RAO SURVEY

15. In his report, Dr. Rao acknowledges and relies on the guidelines and standards generally employed in the field of survey research as set forth on pages 102-103 of the <u>Manual for Complex Litigation: Fourth Edition (2004)</u> and expanded upon in the <u>Reference Guide on</u>

Survey Research chapter of the Reference Manual on Scientific Evidence: Third Edition (2011) authored by Shari Seidmond Diamond, J.D., Ph.D. Those guidelines require that:

    a. Those responsible for the design, conduct, and analysis of the surveys be experts in the field of survey research;

    b. The survey design properly addresses its objectives;

    c. The relevant universe be defined appropriately;

    d. A representative sample be drawn from the relevant universe;

    e. The measures collected include data for control groups and/or control questions when appropriate;

    f. The survey questions be framed clearly and precisely so as to avoid bias;

    g. Once gathered, the data be accurately analyzed and reported.

16. It is my opinion that Dr. Rao's survey <u>fails to meet the majority of these criteria</u>, specifically:

    a. The survey was not conducted by an expert in the field;

    b. The survey did not properly address its objectives;

    c. The survey questions were severely biased;

    d. No attempt was made to employ control questions, and

    e. The resulting data was not accurately reported.

For all of these reasons, discussed in more detail below, Dr. Rao's survey is unreliable and his conclusions have no probative value.

## **THE SURVEY WAS NOT CONDUCTED BY A SURVEY EXPERT**

17. Dr. Rao states in paragraph 1 of his expert report that he is "…an economist and Managing Director at Navigant Economics and an Adjunct Professor in the Department of Industrial Management Sciences at Northwestern University."

18. Page 1 of Tab 1 of his expert report states that "Dr. Rao has provided economic analysis in antitrust litigation…" and that "His intellectual property experience includes valuing patents,

trademarks, and trade secrets…" and that "He has studied market structure, competition and performance…."

19. Page 2 of his vita further states that his educational training is in engineering and economics.

20. Page 3 lists his affiliations as the American Economic Association, the Licensing Executives Society, and the Institute of Electrical and Electronics Engineers.

21. Pages 7-13 list 78 accomplishments: 25 preprints and publications and 53 presentations and speeches.

22. Consistent with his education, training, and professional associations, not a single one of the 78 listed accomplishments reference survey expertise in general or, more importantly, survey expertise in litigation involving intellectual property matters.

23. Therefore, by his own admission, <u>Dr. Rao is not an expert in the field of survey research</u>. <u>Rather, he is an economist who, it would appear, conducted a survey to support his damages theories</u>.

## **THE SURVEY DESIGN DID NOT ADDRESS THE STATED OBJECTIVES**

24. In paragraphs 19-24, Dr. Rao explains that he understands the parties' dispute to involve allegations of false claims in advertising and labeling with regard to the terms "impervious" and "fully impervious" and a color key system employed by Kimberly-Clark. In paragraph 26, Dr. Rao states that he designed his survey "to determine consumer awareness and understanding of the terms 'impervious' and 'fully impervious' and to measure the impact on the purchase decisions of surgical gown consumers." The survey, however, does not test these issues and, therefore, does not provide any meaningful information about consumer understanding of these terms.

25. In order to measure true consumer reaction and understanding, a well-designed survey should replicate, to the extent possible, the market conditions in which the relevant consumers would encounter the products or advertising at issue. (McCarthy, Section 32:163) Despite his stated

understanding of the false advertising claims at issue, Dr. Rao does not test consumer reaction to or understanding of any advertising claims. For example, Dr. Rao does not show consumers any of the advertisements at issue or ask them what meaning they take from specific advertising claims. Nor does he show consumers the actual label claims and ask what meaning they take from the labeling.

26. Dr. Rao also did not design the survey in a manner that would objectively test consumers' understanding of the terms "impervious" and "fully impervious." Rather, he prejudiced respondents by improperly defining "impervious" in the screening process and then compounded this error by asking leading, closed-ended questions that merely asked respondents to confirm the Defendant's own assertions about the meaning of "impervious" and "fully impervious."

