**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **KIMBERLY-CLARK CORP.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | **Civ. Action No. 1:10-cv-34-CAP** |
| **v.** | ) | |
| | ) | **Judge Charles Pannell, Jr.** |
| **CARDINAL HEALTH 200, LLC** | ) | |
| **f/k/a CARDINAL HEALTH 200,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**CARDINAL HEALTH 200, LLC'S RESPONSE**
**TO KIMBERLY-CLARK'S MOTION *IN LIMINE* TO EXCLUDE THE**
**SURVEY AND TESTIMONY OF MOHAN RAO, PhD.**

### Introduction

For more than two years, Kimberly-Clark has avoided answering (or asking) the central question at issue in this case: do gown users or purchasers consider a gown with leaky sleeve seams to be impervious? That question has now been answered definitively by the survey conducted by Cardinal's expert, Dr. Mohan Rao, PhD., an economist and survey expert. The answer is no.

Kimberly Clark doesn't like that answer: caught flat-footed with no survey evidence of its own, Kimberly-Clark now launches an undignified *Daubert* attack on Dr. Rao personally and professionally, suggesting that Dr. Rao is somehow not a survey expert, that he is "untruthful" and that his survey is defective and

unreliable. The motion seeks to exclude Dr. Rao's survey based on defects Kimberly-Clark's experts speculate may exist in the survey; of course, without any survey evidence of their own, they cannot say for sure that these defects *actually* exist in Dr. Rao's survey. *See Cardinal's Daubert Motion to exclude Opinions of Kenneth Hollander and Kenneth Bernhardt, Doc. No. 251.* Although the Eleventh Circuit has held that such alleged defects go to the weight and not the admissibility of survey evidence, Kimberly-Clark nonetheless argues that Dr. Rao's survey is the very rare exception and warrants outright exclusion under *Daubert*.

Kimberly-Clark further argues that the question it cannot answer (and still hope to win) should never be asked; belittling this central question posed by Dr. Rao:

> If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid borne microorganisms, would you consider that gown to be impervious? Yes/No

Kimberly-Clark then provides a "translation" of this survey question for the Court that reveals the absurdity of Kimberly-Clark's entire litigation position and apparently admits what Cardinal has been arguing from the first. According to Kimberly-Clark, Dr. Rao's question should be translated this way:

> "Translation: if a product is advertised as X, *yet that claim was not true*, would you think that claim was true?"

*Kimberly-Clark's Memorandum of Law ("Memo") at p. 17, Doc. No. 245 (emphasis added).* In other words, by Kimberly-Clark's own admission, if a surgical gown has leaky sleeve seams, then a claim of imperviousness is "not true." If Kimberly-Clark truly believes that statement -- that the presence of leaky sleeve seams means a surgical gown is not impervious -- this case should be over, because Kimberly-Clark has never maintained that the sleeve seams of its KC400 don't leak; it just maintains that even with leaky sleeve seams, the KC400 can still be advertised as "impervious."

The Court has observed that the "key questions that must be answered in this case" are the meaning of the terms "impervious" and "fully impervious" as those terms are used in the marketing of surgical gowns. *Order of September 7, 2012, Doc. No. 224.* Dr. Rao's survey addresses those questions directly; when Kimberly-Clark markets a gown with leaky sleeve seams as "impervious," do consumers of surgical gowns believe the gown is "impervious" (or "fully impervious")?

Contrary to Kimberly-Clark's scatter-shot attacks, Dr. Rao is a qualified economist and survey expert, and his survey addresses those key questions fairly and in accordance with recognized survey methodology. Kimberly-Clark's motion should be denied.

## Survey Conducted by Cardinal's Expert, Dr. Mohan Rao, Ph.D.

In order to shed light on the meaning of the contested terms and meet its burden under the Lanham Act on its Counterclaim[1], Cardinal retained Dr. Mohan Rao, Ph.D. ("Dr. Rao"), a survey and damages expert affiliated with Navigant Economics. Dr. Rao conducted a consumer survey assessing, among other things:

> (1) the scope of gown users' and purchasers' understanding of the definitions of "impervious" and "fully impervious;"
>
> (2) any confusion engendered by the use of those terms;
>
> (3) whether any such confusion was material to the surgical gown buying decisions at issue – that is, whether and to what extent users and purchasers of the Kimberly-Clark KC 400 MicroCool Surgical Gown ("KC 400") would be expected to switch to a different gown if the sleeve seams of the KC 400 were shown to leak; and
>
> (4) the messages conveyed by the Kimberly-Clark Color Key System.