27. The design of the survey is additionally flawed because it suffers from order effect bias. The Reference Guide at page 395 states: "The order in which questions are asked on a survey and the order in which response alternatives are provided in a close-ended question can influence the answers. Thus although asking a general question before a more specific question on the same topic is unlikely to affect the response to the specific question, reversing the order of the questions may influence responses to the general question. As a rule, then, surveys are less likely to be subject to order effects if the questions go from general (e.g., What do you recall being discussed in the advertisement?") to the specific (e.g., "Based on your reading of the advertisement, what companies do you think the ad is referring to when it talks about rental trucks that average five miles per gallon?").

28. After asking respondents numerous biased, closed-ended questions regarding the concept of imperviousness, Dr. Rao asked respondents in Questions 19 and 21, respectively, to rank the importance of various surgical gown features. Because respondents had been peppered with specific questions about imperviousness, which plainly equates to "barrier protection," they

were led to identify that feature as most important, particularly since none of the other features of surgical gowns had been previously discussed at all.

29. <u>The Rao survey clearly was not properly designed to test the issues he recognized to be in dispute, and he improperly defined the term about which he said he was seeking consumer perceptions. Thus his survey is without merit</u>.

## **THE SURVEY WAS SEVERELY BIASED**

30. In addition to the order effect bias of the questions discussed above, many of the questions themselves are improperly leading and biased, and thus unreliable.

31. This improper question bias began in Dr. Rao's screening questionnaire (Q9/14) where he gratuitously introduced the term "impervious" when it absolutely was not necessary to do so, to wit: "Do you use surgical gowns for your institution (sic) that could be classified as 'fluid resistant' or 'impervious' in surgeries where you are exposed to blood and other bodily fluids?" Asking this question clearly suggested that "fluid resistant" and "impervious" are synonymous despite the purpose of the Rao survey as stated in paragraph 26 of his Report, "…to determine consumer…understanding of the terms 'impervious' and 'fully impervious'…."

32. Despite recognizing the value of open-ended questions, Dr. Rao failed to use them.

33. Paragraph 44 of the Rao Report states, "I included open-ended questions in the surveys, as appropriate, to allow respondents to form their own responses. The advantages of using open-ended form (sic) these exploratory questions are to reveal the responses that individuals might give spontaneously."

34. And yet, the entirety of the Rao survey comprised 20 (mostly leading) questions, every one of which was "closed-ended," that is, all of his questions included prelisted alternative answers.

35. Thus, curiously, Dr. Rao tells us the question format that he should have used rather than the question format he actually used.

36. The probative survey protocol a survey expert would have used is to display the litigated ad with an appropriate instruction, for example: "Here is an ad for surgical gowns. Please read it carefully." The first specific probative question should have been, "Based upon reading this ad, do you have an opinion as to what it means for a surgical gown to be 'impervious?'" If the answer was "Yes," the follow-up question should have been, "What, if anything, does the term 'impervious' mean to you in the context of this ad?" These questions are not leading and the second question allows the respondent to provide his/her own answer as to the meaning of the disputed term.

37. However, Dr. Rao's very first (closed-ended, leading) question not only <u>emphasized the litigated issue</u>, the alleged "leaking" sleeve seams, it did so <u>by insinuating that a false claim</u> had been made with the use of "yet," to wit: "If a surgical gown is advertised as impervious, *yet* (emphasis mine) the sleeve seams allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be impervious?"

38. The next three closed-end questions also referenced the sleeve seams' allowing the passage of liquid or liquid-borne microorganisms. These first four questions are "leading" because they suggest the desired answer to the respondent.

39. Six of the remaining 16 questions also contained a leading phrase: Question #5 ("fluid resistance"; Question #6 ("liquid prevention"); Question #9 ("liquid passage"); Question #11 ("sleeve seams liquid prevention"); Question # 16 ("sleeve seams"); and Question #20 ("sleeve seams").

40. This means that 10 of the 20 questions were leading.

41. I have been engaged in intellectual property survey research since 1987 and these leading questions, individually and collectively, are the most biased and improper that I can recall.

42. <u>Therefore, again if only on this basis alone, the Rao survey is without merit</u>.

43. In addition, the troublesome leading nature of the questions was compounded by Dr. Rao's failure to follow standard survey protocol by discouraging his respondents from guessing. Most

survey experts would instruct their respondents as follows: "There are no 'right' or 'wrong' answers, so if you don't know an answer to a question or are unsure of your answer, its perfectly all right to check the 'Don't know' box and we'll just go on to the next question."