Dr. Rao's survey in part sought opinions on the hotly contested issue in this case: do the definitions of the terms "impervious" and "fully impervious" apply to the KC 400 if (as will be shown) the gown leaks at the sleeve seams?

The survey was designed by Dr. Rao and fielded by WorldOne, a global healthcare research company with access to a panel of over 1.7 million healthcare professionals, including surgeons, surgical nurses, and procurement personnel. Utilizing the Computer Assisted Web Interviewing ("CAWI") technique, the

---

[1] Kimberly-Clark retains the burden of proof on its affirmative claims.

double-blind survey was administered via the internet to random samples of two relevant populations, surgeons/surgical nurses and procurement personnel. *Ex. 1, Rao Report, p. 15-29*. Random sampling is a scientifically sound and widely accepted technique that provides an efficient and cost-effective method to assess the views of an entire population using only a sample of consumers. *Id.*

In order to project the results of the random sample to the population at large, the sample size for each group was determined using recognized statistical methodologies for each sample. *See Ex.1, Rao Report, p. 20-21, ¶¶ 39-41 (citing Sharon Lohr, "Sampling: Design and Analysis", Duxbury Press, 1999, page 24; Chava Frankfort-Nachmias and David Nachmias, Research Methods in the Social Sciences, Sixth Edition, Worth Publishers, 1999, pages 179-181) and Tabs 6-7).*

Once the survey was completed, Dr. Rao reported the results for each group. First, he analyzed the survey results to determine what meaning gown users take from the terms "impervious" and "fully impervious," *i.e.*, whether Kimberly-Clark's (or, for that matter, Cardinal's) advertising claims are deceptive. Second, he analyzed the results to determine a switching percentage – specifically, what percentage of the identified KC400 users/purchasers would be expected to switch to a different gown if they knew the sleeve seams of the KC400 leaked. To do so, Dr. Rao determined the number of KC400 users/purchasers in each group, and

within that group considered those that (1) were aware of the KC400 being described as impervious, and (2) ranked "barrier protection" as the most important attribute in selecting the gown, and (3) would have switched to a different gown had they had known that sleeve seams allowed penetration of liquid or liquid-borne microorganisms. Comparing the number of KC400 users/purchasers who met those three criteria with the total number of KC400 users/purchasers, Dr. Rao concluded that 57% of KC400 gown users/purchasers would be expected to switch. *Ex. 1, Rao Report, p. 29.*

## Legal Standard

The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). Federal Rule of Evidence 702 provides:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Under Rule 702 and *Daubert,* the district court is required to act as a "gatekeeper," admitting expert testimony if it is both relevant and reliable. *Rink*, 400 F.3d at 1291 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579, 597 (1993)); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that [FRE] 702 imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'"). The purpose of this function is to "'ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink,* 400 F.3d at 1291 (citations omitted). The district court must ensure that testifying experts employ the same level of intellectual rigor in the courtroom as in their relevant fields outside the courtroom. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Kumho Tire Co., Ltd.*, 526 U.S. at 152). "It is not necessary that the witness be recognized as a leading authority in the field in question….Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony not its admissibility." *Leathers v. Pfizer, Inc.,* 233 F.R.D. 687, 692 (N.D. Ga. 2006), *citing* 29 Wright & Gold, Federal Practice and Procedure: Evidence*; cited with approval in Nightlight Sys. v. Nitelites Franchise Sys.*, 2007 WL 4563873 (N.D. Ga. 2007).

When considering survey evidence, the Eleventh Circuit has held that alleged technical deficiencies in a survey presented in a Lanham Act action affect the weight to be accorded the survey and not its admissibility. *Jellibeans Inc. v.*

*Skating Clubs of Georgia*, 716 F.2d 833, 844 (11th Circuit 1983); *cited in Atlanta Allergy and Asthma Clinic v. Asthma and Allergy of Atlanta, LLC*, 685 F.Supp 2d 1360, 1372 (N.D. Ga. 2010).