44. As discussed on pages 389-390 of <u>Reference Guide</u>, a survey expert should have a no-guessing instruction and/or a "No opinion" option displayed for each question. Dr. Rao recognized the importance of this requirement, as he stated in footnote 77 of his report:

> "Studies indicate that presentation of an explicit "Don't know" or "No opinion" alternative commonly leads to a 20 percent to 25 percent increase in the proportion of respondents who select that response. This reduces the demand for an answer and, as a result, the inclination to hazard a guess."

45. Yet, Dr. Rao ignored his own guidelines, having failed to instruct his respondents not to guess, and failing to include a "No opinion" option for 13 of the 20 closed-ended questions administered to surgeons and nurses (numbers 1-5, 7-9, 11-12, 14-15 and 20) and 13 of the 20 questions administered to purchasing agents (numbers 1, 3-7, 9-11, 13-14, 16-17 and 22).

46. Absent the discouragement of guessing, it is possible that all of the respondents' answers to Dr. Rao's leading questions are based upon guesses rather than knowledge or opinion. "When people are asked about an object about which they have no knowledge, researchers hope that respondents will say that they have no opinion, are not familiar with the object, or do not know how they feel about it. But if a question's wording suggests that respondents should have opinions, they may not wish to appear uninformed and therefore give an arbitrary answer. ... Indeed, respondents have been willing to offer opinions about obscure or purely fictitious objects." Jon A. Krosnick, "Survey Research," <u>Annual Review of Psychology</u> (1999), vol. 50 at 557.

47. <u>Therefore, because some or all of the answers to his (leading) questions may have been pure guesses, the Rao survey is without merit.</u>

**NO ATTEMPT WAS MADE TO EMPLOY CONTROL QUESTIONS**

48. Dr. Rao made no attempt to employ control questions that could have helped measure and isolate "noise" and other measurement error (such as yea-saying and respondent's pre-existing beliefs) that may be present to some degree.

49. As noted in Reference Guide at 401:

    "Every measure of opinion or belief in a survey reflects some degree of error. Control groups and, as a second choice, control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question."

50. It is common practice to include brands and categories that do not exist to measure the degree of yea-saying. Among the Rao questions that beg for such an approach are Q18/20, which ask which surgical gowns the respondent has used/purchased. If non-existent brands had been included, the percentage of people, if any, choosing this option would help account for noise.

51. Dr. Rao's failure to employ control questions further undermines the reliability of his survey, further illustrates his lack of expertise in survey research, and further substantiates my opinion that his survey is without merit.

**THE DATA WAS NOT ACCURATELY REPORTED**

52. The Rao Report violated several report-writing principles observed by survey experts.

53. It is axiomatic in survey research conducted solely for the purpose of litigation that the expert show and discuss the results of every question posed to respondents. For reasons that are unclear, Dr. Rao chose not to report the results of 6 of the 20 (leading, closed-ended) questions he asked surgeons and nurses:

    Question #4. If a surgical gown is made of impervious fabric, but the seams of the gown allow the passage of liquid or liquid-borne microorganisms, would you consider that gown to be fully impervious? [Yes / No]

    Question #6. If a surgical gown prevents the passage of liquid or liquid-borne microorganisms in the

shaded areas depicted, then what AAMI Level does that gown meet?
a. AAMI Level 1
b. AAMI Level 2
c. AAMI Level 3
d. AAMI Level 4
e. None
f. Don't know

Question #8. Does the red color in the color-key system depicted here convey any message about which areas of the gown are impervious? [Yes / No]

Question #9. Would you expect the shaded areas in the red column of the color-key system depicted here to allow the passage of liquids or liquid-borne microorganisms? [Yes / No]

Question #10. Which areas of the gown in the color-key system depicted here do you understand to be impervious?
(Select all that apply)
a. Front of gown in the shaded area
b. Sleeve material in the shaded area
c. Sleeve seams in the shaded area
d. Other (please describe):
e. None
f. Don't know

Question #12. Do you associate the surgical gown in the image with any of the AAMI Levels? [Yes / No]

In addition, Dr. Rao chose not to report the results of 7 of the 20 (leading, closed-ended) questions he asked of purchasing agents: Numbers 1, 2, 6, 8, 10, 11 and 14.