**Argument**

I.    <u>Dr. Rao is a qualified survey and damages expert</u>

Kimberly-Clark unfairly attacks Dr. Rao, and by implication his work, maligning his experience and qualifications as a survey expert, calling his testimony about his experience "untruthful" and saying his work "exceeds his qualifications" and is a "farce" and "silly." *Memo, pp. 1, 10, 17; Motion, p. 1* These criticisms are wrong and unnecessary, as Dr. Rao more than meets the qualifications necessary for survey expertise. Kimberly-Clark ignores the *Reference Guide on Survey Research* direction that:

> Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, *political science*, marketing, communication sciences, *statistics, or a related discipline*; that training should include courses in survey research methods, sampling, measurement, interviewing, and statistics. In some cases, professional experience in teaching or conducting and publishing survey research may provide the requisite background. (Italics added)

Ex. 2, Diamond, S.S. (1994) *Reference Guide on Survey Research*, *In <u>Reference Manual on Scientific Evidence</u>,* Washington, D.C.: Federal Judicial Center, pp. 221-271, 375 (hereafter "Reference Guide").

Dr. Rao's academic and professional record more than satisfies the *Reference Guide* requirements for survey expertise. Dr. Rao has graduate degrees in both economics and political science, and has taught statistics for the past twenty years. *Ex. 1, Tab 1; Ex. 3, p. 13.* As he testified, his graduate training included extensive coursework in statistics, sampling, and survey research. *Id. p. 13.* Dr. Rao also taught Ph.D.-level courses at UCLA in survey methodology and analysis, statistical analysis, statistical sampling and sampling specifically related to surveys, and he lists among his accomplishments at least eight publications or presentations in the area of survey design and methodology. *Id., p. 58, 61.*

Kimberly-Clark cites some of the professional materials authored by Dr. Rao as evidence that he is not qualified, but apparently failed to read them. Dr. Rao's paper *"Inferring Micro- from Macrolevel Change: Ecological Panel Inference in Surveys,"* relates extensively to survey methodology and analysis; Dr. Rao developed a novel statistical approach to improving the quality of public opinion surveys, and addressed the very concerns encountered in consumer opinion surveys, including how to reduce "priming" of respondents in survey research, sub-aggregating relevant groups from a larger population, interpreting survey responses using a binomial distribution, selecting sample

size, and sampling errors — all issues relevant to the survey conducted in this matter. *Rao and Schuessler, "Inferring Micro- from Macrolevel Change: Ecological Panel Inference in Surveys," Ex. 4.* Dr. Rao has also presented to academic and professional audiences on survey analysis. *See e.g. Ex. 5. Use of Statistics in IP Litigation, Dec. 1, 2005* (addressing survey design, including open-ended questions, appropriate question order, question framing, appropriate sample size and identification of a relevant population (Mohan Rao, PhD., sole presenter)).

Not surprisingly, Dr. Rao has been qualified as a survey expert in litigation matters in the past, including cases where the sole focus of his testimony was the design, implementation, and analysis of consumer perceptions based on a consumer survey. As one example, in the case of *Federal Trade Commission v. Mercury Mark. of Delaware* (E.D. Pa. 2004), Dr. Rao designed and conducted a survey of consumer perceptions about their telephone bills, and his testimony as a survey expert was accepted by the court. *See Report of Mohan Rao, Ph.D., (August 23, 2004) Ex. 6.*

Kimberly-Clark falsely alleges that Dr. Rao "misstated his consumer survey experience in at least 3 litigation matters" and was "untruthful." *Memo, p. 8; Motion, p. 1.* However, even a cursory review of those three

matters demonstrates that Dr. Rao's testimony is consistent with his work in those cases, which reinforces his qualifications as a survey expert. In *Procter & Gamble v. Ultreo Inc.,* Kimberly-Clark suggests that "the consumer survey relating to the alleged false advertising was addressed by an entirely different set of experts." *Memo, p. 8.* In fact, as Dr. Rao testified, he critiqued one of the surveys advanced in that case, and provided testimony on sample size, sample selection and survey sampling methodology. *Ex. 3, pp. 13, 36-37.* In the same court order, 574 F.Supp.2d 339, 250 (S.D.N.Y. 2008) (Ex. 7), cited by Kimberly-Clark, the Court specifically references Dr. Rao's critique as a basis for rejecting the survey at issue (performed by Coulter-Renken):

> The Coulter-Renken Study is based on a sample of 3,116 internet survey respondents. However, the study itself does not provide any indication of how this sample was selected. (Rao. Decl. at 17). There is no indication of whether the universe from which these respondents were chosen was a properly defined universe, or whether the 3,116 respondents constituted a representative sample of that universe. Without any information as to the composition and selection methodology of the survey sample, the Coulter-Renken study is simply not probative of irreparable injury.