54. Given the other flaws in Dr. Rao's survey, one would correctly conclude that it is not important to know the unreported answers to these 13 questions. But still, their omission does cause the reader to wonder why the answers were not reported.

55. In addition, Dr. Rao placed all of his tabular data in Tabs 10 and 11 appended to his report rather than in the report body, as would be expected. This placement makes it difficult for the reader to match his reported data to the actual questions. But when one perseveres, one finds that his questionnaire numbers and data question numbers do not match. For example, Tab 10 surgeon and nurse data identified as numbers 1-7 actually portray the data from questionnaire numbers 5, 3, 1, 2, 7, 11 and 13. This mismatch, whether intentional or not, makes it difficult to reconcile the questions and answers.

56. The same mismatched numbers problem is also observed in Tab 11 for purchasing agents.

57. <u>The failure to report numerous answers and the mismatch of data and explanatory prose suggest an intent to mislead the reader.  At a minimum, this conduct is yet another illustration of Dr. Rao's lack of survey expertise</u>.

### SUMMARY OPINION

58. Dr. Rao is not a survey expert, his survey was poorly designed, he failed to follow many accepted procedures (even several he acknowledged), asked plainly leading questions, had no control mechanism, and failed to properly report the results.

    <u>Accordingly, it is my opinion that Dr. Rao's survey and the opinions flowing from his survey have no probative value</u>.

I respectfully reserve the right to amend these opinions with further comments in the event that more information becomes available.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

_____          January  3, 2012
Kenneth Hollander

# EXHIBIT A

# Kenneth Hollander Deposition and/or Trial Testimony: 2007-2012

U.S. District Court for Central District of California Western Division. Nissan Motor Co. Ltd. and Nissan North America, Inc. v. Nissan Computer Corporation and The Internet Center, Inc., CV 99-12980 DDP (Mcx).

U.S. District Court District of New Jersey. IDT Telecom Inc. and Union Telecard Alliance, LLC v. CVT Prepaid Solutions, Inc. CV 07-1076

U.S. District Court Central District of California. TrafficSchool.Com, Inc. v. Edriver, Inc. CV06-7561 PA (Cwx)

U.S. District Court Southern District of California. Brighton Collectibles, Inc. v. Renaissance Group International and Ralph's Grocery Company, CV-06-1115 H POR

U.S. District Court Northern District of Illinois Eastern Division, Luster Products v. Intimate Beauty Corporation and V. Secret Catalogue, Inc, CV05C-4527

U.S. District Court Southern Division of Georgia, Savannah Division, Peter Brasseler Holdings, L.P. v. GEBR.Brasseler GmbH & Co., CV407-025-BAE

U.S. District Court, Central District of California, Carter Bryant v. Mattel, Inc., CV 04-9049 SGL (RNBx)

U.S. District Court, Central District of California, Western Division, Chicken Soup for the Soul v. Health Communications, CV 08-00890 SVW (JTLx)

Superior Court of the State of California, County of Los Angeles, West District, Idol Go Home v. American Idol Productions, SC089798

U.S. District Court District of Maryland, Northern division, The Coryn Group v. O.C. Secrets, 08-cv-02764-WDQ

U.S. District Court, Southern District of Maryland, ING Bank v. PNC Financial Services, CV08-514

U.S. District Court, Western Division of Arkansas, Hot Springs Division, Georgia-Pacific Consumer Products v. Myers Supply, 6:08-cv-06086-RTD

Superior Court of California, County of Alameda, Maria Jones v. DineEquity, Inc., RG08391858

Superior Court of California, Court of San Diego, L'Oreal USA S/D Inc. v. Bot Hair, L.P.; SD Hair, Ltd; Hair of Nevada, LLC, 37-2008-00078069-CU-BT-C

Superior Court of California, County of Los Angeles, Curt Schlesinger and Pewter Lore v. Ticketmaster, BC 304565

U.S. District Court Middle District of North Carolina Greensboro Division, Sealy Corporation v. Simmons Bedding Company, 1:10-cv-00702

U.S. District Court Central District of California, American Optometric Society v. American Board of Optometry, CV10-03983-AHM