Moreover, in his testimony here, Dr. Rao never claimed that he was the sole expert responding to the opposing expert's survey. *Ex. 3, pp. 36-37.*

Kimberly-Clark also dismisses Dr. Rao's work in *LG Electronics U.S.A v. Whirlpool Corporation*, stating that Dr. Rao is "a damages expert," and "his

opinions did not pertain to consumer perceptions" and "a separate set of experts dealt with the consumer survey issues." *Memo* p. 8. As he testified, in *LG Electronics,* Dr. Rao reviewed several consumer perception surveys relating to steam dryers, evaluating the surveys on robustness of design and relevance, and testifying as to those issues. *Ex. 3, p.19*. As set forth in the Court's order in that case, Dr. Rao provided testimony about the surveys and consumer perceptions. *Ex. 8, LG Electronics U.S.A. v. Whirlpool Corp.*, *2010 WL 3397358 (N.D.Ill. Aug. 24, 2010).*

In another *LG Electronics U.S.A v. Whirlpool* matter involving refrigerators, Kimberly-Clark claims "Dr. Rao again served as a damages expert while a different witness…opined about consumer perception of various ads." *Memo p. 8-9.* However, Dr. Rao in fact collaborated to design a survey in that matter, and never suggested that he was the sole designer of the survey; when asked if he designed the survey he responded:

> A. [I] collaborated in the design of the survey with [another] firm. They largely executed it. The bulk of the input came from me, [but] in that case, there was a second person as well who was involved… with the design of it.

Rao Dep. p. 17. Dr. Rao has "misstated" nothing: in its efforts to 'shoot the messenger,' Kimberly-Clark grossly misrepresents Dr. Rao's qualifications and

experience. He is well-qualified to design and implement surveys, and to offer survey opinions in this case.

## II.    Dr. Rao surveyed a relevant universe of respondents

Kimberly-Clark alleges that Dr. Rao's screening questions yielded an irrelevant universe of gown users/purchasers by failing to ascertain the degree of influence of each in the purchasing decision. *Memo p.12.* This argument ignores the fact that Dr. Rao had already identified an appropriate population of influential gown users/purchasers as including surgeons/surgical nurses and procurement personnel. Dr. Rao did not develop this survey universe from thin air; as set forth in his report, the decision to include surgeons/surgical nurses and procurement personnel was made by reference to both parties' own internal marketing documents, which identify surgeons, surgical nurse and procurement personnel as the relevant target market, as well as interviews of Cardinal personnel. *Ex. 1, p.17, ¶ 31, FN 59.*

Dr. Rao also validated the propriety of including these groups in the survey. For surgeons/surgical nurses, the survey asked procurement personnel "[w]hen ordering surgical gowns, do you seek input from any of the following" (Select all that apply) Surgeons and/or nurses, Administrators, Other (please describe), None." *Ex. 1*, *Tab 9, Q 2.* Procurement personnel overwhelmingly selected

surgeons/nurses as the group consulted. *Ex. 3, pp. 97-98*. Dr. Rao's survey also insured that procurement personnel had more than a trivial role in purchasing surgical gowns, but in fact actually order gowns, asking: "*Do you order* surgical gowns for your institution that could be classified as 'fluid resistant' or 'impervious for use in surgeries where surgical staff are exposed to blood and bodily fluids?" (italics added). *Ex. 1, Tab 4, Q 14-15*.

Moreover, Kimberly-Clark and its experts have no basis for their untested hypothesis that variations in the respondents' degree of influence would impact the survey results in any way. In fact, the lack of any impact is demonstrable from Dr. Rao's survey results. Dr. Rao excluded from the survey purchasing personnel who indicated they had no influence in the purchasing decision, but included in the survey surgeons and surgical nurses who indicated they had no influence. This inclusion allows a test of any impact; when the results are recalculated by standard statistical methods to exclude the "no influence" surgeons/surgical nurses, the switching percentage changes from 58.4 percent to 58.2 percent, which Kimberly-Clark's expert, Dr. Bernhardt admitted is not a material impact. *Ex. 3, pp. 210-212; Ex. 9, Bernhardt Dep. p. 60*. Because Kimberly-Clark provides no evidence that a different "survey universe" would have produced different results, its criticism is without basis, and in any event, goes to the weight afforded the survey, not its

admissibility. *Nightlight Sys. Inc.*, 2007 WL 4563873, at \*7 (where plaintiff provided little support indicating different universe would produce different results, extent to which universe may be flawed goes to weight, not admissibility).

III.    The survey population is appropriately defined

Kimberly-Clark suggests that Dr. Rao failed to include in the survey other groups potentially involved in the purchasing decision, such as OR managers, infection control personnel and material managers. Dr. Rao's survey was designed to "determine consumer awareness and understanding of the terms 'impervious' and 'fully impervious' and to measure the impact on the purchase decision of surgical gown consumers…" *Ex. 1, p. 15 ¶ 26*. Dr. Rao validated the inclusion of the selected population, and included the group (surgeons/surgical nurses) overwhelmingly identified by procurement personnel as being involved in the purchasing decision. Kimberly-Clark's suggestion that Dr. Rao needed to survey all relevant groups surveyed in an AAMI-commissioned study misses the point; Dr. Rao's survey was intended to target directly those that influenced gown purchases, and the AAMI study was not. Again, Kimberly-Clark provides no evidence that the results would be different if all conceivable groups were included, and such criticism goes to the weight afforded the survey, not its admissibility. *Nightlight Sys.*, 2007 WL 4563873, at \*7.

IV.    The sample was representative of the population

Dr. Rao's survey sample is representative of the population. As the *Reference Guide* teaches, all survey samples produce estimates of population values, not exact measures of those values. *Ex. 2, p. 381*. Kimberly-Clark argues that Dr. Rao's survey is not a probability sample, when in fact the *Reference Guide* defines a stratified random sample like the one employed by Dr. Rao as one type of probability sample. *Id. at 380*. Consistent with standard survey methodology, Dr. Rao used randomly selected samples from within relevant populations to project results to the populations at large. *Id.; Ex. 1, pp.19-20*.

Kimberly-Clark next argues that Dr. Rao failed to account for certain demographic differences in the sample population. *Memo p. 14-15*. In fact, as Dr. Rao testified, he did perform standard statistical tests to determine if there were relevant differences in responses based on surgeon versus surgical nurse, or surgical specialty, and there were none. *Ex. 3, pp. 100-103*. No random sample can capture an absolute cross-section of any group, especially when surveying elite populations such as those surveyed here. *See "Elites and Other Special Populations" Pew Research Center for the People & the Press (2013) Ex. 10* (acknowledging particular challenges in sampling "experts or elites in particular fields" including the difficulty of contacting those populations.) Nonetheless, Dr.

Rao utilized recognized survey methodology to sample an appropriate and relevant sample population; Kimberly-Clark provides no evidence showing the defined sample population affected the results, and its speculative arguments go to the weight afforded the survey.

V.      Dr. Rao's questions were not leading.

Kimberly-Clark next suggests that certain of Dr. Rao's questions were leading. *Memo p. 16-17.* In his screening questions, Dr. Rao asked respondents: "Do you use [or order] surgical gowns for your institution that could be classified as 'fluid-resistant' or 'impervious' in surgeries where you [or the surgical staff] are exposed to blood or other bodily fluids?" Rao Report, Tab 4, Q 9-14. Kimberly-Clark suggests that including the phrase "fluid resistant *or* impervious" *defined* impervious *as* fluid resistant. The question provides no definition of either of these terms (common descriptive terms for the gown category at issue), while seeking only to screen those with experience in the category. Moreover, Kimberly-Clark's expert's suggestion that these questions "define" impervious to *mean* "fluid-resistant" is belied by the use of the connector "or," rather than the connector "and." In any event, Kimberly-Clark identifies no recognized standard or methodology to support the view that these screening questions improperly "defined" the term "impervious."

VI.     The substantive survey questions addressed
        the central issue in a non-leading manner

Again hoping to avoid the central question at issue, Kimberly-Clark argues that Dr. Rao asked the substantive questions in a leading manner. On the contrary, Dr. Rao's questions were designed to test the central issue directly in an even-handed manner, to wit:

> If a surgical gown is advertised as impervious, yet the sleeve seams allow the passage of liquid or liquid borne microorganisms, would you consider that gown to be impervious? Yes/No

It is not entirely clear which answer Kimberly-Clark believes was suggested, yes or no (and in any event, Dr. Rao controlled for the phenomena of "yea-saying" by turning the question around at times, from "allow" to "prevent.") *Ex. 1, Tab 8, Qs. 2-3.* As set forth in the academic literature, Dr. Rao followed proper survey protocol, which dictates using specific questions rather than general ones. *See "Sampling: Design and Analysis" at p. 12.* Rather than asking respondents for a general definition of "impervious" or "fully impervious," the question was refined to explore gown users/purchasers' understanding of those terms as they impact the central issue here: do gown users/purchasers believe a gown with leaky sleeve seams is impervious (or fully impervious) or not? Kimberly-Clark's surprising "translation" reads Dr. Rao's question this way:

>"Translation: if a product is advertised as X, *yet that claim was not true*, would you think that claim was true?" (emphasis added)

This "translation" fails to follow the form of the question, or show how it is leading: using Kimberly-Clark's logic, a fair translation might be "if a product is advertised as X, but some condition [Y] exists, would you consider the product to be X?, such as, "If a car is advertised as fuel-efficient, yet the car gets 41 miles to the gallon, would you consider that car fuel-efficient?" (Indeed, all the Kimberly-Clark "translation" shows is that it apparently agrees with Cardinal: if a gown has leaky seams, a claim that it is impervious is not true.) Dr. Rao's question directly tests the respondents' beliefs regarding the central issue in this case, and does so in a non-leading manner.

Dr. Rao also fairly assessed the attributes most important to the gown purchasing decision. Kimberly-Clark suggests that first asking specific questions about "imperviousness" unfairly prejudiced the respondents to later choose "barrier protection" as the most important attribute (from a list of attributes that Kimberly-Clark's expert agreed was appropriate). *Memo p. 18:* "Kimberly- Clark MicroCool Breathable Impervious Surgical Gowns," KCp0001170-KCp0001175, at KCp0001171. Of course, the only way to test this presumed order effect bias is to perform a survey re-ordering the questions, which neither

Kimberly-Clark expert has done. *Ex. 2, p. 395-396; Ex. 11, Hollander Dep., p. 64*; *Ex. 9, p. 63*.

VII.   <u>Dr. Rao's survey replicated relevant market conditions.</u>

Cardinal has two principal contentions in this case (1) that the Kimberly-Clark Color Key system conveys the impression to consumers that the sleeve seams of the KC400 are impervious when they are not, and (2) that Kimberly-Clark's use of the term "impervious" in marketing the KC400 – in any manner – is improper, because it is not in fact impervious. Therefore, the relevant market conditions in this case are the images of the Color Key system, and the meaning of the term "impervious" as used by Kimberly-Clark to describe the KC400. Dr. Rao's survey tests both under appropriate market conditions.

First, Dr. Rao showed respondents the Color Key System and asked questions about the meanings perceived by respondents. Dr. Rao's questions allowed respondents to provide a wide range of responses: having no opinion ("None" and "Don't Know"), forming their own responses ("Other (please describe)_____") , or selecting options from a list. *Ex. 1*, p. 21 *¶ 44 and Tab 9, Q.11*.

Second, as described above, the survey asked respondents directly about their impressions of using the terms "impervious" or "fully impervious" in

connection with marketing a gown with leaky sleeve seams. Dr. Rao's survey elicited responses bearing directly on that central issue. Cardinal contends the use of those terms in connection with the KC400 – in any context – is improper, and Dr. Rao appropriately addressed that issue in the questions posed in the survey

VIII.  Dr. Rao's survey contains standard survey controls

Kimberly-Clark argues that Dr. Rao's survey failed to follow "several other" standard survey methodologies, including failing to use controls to discourage guessing. However, Dr. Rao does use controls, including control questions, where necessary to discourage guessing. Courts have recognized that a control question is one that offers a "don't know" or "no opinion" option as a response to a closed question, to screen out respondents who may not have an opinion on the issue and to minimize guessing. *Procter & Gamble Pharms., Inc. v. Hoffman-LaRoche, Inc.,* 2006 WL 2588002, at *23 (S.D.N.Y. Sept. 6, 2006). Dr. Rao used these open-ended forms as controls where appropriate, allowing respondents to select an answer, or provide their own narrative answer, or choose options such as "Other" "None" or "Don't Know" on seven of the twenty survey questions. *Ex. 1, Tabs 8 & 9.* As Dr. Rao observed, the purpose of those questions is to discourage guessing and filter out noise. *Ex. 1, p. 44.* Moreover, Kimberly-Clark

criticizes Dr. Rao for failing to use controls, but provides no evidence that additional controls would have affected the results.

Kimberly-Clark also suggests that Dr. Rao failed to screen the respondents to determine potential bias or validate the identity of the respondents. However, by its very nature, the random sample employed by Dr. Rao is designed to minimize potential bias. *Ex. 2, pp. 380, 385-386.* As Dr. Rao testified, the likelihood of any potential bias having a significant impact on the results is speculative, and by any reasonable measure trivially small, and Kimberly-Clark provides no contrary evidence. *Ex. 3, pp. 105-108.* [2]

IX. <u>Dr. Rao's switch rate is calculated appropriately</u>.

Kimberly-Clark still fails to grasp the concept of the "switch rate" calculated by Dr. Rao. In his report, Kimberly-Clark's expert, Dr. Bernhardt, opines that Dr. Rao used an inappropriate base to calculate an expected percentage of KC 400 users/purchasers that would switch to a different gown if they knew the sleeve seams leaked. Dr. Bernhardt could not recall ever calculating a switching

---

[2] Kimberly-Clark's argument that the form Dr. Rao's report somehow influenced the results is ridiculous. *Memo pp. 22-23*. Cardinal provided all answers to all questions to Kimberly-Clark, and its experts confirmed they were able to track and analyze them. Although Dr. Rao's report only discussed the questions most relevant to confusion and materiality, all questions and answers were made available, and Kimberly-Clark fails to indicate how the form of the report affects the results or the survey validity.

percentage before, and his opinion demonstrates a fundamental misunderstanding of the methodology for doing so and the survey design employed by Dr. Rao. *Ex. 9, p. 42.*

Analyzing the results of the survey, Dr. Rao determined the number of KC 400 users/purchasers who (1) were aware of the KC 400 being described as "impervious, *and* (2) ranked barrier protection as the most important feature in gown selection, *and* (3) would have switched to a different gown if they had known the sleeve seams leaked. *Ex. 1, Tabs 10 & 11, Q. 14.* He then divided the number of KC 400 gown users by the number responding affirmatively to all three questions, to yield a percentage of KC 400 gown users that would be expected to switch. *Id.*

In Dr. Bernhardt's report, he provides a badly flawed recalculation of the switch rate, which Kimberly-Clark adopts in its motion. He has since testified that he does not believe the methodology he presents is an appropriate way to compute the switching percentage *Ex. 9, p. 81*, and he is correct. In his calculation, Dr. Bernhardt divides the number who indicated they would switch (again, who had heard KC 400 described as impervious/ranked barrier protection most important/said they would switch) *by the total adjusted number of those taking the survey.* By Dr. Bernhardt's calculation, this yields switching percentages of 14%

for surgeons and surgical nurses, and 22% for procurement personnel (as opposed to Dr. Rao's conclusions of 57% and 58%). *Ex. 12, Bernhardt Report, p. 11, ¶ 25.*

When calculating the percentage of those who would be expected to switch from the KC400, the obvious pre-condition is that the consumer must first be a KC400 user/purchaser. Although Dr. Bernhardt admits that one cannot switch if one is not using/purchasing the KC 400, *Ex. 9, p. 77*, he ignores that precondition. Dr. Bernhardt instead uses a base which includes all respondents, including those *who did not use/purchase the KC 400 gown*, and *were never asked the switching question*. Put another way, by including non-users/non-purchasers in the base, Dr. Bernhardt in effect assumes that KC 400 non-users/non-purchasers would *not* switch. Because Dr. Bernhardt has apparently disavowed this calculation, and it is fundamentally wrong, Kimberly-Clark's recalculation of the switch rate has no merit.[3]

Dr. Rao's switch rate is also calculated from an appropriate sample size. In his report, Dr. Rao details the recognized methodologies he used to determine the appropriate sample size for surgeons/surgical nurses and procurement personnel. *Ex. 1, p. 20-21.* Calculating statistics for relevant groups from an appropriately

---

[3] As set forth in Section 8 above, the survey contains sufficient controls to alleviate any concern that purchasers/users with no influence over surgical gown purchasing were included in the switch rate calculation.

sized sample is the hallmark of survey analysis. *"Sampling: Design and Analysis" at p. 12, p. 3; Ex. 3, p. 114.* Kimberly-Clark fails to show that Dr. Rao deviated from these standard methodologies.

## CONCLUSION

Dr. Rao is a competent and qualified expert in the area of survey design and analysis, and his survey follows standard survey methodologies. The majority of Kimberly-Clark's criticisms are based on speculation, not established methodology, and those that are not go to the weight afforded the survey, not its admissibility. The motion should be denied.

Dated:  February 28, 2013

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Steven J. Thompson
Ethan E. Trull (*admitted pro hac vice*)
Steven J. Thompson (*admitted pro hac vice*)
Samera S. Ludwig (*admitted pro hac vice*)
Lisa C. Sullivan (*admitted pro hac vice*)
Ungaretti & Harris LLP
3500 Three First National Plaza
Chicago, Illinois 60602
312-977-4400
312-977-4405 facsimile

Earl W. Gunn
Georgia Bar No. 3158262
William C. Buhay
Georgia Bar No. 093940
wbuhay@wwhgd.com

</div>

Weinberg, Wheeler, Hudgins,
Gunn & Dial, LLC
One Atlanta Plaza – Suite 3000
950 East Paces Ferry Road
Atlanta, Georgia 30326
404-876-2700
404-875-9433 facsimile
*Attorneys for Defendant*

## LOCAL RULE 7.1(D) CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing submission to the Court was computer-processed and prepared using Times New Roman font of 14 point size pursuant to Local Rule 5.1B of the Northern District of Georgia.

/s/ Steven J. Thompson

Steven J. Thompson

# CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2013, I electronically filed with the Clerk of the Court *CARDINAL HEALTH 200, LLC'S RESPONSE TO KIMBERLY-CLARK'S MOTION IN LIMINE TO EXCLUDE THE SURVEY AND TESTIMONY OF MOHAN RAO, PhD.* using the CM/ECF system, which will send notification of such filing to the parties of record as follows:

Christopher P. Galanek
Ryan T. Pumpian
Damon J. Whitaker
BRYAN CAVE POWELL GOLDSTEIN
One Atlantic Center – Fourteenth Floor
1201 West Peachtree Street, NW
Atlanta, Georgia 30309-3488
Telephone: (404) 572-6600

J. Bennett Clark
BRYAN CAVE POWELL GOLDSTEIN
One Metropolitan Square
    211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
Telephone: (314) 259-2000


/s/ Steven J. Thompson

Ethan E. Trull (*admitted pro hac vice*)
Steven J. Thompson (*admitted pro hac vice*)
Samera S. Ludwig (*admitted pro hac vice*)
Lisa C. Sullivan (*admitted pro hac vice*)
UNGARETTI & HARRIS LLP
3500 Three First National Plaza
Chicago, Illinois 60602
312-977-4400
312-977-4405 facsimile

4836-1767-1443.1

Earl W. Gunn
Georgia Bar No. 3158262
William C. Buhay
Georgia Bar No. 093940
wbuhay@wwhgd.com
WEINBERG, WHEELER, HUDGINS,
      GUNN & DIAL, LLC
One Atlanta Plaza – Suite 3000
950 East Paces Ferry Road
Atlanta, Georgia 30326
404-876-2700
404-875-9433 facsimile

4836-1767-1443.1